# In the

# United States Court of Appeals

## For the Seventh Circuit

F I L E D

No. 06-1160

APR 2 6 2007

PHOENIX BOND & INDEMNITY CO. and
BCS SERVICES, INC.,

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

*Plaintiffs-Appellants,*

*v.*

JOHN BRIDGE, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 05 C 4095—**James F. Holderman**, *Chief Judge.*

ARGUED JANUARY 16, 2007—DECIDED FEBRUARY 20, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Failure to pay property
taxes creates a lien for the amount of the unpaid tax
(including interest), plus a penalty. Cook County, Illinois,
sells tax liens at auction. The bids are stated as per-
centage penalties that the owner must pay (on top of the
taxes and interest) to the winning bidder to clear the lien.
The bidder willing to accept the lowest penalty wins the
auction; the winner pays the back taxes to the County
and receives the tax lien plus the right to collect the
penalty. If the owner does not pay up, the lien holder can
obtain a tax deed and thus become the parcel's owner.

2                                        No. 06-1160

State law sets the maximum penalty at 18%, see 35 ILCS 200/21-215, and the County's regulations set the minimum penalty at zero. Most parcels attract multiple bids at 0% penalty. The bidders expect to make their profits not by collecting surcharges from owners but from reselling (for more than the amount paid to the County in back taxes) the parcels of owners who do not pay. Vigorous competition among bidders has driven the winning penalty down to the floor, and from the County's perspective this is all to the good: it recovers the taxes, and owners need not pay extra. But multiple, identical bids pose a problem: who wins the auction? The County might allow negative bids (so the owner could redeem by paying less than the face amount of the tax), and then the market would clear, but the regulations forbid such bids—perhaps because a negative penalty would lead rational owners not to pay their taxes until after the liens had been sold.

The County's solution to the problem of multiple bids at 0% is allocation by lot. If X bids 0% on ten parcels, and each parcel attracts five bids at that penalty rate, then the County awards X two of the ten parcels. Winners share according to the ratio of their bids to other identical bids. This creates an incentive to submit multiple bids per parcel, either directly or through agents. If Y submits two bids per parcel, then its take from the auction will be double that of X. To prevent this, the County promulgated what it calls the "Single, Simultaneous Bidder Rule": each "tax buying entity" must submit bids in its own name, and no "related entity" may bid. A "related entity" is any other person or firm that either (a) has a shareholder, partner, principal, or officer in common with the "tax buying entity," or (b) has a "contractual relationship with" the "tax buying entity." Thus if Jones is a partner in Y, a bidder at the sale, any other business in which Jones has an ownership or management role is

forbidden to participate; likewise Z can't participate if it has a contractual relation with Y (for example, if Z has agreed to sell to Y any of the tax liens that Z receives at the auction). Before each auction, every potential bidder must furnish the County with an affidavit that no agent or other related entity will participate in that auction.

Phoenix Bond and BCS Services, two regular participants in Cook County's tax sales, contend that Sabre Group, LLC, and its principal Barrett Rochman regularly violate the Single, Simultaneous Bidder Rule by arranging for related firms to bid, and that as a result Sabre Group obtains an extra portion of profitable liens. If this is so, then Sabre Group's affidavit must be false; and if it is false, the Sabre Group knows that it is false and hence has committed fraud. Because the tax-sale process employs the mail—perhaps to send affidavits, and certainly to send notices to owners that the liens have been sold and the taxes must be paid or the property forfeited—any fraud that affects which bidders obtain how many liens is "mail fraud." See *Schmuck v. United States*, 489 U.S. 705 (1989). And because Sabre and its affiliates have engaged in a pattern of mail fraud, the argument goes, a private treble-damages remedy is available under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964. The damages would be set by the value of the liens that would have gone to Phoenix Bond and BCS Services had Sabre Group and its affiliates complied with the Single, Simultaneous Bidder Rule.

This at any event is the theory that plaintiffs advance. They did not get very far, however. The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(1) for lack of standing, and thus absence of federal jurisdiction. 2005 U.S. Dist. LEXIS 34912 (N.D. Ill. Dec. 21, 2005). The County is the proper plaintiff, the district court concluded.

Standing is not a problem in this suit. Plaintiffs suffer injury in fact, and that injury can be redressed by dam-

ages. Extra bids reduce plaintiffs' chance of winning any given auction, and loss of a (valuable) chance is real injury. So the Supreme Court held in *Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville*, 508 U.S. 656 (1993). Thousands of liens are sold at each auction. Plaintiffs suffer an actual (and substantial) reduction in the number of liens they take away. No more need be said about standing.

Injury in fact is not sufficient under RICO, however; the plaintiff also must establish that its injury was proximately caused by the defendants' scheme. See *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006); *Holmes v. SIPC*, 503 U.S. 258 (1992). The Court acknowledged in *Holmes* that "proximate causation," a term long used in tort law, poses a set of questions to ask; it is not a formula that may be applied algorithmically. 503 U.S. at 268-70. Is someone else a distinctly better enforcer? Does the presence of intermediate parties make it too hard to calculate damages—or create a risk that recovery by this plaintiff will come at the expense of someone with a better claim? If so, then suit by the remotely injured person should not be allowed.

In *Holmes*, for example, manipulation supposedly caused the price of shares in six firms to decline substantially; broker-dealers that had specialized in those firms' securities for their own accounts went bankrupt and were liquidated; when the broker-dealers failed, customers whose funds had been invested in other securities suffered because the broker-dealers could not keep promises to their customers (for example, could not pay in full for other securities that the customers had sold); the Securities Investor Protection Corp., which paid off the customers' claims against the broker-dealers, then sued the persons supposedly responsible for the manipulation that set off this chain of events. The Court held that the broker-dealers (or their trustees in bankruptcy) that had

invested in the securities subject to the manipulation, and not persons who suffered derivative injury when the broker-dealers failed, were the right plaintiffs. SIPC was subrogated to the customers' claims, but the customers did not suffer immediate injury and could not use RICO to recover ahead of the broker-dealers' other customers. See also *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989) (favorably cited in *Holmes*, 503 U.S. at 274). Any money that the broker-dealers recovered could be used to satisfy all claims against them. Recovery by the SIPC would cut out the broker-dealers' other creditors.

In *Anza* the plaintiffs were business rivals of retailers that allegedly had cheated on their taxes. The theory of causation was that, by not paying sales taxes, defendants reduced their costs of doing business and thus could cut the retail price; consumers then bought less from the plaintiffs (and for less per unit, as plaintiffs had to compete with defendants' low prices). The entity directly injured by the fraud was the polity entitled to the taxes, and the Court thought that it would be too difficult to determine how much (if any) of the tax savings had been passed on to customers. Cf. *Kansas v. Utilicorp United Inc.*, 497 U.S. 199 (1990); *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Instead of trying to determine what had been passed on—and to apportion damages if the governmental bodies also sued—the Court thought it best to allocate the entire claim to the immediate victim.

Defendants maintain that Cook County is the victim of their fraud (supposing, as they must at the pleading stage, that they have committed fraud). Yet Cook County did not lose even a penny: each winning bidder always pays all back taxes and interest. The bidding at these auctions concerns how much the owners must pay in penalties, not how much the County receives. And as long as competition drives the bidding down to 0% penalty,

property owners are indifferent to who acquires the tax lien. The *only* injured parties are the losing bidders, who acquire fewer tax liens than they would if the Single, Simultaneous Bidder Rule were followed.

To see this, suppose the FCC decides to award 500 radio licenses for $10,000 each by lottery and insists that each person submit only one entry directly or through any related entity. If Jones arranges for friends, family, and a raft of newly formed corporations to submit 1,000 entries, honest entrants would be crowded out, while Jones could end up with multiple licenses. The honest entrants would be the only losers: the federal Treasury would still receive $10,000 per license, and the general population would be indifferent (presumably all winners would resell their licenses to whoever could make best use of the frequencies).

It is possible to imagine circumstances under which the County (or at least its taxpayers) would be a victim of cooperation among bidders. If all of the potential bidders get together and agree to raise the penalty to 10% or even 18%, that would constitute a monopsony cartel, and the taxpayers would be the worse for it. But defendants (understandably) do not contend that they have organized a cartel, a line of argument that would win this suit at the expense of establishing the Antitrust Division and the property owners as potential plaintiffs. For their part, plaintiffs do not allege that defendants have formed a cartel, for a cartel would be to their benefit. If defendants raised the penalty bid even to 1%, plaintiffs and anyone else outside the group could bid 0% and obtain all of the liens. Even a few non-cooperating bidders would spoil the cartel. On the allegations of plaintiffs' complaint there is no cartel, and therefore plaintiffs rather than the County or the property owners are the immediately injured parties.

Doubtless the County could enforce its own rule, even though it loses nothing financially from the submission of multiple bids by related bidders. But of course the complaint alleges that defendants are lying to the County, which makes enforcement difficult—defendants' affidavits assure the County that the Rule is being complied with. Anyway, the proposition "G can penalize fraud" differs from the proposition "G is the immediate victim of fraud." If a government's ability to penalize fraud knocked out private litigation, then §1964 would no longer apply when the predicate act is fraud, for governments always have some ability to detect and penalize frauds.

According to defendants, the suit should be dismissed even if plaintiffs are the immediate and principal (if not the only) losers. That's so, defendants say, for two reasons: first, no false statements were made to plaintiffs; the affidavits were filed with the County. Second, plaintiffs are not in the "zone of interests" protected by the statute making mail fraud a federal crime. These come to largely the same thing, and the argument is not sound whichever way it is put.

The mail fraud statute, 18 U.S.C. §1341, defines a fraudulent *scheme*, rather than a particular false statement, as the crime. It is illegal to obtain money by a scheme that entails fraud, if use of the mail is integral to the scheme. That's why it is unnecessary to show that the false statement was made to the victim. A scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO if the injury is not derivative of someone else's. So we held in both *In re EDC, Inc.*, 930 F.2d 1275, 1279-80 (7th Cir. 1991), and *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1257 (7th Cir. 1995), and we see no reason to change course. Three other circuits that have considered this question agree with our conclusion that the direct *victim* may recover through

RICO whether or not it is the direct *recipient* of the false statements. See *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 263-64 (4th Cir. 1994); *Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103-04 (1st Cir. 2002); *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 263 (2d Cir. 2004), reversed on other grounds, *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006). But see *Vandenbroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 701 (6th Cir. 2000) (plaintiffs must show that they "in fact relied upon [the defendant's] material misrepresentation"); *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1360-61 (11th Cir. 2002) (same). The box score is thus four circuits on one side and two on the other; we shall adhere to the majority position. (Changing sides could not eliminate the conflict.)

Defendants say that Phoenix Bond and BCS Services are not in the zone of interests protected by the mail fraud statute because they weren't taken in by any false statement. That's just a different take on the proposition that only recipients of the untruth have a remedy. When we articulated a zone-of-interests approach in *EDC* and *Israel Travel*, it was to drive home the point that the *injury* must be direct rather than derivative. We said, for example, that "business rivals may not use RICO to complain about injuries derivatively caused by mail frauds perpetrated against customers" (61 F.3d at 1258) and that "victims of fraud are the object of solicitude; §1341 does not establish a regime of truth-telling without regard to details like who is losing out and why" (*ibid.*). We summed up: "firms suffering derivative injury from business torts . . . must continue to rely on the common law . . . rather than resorting to RICO" (*ibid.*). Because a zone-of-interests approach so closely overlaps the law as developed in *Holmes* and *Anza*, it serves no independent role. When the injury satisfies the requirements of *Holmes* and *Anza*, it cannot be knocked out by a zone-of-interests

No. 06-1160                                                          9

requirement that has no purchase in the text of either
§1341 or RICO.

REVERSED AND REMANDED

A true Copy:

Teste:

Clerk of the United States Court of
Appeals for the Seventh Circuit

USCA-02-C-0072—2-20-07