**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PHOENIX BOND & INDEMNITY CO., BCS SERVICES, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.  05 C 4095** <br> **Consolidated with No. 07 C 1367** |
| **v.** | ) ) | |
| | ) | **Judge James Holderman** |
| **JOHN BRIDGE, BARRETT ROCHMAN, SABRE GROUP LLC, ROBERT JENSEN, JOSEPH VARAN, CRONUS PROJECTS, LLC, JEFFREY BRIDGE, REGAL ONE, LLC, CCJ INVESTMENTS, LLC, DRN II, INC., FRANCIS ALEXANDER, GEORGETOWN INVESTORS, LLC, JASON BAUMBACH, OPTIMUM FINANCIAL, INC., L.C.C. VENTURE, LLC, JESHAY, LLC, JESSE ROCHMAN, CHRISTOPHER ROCHMAN, CORINNE ROCHMAN, BRB INVESTMENTS, LLC, DOUGLAS NASH, MUD CATS REAL ESTATE, LLC, CARPUS INVESTMENTS, LLC, GREGORY ELLIS, GJ VENTURE, LLC,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Magistrate Judge Maria Valdez** |
| **Defendants.** | ) ) ) ) ) | |

<u>**ANSWER TO CORRECTED SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY AND AFFIRMATIVE DEFENSES**</u>

Defendants Jesse Rochman ("Jesse"), Christopher Rochman ("Christopher"), Corinne Rochman ("Corinne"), CCJ Investments LLC ("CCJ") and BRB Investments LLC ("BRB"), by their attorneys, Harold Moskowitz and Donald Levine, respond to the Complaint of Plaintiffs Phoenix Indemnity & Bond Co. ("Phoenix") and BCS Services, Inc. ("BCS") as follows:

**Nature of the Action**

1.     Two tax buyers—Phoenix and BCS—bring this action against individuals and corporate entities that conspired to violate and violated the Cook County Single Simultaneous Bidder Rule (the "Rule" or the "Single Bidder Rule") in the each of the annual tax sales held from 2002 through 2007, thereby damaging the Plaintiffs, as well as other tax buyer participants in those tax sales. John Bridge, B. Rochman, and Sabre (the "Sabre Defendants") directed and controlled secret agreements with the other defendants, and others, to do Sabre's bidding—literally. Through a series of fraudulent schemes and collusive bidding, the Defendants unlawfully obtained the opportunity to purchase a greater number of the liens available for bid at the tax sales through the conspiracy, thus reducing the number of liens Plaintiffs were able to purchase and costing Plaintiffs the financial benefits flowing from those purchases. Phoenix and BCS seek to enjoin the Defendants and to recover damages Plaintiffs suffered as a result of these schemes under sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and tortious interference with prospective business advantage.

ANSWER:

Defendants admit that BCS and Phoenix are tax buyers. Defendants deny the remaining allegations of this Paragraph.

**Jurisdiction and Venue**

2.     This Court has jurisdiction over federal law claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a). This Court has pendent jurisdiction over the state law claims of tortious interference with prospective business advantage arising out of these transactions.

ANSWER:

Defendants admit the allegations of this Paragraph.

3.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because the Defendants reside in, are found in, have an agent in, and/or transact their affairs in, the Northern District of Illinois where a substantial part of the events complained of occurred.

ANSWER:

Defendants admit the allegations of this Paragraph.

**Parties**

4.      Plaintiff Phoenix Bond & Indemnity Co. is an Illinois corporation.  Its business includes buying tax liens, and it participated in the Cook County tax sales held in 2002 through 2007, inclusive, for delinquent taxes for the years 2000 through 2005.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

5.      BCS Services, Inc. is an Illinois corporation.  Its business includes buying tax liens, and it participated in the Cook County tax sales held in 2002 through 2007, inclusive, for delinquent taxes for the years 2000 through 2005.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

6.      Defendant John Bridge is an Illinois resident.  He, together with B. Rochman, operated and controlled the affairs of Sabre.  He was a registered tax bidder of Sabre in the 2004 annual tax sale.

ANSWER:

Defendants admit Bridge is an Illinois resident.  Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

7.      Defendant Barrett Rochman is an Illinois resident.  He, together with John Bridge, operated and controlled the affairs of Sabre, and he is a principal of Sabre.

ANSWER:

Defendants admit that Barrett is an Illinois resident.  Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

8.     Defendant Sabre Group, LLC is an Illinois limited liability company. Its business includes buying tax liens and acquiring deeds to properties for which real estate taxes were unpaid, and it participated in the 2002, 2003 and 2004 Cook County tax sales.  Its named principal is B. Rochman.  Its affairs were operated and controlled by John Bridge and B. Rochman.

ANSWER:

Defendants admit that Sabre is an Illinois limited liability company and that its business includes buying tax liens and acquiring deeds to properties for which real estate taxes were unpaid and that Barrett Rochman is a member of Sabre.  Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

9.     Defendant Regal One, LLC is an Illinois limited liability corporation.   Its business includes buying tax liens, and it participated in the 2002 through 2005 Cook County tax sales.  Its principal is Jeffrey Bridge.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

10.     Defendant Jeffrey Bridge is an Illinois resident.  Jeffrey Bridge is a principal of Regal One and was its registered tax bidder at the 2004 and 2005 annual tax sales.  Jeffrey Bridge and John Bridge are brothers.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

11.     Defendant DRN II, Inc. is an Illinois corporation.  Its business includes buying tax liens, and it participated in the 2002 Cook County tax sale.  Its principal is Douglas Nash.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

12.     Defendant DRN 2, LLC, on information and belief, is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2003 Cook County tax sale.  Its principal is Douglas Nash.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

13.     Defendant Jeshay, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2004 Cook County tax sale.  Its principal is Douglas Nash.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

14.     Defendant Mud Cats Real Estate, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2005 and 2006 Cook County tax sale.  Its principal is Douglas Nash.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

15.     Defendant Douglas Nash is an Illinois resident.  He is a principal of DRN II, DRN 2, Jeshay and Mud Cats.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and, therefore, deny them.

16.     Defendant Cronus Projects, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2003 through and 2007 Cook County tax sales.  Its principals are Robert Jensen and Joseph Varan.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

17.     Defendant Robert Jensen is an Illinois resident.  He is a principal of Cronus and was a registered bidder for Cronus in the 2004 and 2005 annual tax sales.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and, therefore, deny them.

18.     Defendant Joseph Varan is an Illinois resident.  He is a principal of Cronus and was a registered bidder for Cronus at the 2004 annual tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and, therefore, deny them.

19.     Defendant CCJ Investments, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2003 and 2004 Cook County tax sales.  Its principals are Christopher Rochman, Jesse Rochman and Corinne Rochman.

ANSWER:

Defendants deny that Christopher, Jesse and Corinne Rochman are principals of CCJ.

Defendants admit that Christopher, Jesse and Corinne Rochman were members of CCJ.

Defendants admit the remaining allegations of this Paragraph.

20.     Defendant BRB Investments, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2005, 2006, and 2007 Cook County tax sale.  Its principals are Jesse Rochman, Corinne Rochman and Christopher Rochman.

ANSWER:

Defendants deny that Christopher, Jesse and Corinne Rochman are principals of BRB.

Defendants admit that Christopher, Jesse and Corinne Rochman are members of BRB.

Defendants admit the remaining allegations of this Paragraph.

21.     Defendant Jesse Rochman is an Illinois resident.  He is a principal of CCJ and was a registered bidder for CCJ at the 2004 annual tax sale. He is a principal for BRB and was a registered bidder of BRB at the 2005 annual tax sale.  On information and belief, Jesse Rochman is Barrett Rochman's son.

ANSWER:

Defendants deny that Jesse Rochman is a principal of CCJ or BRB.  Defendants admit

that Jesse Rochman was a member of CCJ and is a member of BRB and admit the remaining

allegations of this Paragraph.

22.     Defendant Christopher Rochman is an Illinois resident.  He is a principal of CCJ and was one of its registered bidders at the 2004 tax sale.  He is a principal of BRB.  On information and belief, Christopher Rochman is Barrett Rochman's son.

ANSWER:

Defendants deny that Christopher Rochman is a principal of CCJ or BRB.  Defendants

admit that Christopher Rochman was a member of CCJ and is a member of BRB and admit

the remaining allegations of this Paragraph.

23.     Defendant Corinne Rochman (a/k/a Corie Rochman) is a Florida resident. Corinne Rochman is a principal of CCJ and BRB.  On information and belief, Corinne Rochman is related to Barrett Rochman.

ANSWER:

Defendants deny that Corinne Rochman is a principal of CCJ or BRB.  Defendants

admit that Corinne Rochman was a member of CCJ and is a member of BRB and admit the

remaining allegations of this Paragraph.

24.     Defendant Georgetown Investors, LLC is an Illinois limited liability company. Its business includes buying tax liens, and it participated in the 2004 through 2007 Cook County tax sales. Its principal is Francis Alexander.

ANSWER:

Defendants  are  without  sufficient  information  with  which  to  admit  or  deny  the

allegations of this Paragraph and therefore, deny them.

25.     Defendant Francis Alexander is an Illinois resident.  She is a principal of Georgetown.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and, therefore, deny them.

26.     Defendant Optimum Financial, Inc. is an Illinois corporation. Its business includes buying tax liens, and it participated in the 2004 Cook County tax sale.  Its principal is Jason Baumbach.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

27.     Defendant Carpus Investments, LLC is an Illinois limited liability company. Its business includes buying tax liens, and it participated in the 2005 Cook County tax sale. Its principal is Jason Baumbach.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

28.     Defendant Jason Baumbach is an Illinois resident.  He is the principal of Optimum and Carpus.  On information and belief, Jason Baumbach is John Bridge's nephew.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

29.     Defendant L.C.C. Venture, LLC, is an Illinois limited liability company. Its business includes buying tax liens, and it participated in the 2004 Cook County tax sale.  One of its principals is Gregory Ellis.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

30.     Defendant GJ Venture, LLC is an Illinois limited liability company.  Its business includes buying tax liens, and it participated in the 2005, 2006 and 2007 Cook County tax sale. Its principal is Gregory Ellis.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

31.     Defendant Gregory Ellis is an Illinois resident.  He is currently a principal of GJ and L.C.C.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and, therefore, must deny them.

**Third-Party Co-Conspirators**

32.     Heartwood 88, LLC ("Heartwood") is a Florida corporation with its principal place of business in Florida.  Its business includes buying tax liens, and it participated in the Cook County tax sales held in 2003 through 2007, purchasing liens on behalf of Sabre as its nominee.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

33.     Bamp, LLC ("Bamp") was an Illinois corporation that voluntarily dissolved on December 21, 2004.  Its business included buying tax liens, and it participated in the 2004 Cook County tax sale, purchasing liens on behalf of Sabre as its nominee.  Its principal place of business was in Maryland, and its principal was Anthony DeLaurentis ("DeLaurentis"), a Maryland resident and attorney.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

34.     Richarony, LLC ("Richarony") was an Illinois corporation that voluntarily dissolved on December 21, 2004. Its business included buying tax liens, and it participated in the 2004 Cook County tax sale, purchasing liens on behalf of Sabre as its nominee.  Its principal place of business was in Maryland, and its principal was Richard Turer ("Turer"), a Maryland resident and attorney.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

35.     Sass Muni-IV ("Sass IV") is a New York corporation, with its principal place of business in New York.  Its business includes buying tax liens, and it participated in the 2002, 2003 and 2004 Cook County tax sales, purchasing liens on behalf of Sabre as its nominee.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

36.     Sass Muni-V ("Sass V") is a New York corporation, with its principal place of business in New York.  Its business includes buying tax liens, and it participated in the 2005 through 2007 Cook County tax sales, purchasing liens on behalf of Sabre as its nominee.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

**Factual Background To All Counts**

37.     The duly elected Treasurer and Ex-Officio Collector of Cook County, Illinois ("the Collector") is charged under the Property Tax Code (35 ILCS 200/22-70 et seq.) with the collection of delinquent real estate taxes through judicial sale of judgments obtained against delinquent property.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

38.     The duly elected Clerk of Cook County, Illinois ("the Clerk") is charged under the Property Tax Code with assisting the Collector in the conduct of the tax sale and keeping related records thereafter. The Collector and the Clerk are referred to hereafter jointly as "the County."

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

39.     The annual Cook County tax sale is part of the Illinois property tax system. If a property owner fails to pay his property taxes due in a given year, the County offers for sale to the public a tax lien on that property. The purchaser of the tax lien pays the delinquent tax. The property owner may redeem that lien by paying the delinquent tax plus the accrued penalty. Upon redemption, the tax buyer surrenders the lien and receives the tax amount plus the determined penalty. If the property owner does not redeem the lien within two to three years, the tax buyer may commence a judicial proceeding by filing a Petition for Tax Deed and obtain title to the property.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

40. The tax sale process begins when the Collector publishes a list of delinquent real estate parcels in area newspapers. The publication provides notice that the Collector will apply to the Circuit Court for judgments against delinquent real estate and orders to sell those judgments at public tax sale. Thereafter, the Circuit Court issues the requested judgments and orders. At the tax sale, the County tax sales the tax liens on the delinquent properties in exchange for the County's receipt of the delinquent taxes. Each tax lien represents a different parcel of real estate for which taxes are delinquent.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions

of law to which an admission or denial is not required. To the extent that the allegations of

this paragraph are statements of facts, Defendants deny them to the extent that they contradict

the provisions of the Property Tax Code.

41. The terms, manner and method by which the judicial sale is conducted are prescribed by the Collector. Among other things, the Collector provides a registration package to each prospective tax buyer. The package sets forth the rules by which the sale is to be conducted, including the terms and conditions with which all participants must comply. An example of the registration package is attached hereto as Exhibit A.

ANSWER:

Defendants deny that Exhibit A is an example of the registration package of any other

tax auction other than the 2004 Cook County tax auction. They admit the remaining

allegations of this Paragraph.

42. Tax buyers must complete the registration package to be qualified to attend the tax sale and to bid on the tax liens. Registration requires the submission of an application and sworn affidavit in compliance with rules established by the Cook County Treasurer. A prospective tax buyer who fails to satisfy any of these requirements, i.e. the application, the affidavit of compliance, or the related bond, would not be permitted to bid on or purchase liens at the tax sale.

ANSWER:

Defendants admit that registration requires the submission of an application and/or a

sworn affidavit in compliance with rules established from time to time by the Cook County

Treasurer. The remaining allegations of this paragraph are not allegations of fact, but

12

Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them.

43.     Bids are not made in cash amounts and taxes are not sold to the highest bidder. When a taxpayer redeems his taxes from a tax buyer, he pays the amount of taxes paid by the tax buyer at the sale, plus penalty. At the tax sale, the tax buyers bid on the rate of penalty. The tax buyer who bids the lowest rate of penalty will win the bid. If more than one tax buyer bids at the same lowest 0% penalty rate, the auctioneer will allocate the liens on a rotational basis to ensure that there is an equal apportionment of liens among the lowest bidding tax buyers. The highest permissible penalty rate is 18% of the delinquent tax per penalty period. Since approximately 2000, the typical penalty rate has been 0%.

ANSWER:

Defendants admit that when a taxpayer redeems his taxes from a tax buyer, he pays the amount of taxes paid by the tax buyer at the sale, plus penalty; that at the tax sale, the tax buyers bid on the rate of penalty; and the highest permissible penalty rate is 18% of the delinquent tax per penalty period. Defendants deny the remaining allegations of this Paragraph.

44.     After each tax sale, the County issues a Certificate of Purchase evidencing the tax lien sold on each parcel of real estate to and in the name of the tax buyer who made the successful bid.

ANSWER:

Defendants admit the allegations of this Paragraph.

45.     As a matter of law, no more than four months and fifteen days after purchase of a lien, the tax buyer who owns the certificate of purchase must draft a notice pursuant to 35 ILCS 200/22-5 (the "22-5 notice"), alerting the last assessee that the lien has been sold for delinquent taxes. The tax buyer provides the 22-5 notice to the County for the County to mail to the last assessee. The County sends the notice by U.S. mail to the last assessee, including last assesses residing outside the state of Illinois. The tax buyer retains a file-stamped copy of the same. The certificate holder pays the County for the mailing. The 22-5 notice is a mandatory condition to obtain a tax deed. The failure to file the 22-5 notice renders the tax certificate essentially worthless as it would be incapable of foreclosure through a petition for tax deed, leaving the tax buyer with no ability to secure a redemption of the tax lien, to recover its money or to obtain a deed.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

46.     If the property remains unredeemed after two to three years from the date of purchase, a lien holder may file a petition for deed. These petitions must be filed five months before the end of the period of redemption. Pursuant to 35 ILCS 200/22-10, in the first sixty days of the five-month period, the lien holder is required to provide notice to property owners, occupants and other interested parties (the "22-10 notice"). Pursuant to 35 ILCS 200/22-15, the Cook County Sheriff serves the lien holders' 22-10 notice of the deed petition and the impending expiration of the period of redemption on property owners, occupants and other interested parties in person. If any owners or interested parties cannot be served in person within Cook County, Illinois, the sheriff will serve them by certified mail. Certified mail will be used to send the 22-10 notices to all parties outside of Illinois. The failure to prepare and serve 22-10 notices renders the lien essentially worthless as the lien holder cannot obtain a deed without proper service of the 22-10 notice, and the property owner will face no legal consequences for failing to redeem the tax liens.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

47.     Further, during the first sixty days of that five-month period before the period of redemption expires, the tax buyer prepares a notice pursuant to 35 ILCS 200/22-25 (the "22-25 notice") and delivers that notice with the requisite fee for mailing to the Circuit Court of Cook County with direction to mail it to the relevant property owners and occupants alerting them that the lien holder has filed a petition for tax deed and the date upon which the period of redemption will expire. The County sends the notice by U.S. mail to the relevant property owners and occupants, including property owners outside the State of Illinois. The lien holder cannot obtain a deed without proper service of the 22-25 notice.

ANSWER:

The allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions

of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Property Tax Code.

48.     The tax buyer's potential sources of profit from the tax liens include the penalty accrued on the tax lien judgment purchased, a 12% penalty accrued on any subsequent real estate taxes the tax buyer pays on the property, and obtaining a deed through the enforcement of the tax lien.

ANSWER:

Defendants admit that among potential sources of profit from the tax liens for tax buyers include the penalty accrued on the tax lien judgment purchased, a 12% penalty accrued on any subsequent real estate taxes the tax buyer pays on the property, and obtaining a deed through the enforcement of the tax lien. They deny the remaining allegations of this Paragraph.

49.     The 2002 annual tax sale was held from April 1, 2002 to April 26, 2002. At the 2002 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2000.

ANSWER:

Defendants admit the allegations of this Paragraph.

50.     The 2003 annual tax sale was held from March 10, 2003 to April 4, 2003. At the 2003 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2001.

ANSWER:

Defendants admit the allegations of this Paragraph.

51.     The 2004 annual tax sale was held from May 10, 2004 to June 7, 2004. At the 2004 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2002.

ANSWER:

Defendants admit the allegations of this Paragraph.

52.    The 2005 annual tax sale was held from July 6, 2005 to July 27, 2005.  At the 2005 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2003.

ANSWER:

Defendants admit the allegations of this Paragraph.


53.    The 2006 annual tax sale was held from June 6, 2006 to June 30, 2006.  At the 2006 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2004.

ANSWER:

Defendants admit the allegations of this Paragraph.


54.    The 2007 annual tax sale was held from June 5, 2007 to June 26, 2007.  At the 2007 annual tax sale liens were sold based on property owners' failure to pay real estate taxes in 2005.

ANSWER:

Defendants admit the allegations of this Paragraph.


**The Cook County Single Simultaneous Bidder Rule**

55.    In order to participate in the tax sale, tax buyers must register with the Collector.

ANSWER:

Defendants admit that in order to bid at the tax sale, tax buyers must register with the Collector.  Defendants deny the remaining allegations of this Paragraph.


56.    At the time of registration, the tax buyer, or its authorized agent, must affirm under penalty of perjury its adherence to the Single Bidder Rule.  The Single Bidder Rule— established before the 2001 tax sale—prohibits related bidding entities from simultaneously participating in the sale.

ANSWER:

Defendants deny that there exists something called the "Single Bidder Rule."

Defendants admit that at the time of registration, the tax buyer, or its authorized agent, must affirm under penalty of perjury its adherence to something called the Single Simultaneous Bidder Rule as is from time to time in effect. The remaining allegations of this Paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this Paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Single Simultaneous Bidder Rule.

57. The Single Bidder Rule defines "related bidding entity" as "any individual, corporation, partnership, joint venture, limited liability company, business organization, or other entity that has a shareholder, partner, principal, officer, general partner or other person or entity having an ownership interest in common with, or contractual relationship with, any other registrant" in the tax sale.

ANSWER:

The allegations of this Paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Single Simultaneous Bidder Rule.

58. As part of the registration under the Single Bidder Rule, the tax buyer represents and warrants that: (A) It has no capital, purchase money, or other finances in common with any other bidding entity or person registering to bid at the annual tax sale; (B) It shares no common ownership interest or common source of funds; (C) It has no agreements to purchase or sell any parcels successfully bid on by any other registering bidding entity or person at the same sale; (D) It has no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale; (E) It does not stand to benefit financially under an agreement with any other bidder at the sale concerning parcels to be bid on or purchased by another entity.

ANSWER:

Defendants deny that there is any registration under the Single Bidder Rule or even the Single Simultaneous Bidder Rule. The remaining allegations of this paragraph are not allegations of fact, but Plaintiffs' conclusions of law to which an admission or denial is not

required. To the extent that the allegations of this paragraph are statements of facts, Defendants deny them to the extent that they contradict the provisions of the Cook County Treasurer rules for tax sale auctions or any rules promulgated thereunder from time to time.

59. The Single Bidder Rule ensures that no one can increase the number of liens they obtain to the detriment of other tax buyers by having two or more bidders, or tax buyers, purchasing liens for their benefit. The Single Bidder Rule protects the auctioneer's just allocation of bids on a rotational basis to guarantee an equal apportionment of liens among all tax buyers who bid the lowest rate.

ANSWER:

Defendants admit that the alleged purpose of the Single Simultaneous Bidder Rule is that there is not more than one person bidding at a tax sale at the same time for the intended or perceived purpose of increasing the principal's likelihood of obtaining a successful bid on a parcel. Defendants deny the remaining allegations of this Paragraph.

**Sabre's Scheme To Obtain Additional Liens Beyond Its Appropriate Portion**

60. Determined to provide Sabre an unfair advantage, B. Rochman and John Bridge devised a scheme to enable Sabre to obtain more liens than it, individually, would have been able to obtain under the Treasurer's rotational basis of allocating liens to ensure that there is an equal apportionment of liens among the lowest bidding tax buyers.

ANSWER:

Defendants deny that the Treasurer had any rotational basis for allocating liens among bidding tax buyers. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

61. Pursuant to that scheme, John Bridge, B. Rochman and Sabre organized an enterprise by having numerous entities created and coordinated these entities' activities to acquire liens in the tax sales for Sabre's benefit. The entities that acted as Sabre's nominees and purchased liens for Sabre's benefit included defendants Regal, DRN II, DRN 2, Cronus, CCJ, Georgetown, Optimum, L.C.C., Jeshay, BRB, Mud Cats, Carpus, and GJ, as well as third-parties Heartwood, Bamp, Richarony, Sass IV and Sass V (collectively, the "Sabre Nominees").

ANSWER:

Defendants deny the allegations of this Paragraph to the extent it relates to CCJ and BRB. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

62. John Bridge, B. Rochman and Sabre accomplished their objective of obtaining more liens than Sabre could obtain by itself through the following means: they directed the principals of the respective Sabre Nominees to create entities and/or to register for the tax sale; directed all of the Sabre Nominees to register to participate in the tax sales by filing registrations that concealed that they were bidding for Sabre; provided the list of liens to purchase at the tax sale to the Sabre Nominees; agreed that each of the Sabre Nominees would transfer the certificates of purchase they obtained at the tax sales to Sabre, directly or indirectly, following the respective tax sales in which each participated; and upon receipt of the liens took steps necessary for the scheme to realize the value of the liens, including causing necessary notices to be created and served, paying subsequent taxes on liens acquired by Sabre and the Sabre Nominees and taking steps to secure deeds to property where the property owner failed to redeem the liens.

ANSWER:

Defendants deny the allegations of this Paragraph to the extent it relates to CCJ and BRB. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

63. In the years 2002, 2003 and 2004, B. Rochman and John Bridge submitted registrations and sworn affidavits to the Collector to enable Sabre to participate in the tax sales held during those years. In those registrations, Rochman and Bridge falsely attested that Sabre (A) had no capital, purchase money, or other finances in common with another tax buyer, (B) shared no common ownership interest or common source of funds with another tax buyer, (C) had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, (D) had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and (E) did not stand to benefit financially under an agreement with any other bidder at the sale concerning parcels to be bid on or purchased by another entity. The registrations also falsely represented that Sabre would adhere to the Single Bidder Rule.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

64.     Beginning in 2002, and continuing through the present, the Sabre Defendants executed their scheme to defraud the County and the other tax buyers through violation of the Single Bidder Rule by having the Sabre Nominees file false registrations and affidavits to obtain access to each of the tax sales from 2002 through 2007 to enable them to bid on and purchase liens for Sabre's benefit.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

65.     Through the course of the scheme, the Defendants' improper participation in the tax sales, and their resulting acquisition of liens, deprived the other tax buyers, including Plaintiffs, of the opportunity to acquire tax liens and obtain deeds on the distinct parcels of real estate, thus depriving them of the opportunity to profit from the payment of penalties on subsequent taxes and the sale of parcels for which a deed was acquired.

ANSWER:

Defendants deny the allegations of this Paragraph.

**The 2002 Annual Tax Sale**

66.     In preparation for the 2002 tax sale, B. Rochman, John Bridge and Sabre enlisted Jeffrey Bridge to join the enterprise and obtain liens for Sabre's benefit.  Jeffrey Bridge incorporated Regal on February 26, 2002, a little over a month before the 2002 tax sale, to secretly bid on Sabre's behalf.  To fulfill that function, Jeffrey Bridge and Regal submitted a registration to the Cook County Treasurer's Office to participate in the 2002 tax sale.  That registration misrepresented that Regal had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Regal had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

67.     On or between April 1, 2002 and April 26, 2002—at the direction of John Bridge, B. Rochman and Sabre—Jeffrey Bridge had Regal purchase liens at the 2002 tax sale

for Sabre's benefit. On May 15, 2002, less than three weeks after the 2002 tax sale ended, Regal transferred the liens it acquired to Sabre in furtherance of the scheme. That day, Sabre paid Regal $1,555,737.48 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $8,790.91 as compensation for Regal, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

68.     B. Rochman, John Bridge, and Sabre also enlisted Nash to join the enterprise and obtain liens for Sabre's benefit. To fulfill that function, Nash and DRN II submitted a registration to the Cook County Treasurer's Office to participate in the 2002 tax sale. That registration misrepresented that DRN II had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule. On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that DRN II had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

69.     On or between April 1, 2002 and April 26, 2002—at the direction of John Bridge, B. Rochman and Sabre—Nash had DRN II purchase liens at the 2002 tax sale for Sabre's benefit. On May 15, 2002 (exactly the same day Regal transferred its liens to Sabre), less than three weeks after the 2002 tax sale ended, DRN II transferred the liens it acquired to Sabre in furtherance of the scheme. That day, Sabre paid DRN II $289,436.61 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $2,763.37 as compensation for DRN II, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

70.     John Bridge and B. Rochman also directed Sabre to purchase liens at the 2002 tax sale. The Sabre Defendants also had Sass IV obtain admission to the tax sale pursuant to a

false registration to enable it to purchase liens at the 2002 tax sale for Sabre's benefit.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

71.     By filing the false registration forms that concealed the agreements among these entities to bid for the benefit of Sabre and/or the finances and funding in common, these entities were able to obtain access to the tax sale and obtain liens improperly. Each bid that Sabre, Regal, DRN II and Sass IV made at the 2002 annual tax sale was a step implementing the fraud on the Cook County Treasurer's Office, with the intended victims being all the other tax buyers that were not participating in the conspiracy—including Phoenix and BCS.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

72.     Sabre, Regal, DRN II and Sass IV primarily bid on the same liens simultaneously during the 2002 annual tax sale. Sabre identified liens to be bid on and purchased by each of these entities for its benefit at the tax sale. Lists of which items to bid on were provided by Sabre and Sabre employees to the bidders for Sabre, Regal, DRN II and Sass IV. Each entity had to make the payments to the Treasurer for the liens it purchased at the tax sale. Sabre, Regal, DRN II and Sass IV bid on and obtained liens that at least one of the Plaintiffs also bid on, with identical simultaneous 0% penalty bids, during the 2002 annual tax sale. Pursuant to those bids, Sabre and its nominees obtained liens one of the Plaintiffs would have obtained under the County's allocation methodology. Through their fraudulent registrations, Sabre, Regal, DRN II and Sass IV were able to obtain access to the 2002 annual tax sale and improperly purchase 4,916 liens for $14,504,881. Had Sabre and these nominees not obtained access to the tax sale through their misrepresentations and purchased liens improperly, Plaintiffs would have obtained more liens at the 2002 annual tax sale, including liens obtained by Sabre, Regal, DRN II and Sass IV. Attached as Exhibit B1 is a list of liens on which at least one of the Plaintiffs made a 0% penalty bid, yet lost the lien to Sabre or its nominees pursuant to their simultaneously 0% penalty rate bids.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

**The 2003 Annual Tax Sale**

73.     Having successfully implemented the scheme in 2002, John Bridge, B. Rochman and Sabre continued the enterprise through the 2003 tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

74.     John Bridge and B. Rochman directed Sabre to purchase liens in its own name during the 2003 tax sale.  Sabre obtained access to the 2003 tax sale with its fraudulent registration.  Jeffrey Bridge and Nash continued their roles by having Regal and DRN 2, Nash's new entity, bid for Sabre's benefit at the 2003 tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

75.     To be able to purchase liens for Sabre at the 2003 tax sale, Jeffrey Bridge and Regal submitted a registration to the Cook County Treasurer's Office to participate in that tax sale.  That registration misrepresented that Regal had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Regal had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

76.     On or between March 10, 2003 and April 4, 2003—at the direction of John Bridge, B. Rochman and Sabre—Jeffrey Bridge had Regal purchase liens at the 2003 tax sale for Sabre's benefit.  On April 15, 2003, less than two weeks after the 2003 tax sale ended, Regal transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Regal $1,678,679.70 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $8,210.49 as compensation for Regal, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

77.     To be able to purchase liens for Sabre at the 2003 tax sale, Nash and DRN 2 submitted a registration to the Cook County Treasurer's Office to participate in that tax sale. That registration misrepresented that DRN 2 had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that DRN 2 had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

78.     On or between March 10, 2003 and April 4, 2003—at the direction of John Bridge, B. Rochman and Sabre—Nash had DRN 2 purchase liens at the 2003 tax sale for Sabre's benefit.  On April 22, 2003, less than three weeks after the 2003 tax sale ended, DRN 2 transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid DRN 2 $1,130,795.14 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $7,056.61 as compensation for DRN 2, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

79.     In addition to maintaining their secret agreements with the previous participants bidding on Sabre's behalf again at the 2003 sale, John Bridge, B. Rochman and Sabre added new members to the enterprise to obtain liens for Sabre's benefit.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them.

80.     B. Rochman, John Bridge and Sabre enlisted Jensen and Varan to purchase liens for Sabre at the 2003 tax sale.  To fulfill that function, Jensen, Varan and Cronus submitted a registration to the Cook County Treasurer's Office to participate in that tax sale. That registration misrepresented that Cronus had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Cronus had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them.

81.     On or between March 10, 2003 and April 4, 2003—at the direction of John Bridge, B. Rochman and Sabre— Jensen and Varan had Cronus purchase liens at the 2003 tax sale for Sabre's benefit.  On April 15, 2003 (exactly the same day Regal transferred its liens to Sabre), less than two weeks after the 2003 tax sale ended,  Cronus transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Cronus $1,301,776.53 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of compensation for Cronus, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them.

82.     B. Rochman, John Bridge and Sabre also enlisted B. Rochman's children, J. Rochman, Christopher Rochman and Corinne Rochman, to be the named principals of another entity to bid for Sabre at the 2003 tax sale.  J. Rochman, Christopher Rochman and Corinne Rochman had CCJ incorporated on February 10, 2003, a month before the 2003 tax sale, to secretly bid on Sabre's behalf.  To fulfill that function, J. Rochman, Christopher Rochman, Corinne Rochman and CCJ submitted a registration to the Cook County Treasurer's Office to participate in the 2003 tax sale.  That registration misrepresented that CCJ had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that CCJ had no capital,

purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants admit that Jesse, Christopher, and Corinne had CCJ organized on February 10, 2003 and CCJ submitted a registration to the Cook County Treasurer's Office to participate in the 2003 tax sale. They deny the remaining allegations of this Paragraph.

83.     On or between March 10, 2003 and April 4, 2003—at the direction of John Bridge, B. Rochman and Sabre— J. Rochman, Christopher Rochman and Corinne Rochman had CCJ purchase liens at the 2003 tax sale for Sabre's benefit. On May 15, 2003, less than two months after the County issued Certificates of Purchase, CCJ transferred liens it acquired to Sabre in furtherance of the scheme. Plaintiffs do not have access to information regarding the assignment of tax liens obtained by defendants other than in instances where the tax buyer has filed a petition to obtain a deed to the property or where the County records reflect a transfer related to the payment of subsequent taxes by the tax buyer. Plaintiffs reviewed the County records for that information, and as to each lien reviewed for which such information was available, the lien examined had been transferred to Sabre. Based on this review of the County records, on information and belief, CCJ transferred all of the tax liens it acquired in the 2003 tax sale to Sabre on May 15, 2003.

ANSWER:

Defendants admit that CCJ purchased liens at the 2003 sale and that CCJ assigned liens to Sabre for which Sabre paid CCJ. Defendants deny the remaining allegations of this Paragraph.

84.     The Sabre Defendants also had Heartwood and Sass IV obtain admission to the tax sale pursuant to false registrations to enable each to purchase liens at the 2003 tax sale for Sabre's benefit.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

85.     By filing the false registration forms that concealed the agreements among these entities to bid for the benefit of Sabre and/or the finances and funding in common, these entities were able to obtain access to the 2003 annual tax sale and obtain liens improperly. Each bid that Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood made at the 2003

annual tax sale was a step implementing the fraud on the Cook County Treasurer's Office, with the intended victims being all the other tax buyers that were not participating in the conspiracy—including Phoenix and BCS.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

86.     Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood primarily bid on the same liens during the 2003 annual tax sale. Sabre identified liens to be bid on and purchased by each of these entities for its benefit at the tax sale. Lists of which items to bid on were provided by Sabre and Sabre employees to the bidders for Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood. Each entity had to make the payments to the Treasurer for the liens it purchased at the tax sale. Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood bid on and obtained liens that at least one of the Plaintiffs also bid on, with identical simultaneous 0% penalty bids, during the 2003 annual tax sale. Pursuant to those bids, Sabre and its nominees obtained liens one of the Plaintiffs would have obtained under the County's allocation methodology. Through their fraudulent registrations, Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood were able to obtain access to the 2003 annual tax sale and improperly purchase 5,378 liens for $17,484,374. Had Sabre and these nominees not obtained access to the tax sale through their misrepresentations and purchased liens improperly, Plaintiffs would have obtained more liens at the 2003 annual tax sale, including liens obtained by Sabre, Regal, DRN 2, Cronus, CCJ, Sass IV and Heartwood. Attached as Exhibit B2 is a list of liens on which at least one of the Plaintiffs made a 0% penalty bid, yet lost the lien to Sabre or its nominees pursuant to their simultaneously 0% penalty rate bids.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

**The 2004 Annual Tax Sale**

87.     John Bridge, B. Rochman and Sabre continued the enterprise for the 2004 tax sale, including another expansion by adding new participants to obtain even more liens for Sabre at the 2004 tax sale. They furthered their scheme to defraud in preparation for the 2004 annual tax sale through the same methods that were successful for them in the 2002 and 2003 sales.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them..

88.     John Bridge, B. Rochman and Sabre maintained their secret agreements with the others who had bid for Sabre's benefit in 2002 and 2003, and who continue the practice at the 2004 sale.  These entities, Regal, CCJ, Cronus, Jeshay (Nash's replacement for DRN 2), Sass IV and Heartwood—agreed to bid on liens that B. Rochman, John Bridge and Sabre chose before the tax sale.  Pursuant to the secret agreements, these entities agreed that they would transfer all of their liens to Sabre after the tax sale.  Sabre was thereby able to exercise more bids and obtain more liens through this scheme than was appropriate, thus injuring those tax buyers—including Phoenix and BCS—that complied with the Single Bidder Rule.

ANSWER:

Defendants deny the allegations of this Paragraph.

89.     The relationships among John Bridge, B. Rochman and Sabre and the other entities allowed John Bridge, B. Rochman and Sabre to effectively and efficiently direct and control all the entities' implementation of the scheme to obtain more liens for Sabre through the secret agreements.  For instance, CCJ Investments lists its address in state records at B. Rochman's address—1345 East Park Street in Carbondale, Illinois.  In addition, CCJ had Kelly Penman—a registered bidder for Sabre in the 2004 sale (*see* Exhibit A)—execute assignments of liens to Sabre on CCJ's behalf.  An example of one of those assignments is attached as Exhibit C.

ANSWER:

Defendants admit that Kelly Penman was a registered bidder for Sabre in the 2004

sale; that she executed assignments of liens to Sabre on CCJ's behalf and that Exhibit C is a

copy of one of those assignments.  Defendants deny the remaining allegations of this

Paragraph.

90.     To fulfill the role of obtaining liens for Sabre, Jeffrey Bridge and Regal submitted a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale.  That registration misrepresented that Regal had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Regal had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

91.     On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—Jeffrey Bridge had Regal purchase liens at the 2004 annual tax sale for Sabre's benefit.  On August 17, 2004, about two months after the 2004 tax sale ended, Regal transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Regal $1,363,444.95 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of compensation for Regal, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

92.     To fulfill the role of obtaining liens for Sabre, J. Rochman, Christopher Rochman and Corinne Rochman had CCJ submit a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale.  That registration misrepresented that CCJ had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that CCJ had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants admit that Jesse, Christopher, and Corinne had CCJ submit a registration to the Cook County Treasurer's Office to bid at the 2004 tax sale.  They deny the remaining allegations of this Paragraph.

93.     On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—J. Rochman, Christopher Rochman and Corinne Rochman had CCJ purchase liens at the 2004 annual tax sale for Sabre's benefit.  CCJ transferred liens it acquired during the 2004 annual tax sale to Sabre in furtherance of the scheme.  Plaintiffs do not have access to information regarding the assignment of tax liens obtained by defendants other than in instances where the tax buyer has filed a petition to obtain a deed to the property or where the County records reflect a transfer related to the payment of

subsequent taxes by the tax buyer. Plaintiffs reviewed the County records for that information, and as to each lien reviewed for which such information was available, the lien examined had been transferred to Sabre. Based on this review of the County records, on information and belief, CCJ transferred all of the tax liens it acquired in the 2004 tax sale to Sabre on December 16, 2004.

ANSWER:

Defendants are without sufficient information as to what the Plaintiffs did so that it is

unable to admit or deny said actions and, thus, must deny them. Defendants admit that on or

between May 10, 2004 and June 7, 2004, CCJ purchased liens at the 2004 annual tax sale and

that CCJ ultimately assigned liens it acquired during the 2004 annual tax sale to Sabre for

which Sabre paid CCJ. Defendants deny the remaining allegations of this Paragraph.

94.     To fulfill the role of obtaining liens for Sabre, Jensen, Varan and Cronus submitted a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale. That registration misrepresented that Cronus had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule. On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Cronus had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them.

95.     On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—Jensen and Varan had Cronus purchase liens at the 2004 annual tax sale for Sabre's benefit. On June 23, 2004, about two weeks after the 2004 tax sale ended, Cronus transferred the liens it acquired to Sabre in furtherance of the scheme. That day, Sabre paid Cronus $774,118 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $3,901.93 as compensation for Cronus, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the

allegations of this Paragraph and therefore, deny them.

96.     Nash incorporated Jeshay on March 11, 2004, just three months before the 2004 tax sale, as the replacement for the prior entity, DRN 2.  To fulfill the role of obtaining liens for Sabre, Nash and Jeshay submitted a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale. That registration misrepresented that Jeshay had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Jeshay had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

97.     On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—Nash had Jeshay purchase liens at the 2004 annual tax sale for Sabre's benefit.  On July 7, 2004, one month after the 2004 tax sale ended, Jeshay transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Jeshay $666,508.94 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $9,141.37 as compensation for Jeshay, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

98.     Similarly, John Bridge, B. Rochman and Sabre were able to expand the enterprise further by adding new participants to obtain liens for Sabre's benefit at the 2004 annual tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

99.     John Bridge, B. Rochman and Sabre added Alexander and Georgetown to the enterprise to purchase liens for Sabre's behalf at the 2004 tax sale.  To fulfill that role,

Alexander and Georgetown submitted a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale. That registration misrepresented that Georgetown had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, that Georgetown had no capital, purchase money, or other finances in common with another tax buyer, shared no common ownership interest or common source of funds with another tax buyer, and would adhere to the Single Bidder Rule.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

100.    During the 2004 tax sale, which took place between May 10, 2004 and June 7, 2004, Alexander had Georgetown purchase liens for Sabre's benefit, at the direction of John Bridge, B. Rochman and Sabre. On information and belief, those purchases by Georgetown were funded by John Bridge and John Bridge's relative, James A. Bridge Jr. of Loveland, Colorado.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

101.    In order to participate in the 2004 tax sale, Georgetown filed the required registration documentation, which was signed by Alexander. Notably, Georgetown's 2004 annual tax sale registration originally listed the tax buying entity's name as "Sabre Group." The attestation accompanying Georgetown's registration shows that there was a line drawn through the Sabre Group name and the name "Georgetown" was written in instead. Exhibit D.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

102.    On May 10, 2004, the first day of the 2004 annual tax sale, Georgetown had $400,000 in its bank account, and it received another $100,000 that day. See Exhibit E. Those funds were used to purchase approximately $498,000 worth of liens during the first two and half weeks of the 2004 annual tax sale. Id. By May 27, 2004, with a little over $1,700 left in the bank, Georgetown needed additional funds if it was to continue to participate in the 2004 tax sale. On that day, Georgetown received a wire transfer of $335,000 from "James A. Bridge Jr." of Loveland, Colorado, on information and belief a relative of John Bridge.

Georgetown used these additional funds to purchase tax liens. Id. Bank records reflect that James A. Bridge Jr. received no interest or profit as a result of his transferring $335,000 to Georgetown to use at the tax sale, but rather lost $46 when he picked up the cost of the wire transfer. By the end of the tax sale on June 7, 2004, Georgetown held tax liens with an approximate value of $757,432.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations set forth in this paragraph, and thus, deny them.

103.    Ten days later, on June 17, 2004, Georgetown transferred the liens it acquired to Sabre in furtherance of the scheme. The transfer was purportedly pursuant to a Tax Sale Certificates Sales Agreement signed on behalf of Sabre by John Bridge. Sabre paid Georgetown $760,634.71 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $3,202.32 as compensation for Georgetown, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

104.    Funds paid by Sabre to Georgetown for the liens were deposited into Georgetown's bank account. Out of these amounts, James A. Bridge Jr. received repayment of $335,000 (less the $46 wire transfer fee), approximately $312,000 was transferred to persons or entities currently known only to defendants, and $200,000 was transferred to John Bridge. These withdrawals left the Georgetown bank account balance at $2,500 where it remained at least until January, 2005.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

105.    On information and belief, John Bridge provided the funds for Georgetown's purchases, including some or all of the $500,000 that Georgetown had in its bank account when the sale began. That belief is based on the $200,000 payment to John Bridge on July 28, 2005, which effectively emptied Georgetown's bank account. Id. at GT 6-7. Georgetown's records documenting the source of the $500,000, the reason for the $200,000 payment to John Bridge, the additional $312,000 transferred out of Georgetown's account after receiving the payment from Sabre, and the explanation for James A. Bridge's $335,000 loan, remain in the possession of Georgetown and are currently unavailable to Plaintiffs.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

106.    John Bridge, B. Rochman and Sabre were able to add people to the enterprise who created new entities to bid for Sabre's benefit at the 2004 sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

107.    John Bridge, B. Rochman and Sabre were able to add Baumbach (John Bridge's nephew) to the enterprise as a tax buyer obtaining liens for Sabre's benefit at the 2004 tax sale. Baumbach had Optimum incorporated on March 1, 2004, just three months before the 2004 tax sale, to secretly bid on Sabre's behalf at that tax sale. To fulfill that function, Baumbach had Optimum submit a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale. That registration misrepresented that Optimum had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, that Optimum had no capital, purchase money, or other finances in common with another tax buyer, shared no common ownership interest or common source of funds with another tax buyer, and would adhere to the Single Bidder Rule.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

108.    On April 21, 2004, Optimum borrowed $1,000,000 from Citizens First National Bank. John Bridge executed a Commercial Security Agreement in favor of Citizens First National Bank as collateral for Optimum's loan. Exhibit F. Optimum used the funds from the loan to fund its purchases of liens at the 2004 annual tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

109.    On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—Baumbach had Optimum purchase liens at the 2004 annual tax sale for Sabre's benefit.  On July 17, 2004, less than two months after the 2004 tax sale ended, Optimum transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Optimum $514,474.94 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $6,788.31 as compensation for Optimum, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

110.    Georgetown's bank records, John Bridge's security agreement, and the Tax Sale Certificate Sales Agreements show that while John Bridge was simultaneously (1) operating Sabre, the entity that officially obtained the legal rights to every lien purchased by Georgetown and Optimum 10 days and 5 weeks, respectively, after the tax sale; (2) was the uncle of Optimum's principal Jason Baumbach; (3) guaranteed Optimum's loan to enable it to obtain funds to purchase tax liens at the 2004 sale; and (5) together with (on information and belief) his relative James A. Bridge of Loveland, Colorado, funded Georgetown's purchases at the 2004 tax sale.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

111.    John Bridge, B. Rochman and Sabre also added Ellis to the enterprise to obtain liens for Sabre's benefit.  Ellis had L.C.C. incorporated on May 4, 2004, almost one month before the 2004 tax sale, to secretly purchase liens for Sabre at that tax sale.  To fulfill that role, Ellis and L.C.C. submitted a registration to the Cook County Treasurer's Office to participate in the 2004 tax sale.  That registration misrepresented that L.C.C. had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that L.C.C. had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

112.    On or between May 10, 2004 and June 7, 2004—at the direction of John Bridge, B. Rochman and Sabre—Ellis had L.C.C. purchase liens at the 2004 annual tax sale for Sabre's benefit.  On June 23, 2004, about two weeks after the 2004 tax sale ended, L.C.C. transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid L.C.C. $781,893.73 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $2,938.03 as compensation for L.C.C., which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

113.    John Bridge and B. Rochman also directed Sabre to purchase liens at the 2004 tax sale.  The Sabre Defendants also had Heartwood, Bamp, Richarony and Sass IV obtain admission to the tax sale pursuant to false registrations to enable each to purchase liens at the 2004 tax sale for Sabre's benefit.  Bamp and Richarony transferred the liens they acquired at the 2004 tax sale to Sabre through Heartwood.  Heartwood and Sass IV transferred liens they obtained at the 2004 annual tax sale to Sabre directly.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

114.    By filing the false registration forms that failed to disclose the agreements among these entities to bid for the benefit of Sabre and/or the finances and funding in common, these entities were able to obtain access to the 2004 annual tax sale and obtain liens improperly.  Each bid that Sabre, CCJ, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp and Richarony made at the 2004 annual tax sale was a step implementing the fraud on the Cook County Treasurer's Office, with the intended victims being all the other tax buyers that were not participating in the conspiracy—including Phoenix and BCS.

ANSWER:

Defendants deny the allegations of this Paragraph to the extent it relates to CCJ.

Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph, and therefore deny them.

115.    Sabre, CCJ, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp and Richarony primarily bid on the same liens during the 2004 annual tax

sale.  Sabre identified liens to be bid on and purchased most of these entities for its benefit at the tax sale.  Lists of which items to bid on were provided by Sabre and Sabre employees to the bidders for Sabre, CCJ, Georgetown, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, and Bamp.  Each entity had to make the payments to the Treasurer for the liens it purchased at the tax sale.  Sabre, CCJ, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp and Richarony bid on and obtained liens that at least one of the Plaintiffs also bid on, with identical simultaneous 0% penalty bids, during the 2004 annual tax sale. Pursuant to those bids, Sabre and its nominees obtained liens one of the Plaintiffs would have obtained under the County's allocation methodology.  Through their fraudulent registrations, Sabre, CCJ, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp and Richarony were able to obtain access to the 2004 annual tax sale and improperly purchase 3,532 liens for $11,743,187.  Had Sabre and these nominees not obtained access to the tax sale through their misrepresentations and purchased liens improperly, Plaintiffs would have obtained more liens at the 2004 annual tax sale, including liens obtained by Sabre, CCJ, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp and Richarony. Attached as Exhibit B3 is a list of liens on which at least one of the Plaintiffs made a 0% penalty bid, yet lost the lien to Sabre or its nominees pursuant to their simultaneously 0% penalty rate bids.

ANSWER:

Defendants are without sufficient information as to all of the liens that Sabre, Georgetown, Optimum, Regal, L.C.C., Jeshay, Cronus, Sass IV, Heartwood, Bamp, Richarony or the Plaintiffs bid on during the 2004 annual tax sale, and, thus, deny the allegations made related thereto. Defendants admit that each and every person and/or entity that purchased liens at the 2004 sale made payments to the Cook County Treasurer for the liens they purchased.  They deny the remaining allegations of this Paragraph.

**The 2005 Annual Tax Sale**

116.    The enterprise continued through the 2005 annual tax sale.

ANSWER:

Defendants deny the allegations of this Paragraph.

117.    Nash incorporated Mud Cats on June 10, 2005, just one month before the 2005 tax sale, to bid on and obtain liens for Sabre's benefit at the 2005 tax sale.  To fulfill the role of obtaining liens for Sabre, Nash and Mud Cats submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that Mud Cats had no agreements to purchase or sell any parcels successfully bid on by any other

tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule. On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Mud Cats had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

118. On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre—Nash had Mud Cats purchase liens at the 2005 annual tax sale for Sabre's benefit. On September 28, 2005, approximately two months after the County issued Certificates of Purchase, Mud Cats transferred the liens it acquired to Sabre in furtherance of the scheme. That day, Sabre paid Mud Cats $677,938.29 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $14,500 as compensation for Mud Cats, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

119. Ellis incorporated GJ on June 15, 2005, just one month before the 2005 tax sale, to bid on and obtain liens for Sabre's benefit at the 2005 tax sale. To fulfill the role of obtaining liens for Sabre, Ellis and GJ submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that GJ had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule. On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that GJ had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

120.    On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre—Ellis had GJ purchase liens at the 2005 annual tax sale for Sabre's benefit.  On September 1, 2005, approximately one month after the County issued Certificates of Purchase, GJ transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid GJ $986,621.93 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $10,994.57 as compensation for GJ, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

121.    To fulfill the role of obtaining liens for Sabre, Jensen, Varan and Cronus submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that Cronus had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that Cronus had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

122.    On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre— Jensen and Varan had Cronus purchase liens at the 2005 annual tax sale for Sabre's benefit.  On September 12, 2005, approximately one month after the County issued Certificates of Purchase, Cronus transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Cronus $754,239.66 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $8,545.20 as compensation for Cronus, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

123.    To fulfill the role of obtaining liens for Sabre, Alexander and Georgetown submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that Georgetown had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, had no capital, purchase money, or other finances in common with another tax buyer, shared no common ownership interest or common source of funds with another tax buyer, and would adhere to the Single Bidder Rule.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

124.    On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre— Alexander had Georgetown purchase liens at the 2005 annual tax sale for Sabre's benefit.  On August 29, 2005, approximately one month after the County issued Certificates of Purchase, Georgetown transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Georgetown $736,043.59 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of compensation for GJ, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

125.    Baumbach incorporated Carpus on June 16, 2005, just one month before the 2005 tax sale, to bid on and obtain liens for Sabre's benefit at the 2005 tax sale.  To fulfill the role of obtaining liens for Sabre, Baumbach and Carpus submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that Carpus had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, had no capital, purchase money, or other finances in common with another tax buyer, shared no common ownership interest or common source of funds with another tax buyer, and would adhere to the Single Bidder Rule.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

126.    On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre— Baumbach had Carpus purchase liens at the 2005 annual tax sale for Sabre's benefit.  On August 30, 2005, approximately one month after the County issued Certificates of Purchase, Carpus transferred the liens it acquired to Sabre in furtherance of the scheme.  That day, Sabre paid Carpus $605,824.11 for the liens, which represented the lien purchase price and related fees, as well as a nominal payment of $8,049.14 as compensation for Carpus, which made no economic sense but for the scheme.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

127.    On June 7, 2005, just one month before the 2005 tax sale, J. Rochman, Christopher Rochman and Corinne Rochman incorporated BRB to replace CCJ as their entity to bid on and obtain liens for Sabre's benefit at the 2005 tax sale.  To fulfill the role of obtaining liens for Sabre, J. Rochman, Christopher Rochman, Corinne Rochman and BRB submitted a registration to the Cook County Treasurer's Office to participate in the 2005 tax sale. That registration misrepresented that BRB had no agreements to purchase or sell any parcels successfully bid on by any other tax buyer, had no agreements to purchase or sell any parcels at the annual sale by any entity or person known to be ineligible to bid at the annual sale, and would adhere to the Single Bidder Rule.  On information and belief, based on information provided by other Sabre Nominees regarding the implementation of the scheme, that registration also misrepresented that BRB had no capital, purchase money, or other finances in common with another tax buyer, and shared no common ownership interest or common source of funds with another tax buyer.

ANSWER:

Defendants admit that in order to bid at the 2005 tax sale, BRB was created and filed the required registration documentation with the Cook County Treasurer's office.  They deny the remaining allegations of this Paragraph.

128.    On or between July 6, 2005 and July 26, 2005—at the direction of John Bridge, B. Rochman and Sabre— J. Rochman, Christopher Rochman and Corinne Rochman had BRB purchase liens at the 2005 annual tax sale for Sabre's benefit.

ANSWER:

Defendants admit that BRB purchased liens at the 2005 tax sale.  They deny the remaining allegations of this Paragraph.

129.    The Sabre Defendants also had Heartwood and Sass V obtain admission to the tax sale pursuant to false registrations to enable each to purchase liens at the 2005 tax sale for Sabre's benefit.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

130.    By filing the false registration forms that failed to disclose the agreements among these entities to bid for the benefit of Sabre and/or the finances and funding in common, these entities were able to obtain access to the 2005 annual tax sale and obtain liens improperly.  Each bid that Georgetown, Regal, Mud Cats, GJ, Cronus, Carpus, BRB, Sass V, and Heartwood made at the 2005 annual tax sale was a step implementing the fraud on the Cook County Treasurer's Office, with the intended victims being all the other tax buyers that were not participating in the conspiracy—including Phoenix and BCS.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

131.    Georgetown, Regal, Mud Cats, GJ, Cronus, Carpus, BRB, Sass V, and Heartwood primarily bid on the same liens during the 2005 annual tax sale.  Sabre identified liens to be bid on and purchased by most of these entities for its benefit at the tax sale.  Lists of which items to bid on were provided by Sabre and Sabre employees to the bidders for BRB, Georgetown, Regal, Cronus, Mud Cats, Sass IV, and Heartwood.  Each entity had to make the payments to the Treasurer for the liens it purchased at the tax sale.  Georgetown, Regal, Mud Cats, GJ, Cronus, Carpus, BRB, Sass V, and Heartwood bid on and obtained liens that at least one of the Plaintiffs also bid on, with identical simultaneous 0% penalty bids, during the 2005 annual tax sale.  Pursuant to those bids, Sabre and its nominees obtained liens one of the Plaintiffs would have obtained under the County's allocation methodology.  Through their fraudulent registrations, Georgetown, Regal, Mud Cats, GJ, Cronus, Carpus, BRB, Sass V, and Heartwood were able to obtain access to the 2005 annual tax sale and improperly purchase 2,892 liens for $12,312,382.  Had Sabre's nominees not obtained access to the tax sale through their misrepresentations and purchased liens improperly, Plaintiffs would have obtained more liens at the 2005 annual tax sale, including liens obtained by Georgetown, Regal, Mud Cats, GJ, Cronus, Carpus, BRB, Sass V, and Heartwood. Attached as Exhibit B4 is a list of liens on which at least one of the Plaintiffs made a 0% penalty bid, yet lost the lien to Sabre or its nominees pursuant to their simultaneously 0% penalty rate bids.

ANSWER:

Defendants admit that each and every person and/or entity that purchased liens at the 2005 sale made payments to the Cook County Treasurer for the liens they purchased. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

## RICO Predicate Acts

132.    During the tax sales held in 2002, 2003 and 2004, Sabre purchased hundreds of liens. Sabre, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. Sabre, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. Sabre, John Bridge and B. Rochman caused Cook County to mail these notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10, and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits there from in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibit G identifies a representative sample of these mailings related to the liens that Sabre purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what Exhibit G is a "representative sample" of and, therefore, deny said allegations. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

133.    During the tax sales held in 2002 through at least 2005, Regal purchased hundreds of liens for Sabre's benefit in violation of the Single Bidder Rule. Regal, Sabre, Jeffrey Bridge, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. Regal, Sabre, Jeffrey Bridge, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. Regal, Sabre, Jeffrey Bridge, John Bridge and B. Rochman caused Cook County to mail these notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits there from in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibit H identifies a representative sample of these mailings related to the liens that Regal purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what Regal or Jeffrey Bridge did

or did not do and Defendants are also without sufficient information as to what Exhibit H is a

"representative sample" of and, therefore, deny said allegations. Defendants are without

sufficient information with which to admit or deny the remaining allegations of this Paragraph

and therefore, deny them.

134.    During the tax sales held in 2002 through at least 2006, Nash's entities, DRN
II, DRN 2, Jeshay and Mud Cats purchased hundreds of liens for Sabre's benefit in violation
of the Single Bidder Rule. DRN II, DRN 2, Jeshay and Mud Cats, Sabre, Nash, John Bridge
and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused
Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could
enforce the liens. DRN II, DRN 2, Jeshay and Mud Cats, Sabre, Nash, John Bridge and B.
Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that
were available to convert into deeds. DRN II, DRN 2, Jeshay and Mud Cats, Sabre, Nash,
John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to
enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and
22-25 notices were integral parts of the scheme to obtain additional liens and the profits there
from in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341.
Exhibits I, J, K and L identify a representative sample of these mailings related to the liens
that DRN II, DRN 2, Jeshay and Mud Cats purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what any other parties did or did

not do and Defendants are also without sufficient information as to what Exhibits I, J, K, and

L are a "representative sample" of and, therefore, deny said allegations. Defendants are

without sufficient information with which to admit or deny the remaining allegations of this

Paragraph and therefore, deny them.

135.    During the tax sales held in 2003 through 2007, Cronus purchased hundreds of
liens for Sabre's benefit in violation of the Single Bidder Rule. Cronus, Sabre, Robert Jensen,
Joseph Varan, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices
of the lien sale and caused Cook County to mail those notices to the last tax assessees in order
to ensure that Sabre could enforce the liens. Cronus, Sabre, Robert Jensen, Joseph Varan,
John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25
notices for the liens that were available to convert into deeds. Cronus, Sabre, Robert Jensen,

44

Joseph Varan, John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits there from in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibit M identifies a representative sample of these mailings related to the liens that Cronus purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what any other parties did or did not do and Defendants are also without sufficient information as to what Exhibit M is a "representative sample" of and, therefore, deny said allegations. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

136. During the tax sales held in 2003 through 2007, CCJ and BRB purchased hundreds of liens for Sabre's benefit in violation of the Single Bidder Rule. CCJ, BRB, Sabre, Christopher Rochman, J. Rochman, Corinne Rochman, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. CCJ, BRB, Sabre, Christopher Rochman, J. Rochman, Corinne Rochman, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. CCJ, BRB, Sabre, Christopher Rochman, J. Rochman, Corinne Rochman, John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits therefrom in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibits N and O identify a representative sample of these mailings related to the liens that CCJ and BRB purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what Exhibits N and O are a "representative sample" of, and thus, they deny those allegations. Defendants admit that after the tax sales held in 2002 – 2006, 22-5, 22-10 and 22-25 notices of the lien sale were prepared and that Cook County mailed those notices to the last tax assessees. They deny the remaining allegations of this Paragraph.

137. During the tax sales held in 2004 through 2007, Georgetown purchased hundreds of liens for Sabre's benefit in violation of the Single Bidder Rule. Georgetown, Sabre, Francis Alexander, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. Georgetown, Sabre, Francis Alexander, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. Georgetown, Sabre, Francis Alexander, John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits therefrom in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibit P identifies a representative sample of these mailings related to the liens that Georgetown purchased during the tax sale.

ANSWER:

Defendants are without sufficient information as to what any other parties did or did not do and Defendants are also without sufficient information as to what Exhibit P is a "representative sample" of and, therefore, deny said allegations. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

138. During the tax sales held in at least 2004 and 2005, Baumbach's entities Optimum and Carpus purchased hundreds of liens for Sabre's benefit in violation of the Single Bidder Rule. Optimum, Carpus, Sabre, Jason Baumbach, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. Optimum, Carpus, Sabre, Jason Baumbach, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. Optimum, Carpus, Sabre, Jason Baumbach, John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits therefrom in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibits Q and R identify a representative sample of these mailings related to the liens that Optimum and Carpus purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what any other parties did or did not do and Defendants are also without sufficient information as to what Exhibit P is a

"representative sample" of and, therefore, deny said allegations. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

139. During the tax sales held in 2004 through 2007, Ellis's entities L.C.C. and GJ purchased hundreds of liens for Sabre's benefit in violation of the Single Bidder Rule. L.C.C., GJ, Sabre, Gregory Ellis, John Bridge and B. Rochman prepared and caused to be prepared 22-5 notices of the lien sale and caused Cook County to mail those notices to the last tax assessees in order to ensure that Sabre could enforce the liens. L.C.C., GJ, Sabre, Gregory Ellis, John Bridge and B. Rochman also prepared and caused to be prepared 22-10 and 22-25 notices for the liens that were available to convert into deeds. L.C.C., GJ, Sabre, Gregory Ellis, John Bridge and B. Rochman caused Cook County to mail the 22-10 and 22-25 notices to enable them to convert the liens into deeds for Sabre. These mailings of the 22-5, 22-10 and 22-25 notices were integral parts of the scheme to obtain additional liens and the profits therefrom in violation of the Single Bidder Rule. This conduct violated 18 U.S.C. § 1341. Exhibits S and T identify a representative sample of these mailings related to the liens that L.C.C. and GJ purchased during the tax sales.

ANSWER:

Defendants are without sufficient information as to what any other parties did or did not do and Defendants are also without sufficient information as to what Exhibits S and T are a "representative sample" of and therefore deny said allegations. Defendants are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and therefore, deny them.

140. The 22-10 and 22-25 notices Defendants caused to be mailed, as discussed in paragraphs 130-137 above, included notices mailed to interested parties at addresses located out of state.

ANSWER:

Defendants are without sufficient information with which to admit or deny the allegations of this Paragraph and therefore, deny them.

## COUNT I
## Substantive Racketeering – 18 U. S. C. §§ 1962(c) and 1964
## Against All Defendants

141. Plaintiffs incorporate by reference the allegations of paragraph 1 through 138 of the Complaint as though fully set forth herein.

ANSWER:

Defendants reallege and reassert their answers the allegations of paragraph 1 through

138 of the Complaint as though fully set forth herein.

142. At all relevant times, each defendant were "persons" within the meaning of RICO, 18 U.S.C. § 1961(3).

ANSWER:

The allegations of this Paragraph do not contain well-pleaded allegations of law, but

Plaintiffs' legal conclusions to which an admission or denial is not required. To the extent

that this Paragraph does contain well-pleaded allegations of fact, Defendants deny them.

143. All Defendants, together with Heartwood, Bamp, Richarony, Sass IV, Sass V Turer, and DeLaurentis constitute an association-in-fact "enterprise" (the "Rigged Bidding Enterprise") as that term is defined in 18 U.S.C. § 1964(4), that engages in, and the activities of which affect, interstate commerce. The members of the Rigged Bidding Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its purpose. Specifically, Jeffrey Bridge, Christopher Rochman, Jesse Rochman, Corinne Rochman, Robert Jensen, Joseph Varan, Francis Alexander, Jason Baumbach, Gregory Ellis, Douglas Nash, Turer and DeLaurentis incorporated and became the principals of entities which could bid at the tax sales, operated and directed certain aspects of the affairs of these entities to enable them to bid at the tax sales, executed and prepared and directed or authorized others to execute and prepare registration documentation, participated in securing and moving funds in order to acquire tax liens in the name of their particular entities, had dealings with the Cook County and the Treasurers Office on behalf of their particular entities, bid at tax sales or directed others to bid at tax sales, prepared and/or executed documentation to give the appearance of a legitimate transfer of liens to Sabre, and pretended to act as legitimate, unrelated bidders at tax sales on behalf of those entities. Regal, DRN II, DRN 2, Cronus, CCJ, Georgetown, Optimum, L.C.C., Jeshay, BRB, Mud Cats, Carpus, GJ, Heartwood, Bamp, Richarony, Sass IV and Sass V were formed to bid at tax sales, submit registration documentation in order to participate in

such sales, appear to be entities capable of obtaining funds that could be used to participate at tax sales, deal directly with Cook County and the Cook County Treasurer, enter into agreements with Sabre to transfer liens acquired to Sabre, create the appearance of legitimate, unrelated entities, registered to bid at tax sales, submit registrations to the Cook County Treasurer's Office to obtain access to the tax sales, purchased liens at the tax sales and transferred those liens to Sabre. Sabre registered to bid at the 2002, 2003, and 2004 tax sales, submitted false registrations to the Cook County Treasurer's Office in connection with those sales, purchased liens at those tax sales in its own name, dealt with Cook County and the Cook County Treasurer on behalf of itself. For at least the 2002, 2003, 2004 and 2005 tax sales, Sabre provided lists to the Sabre Nominees identifying which liens should be bid on, acquired liens by transfer from the Sabre Nominees, prepared documentation to create the impression of a post-auction agreement to transfer liens acquired by the Sabre Nominees to Sabre, prepared and caused to be mailed 22-10 and 22-25 notices for liens acquired by itself and each of the other entities so that the liens acquired would not become worthless, and was responsible for and took steps to obtain deeds on any lien acquired by itself or any of the other entities for which the property owner did not redeem. John Bridge and B. Rochman directed the affairs of Sabre and of others which included forming entities to bid at the tax sale, registering those entities to bid, submitting registrations to the Cook County Treasurer's Office falsely stating adherence to the Single Bidder Rule, identifying liens to purchase at the tax sale, funding those entities purchases of liens at the tax sales, purchasing liens at the tax sales, having all those liens transferred to Sabre, and insuring that participants were compensated for their participation. Throughout the period beginning in 2002 through the present, all Defendants, together with Heartwood, Bamp, Richarony, Sass IV, Sass V, Turer, and DeLaurentis, took affirmative steps to hide their fraud and scheme from discovery by the Collector, the Clerk, other tax buyers including Plaintiffs, property owners, lenders and financial institutions and others. The planning and carrying out of the scheme would have been beyond the capacity of each member of the Rigged Bidding Enterprise acting singly and without the aid of each other.

ANSWER:

Defendants deny the allegations of this Paragraph.

144.  The Rigged Bidding Enterprise affects interstate commerce. Participants in the auction, including members of the Rigged Bidding Enterprise, are entities located outside the State of Illinois. Additionally, parties with interest in the property subject to the liens sold at the tax sale, who received the 22-5, 22-10 and 22-25 notices caused to be sent by lien buyers, including defendants, are located outside the State of Illinois.

ANSWER:

Defendants deny the allegations of this Paragraph.

145.  Each defendant is or has been employed by and/or associated with the Rigged Bidding Enterprise. The Defendants and other Sabre Nominees began implementing the fraud and scheme in or before 2002, and they have continued to execute the fraud and scheme through the present.

ANSWER:

Defendants deny the allegations of this Paragraph.

146.    All of the individual defendants and the entity defendants received a financial benefit for their participation in the Rigged Bidding Enterprise.  Such financial benefits for defendants were the product of the scheme and could not have been realized had Sabre not been able to secure more liens than it was entitled to, and obtain the corresponding profits from such liens.

ANSWER:

Defendants deny the allegations of this Paragraph.

147.    Each of the defendants to this Count have mailed or caused to be mailed hundreds of mailings in furtherance of the scheme to obtain liens for the benefit of Sabre greatly in excess of the number of liens Sabre would have been allowed under the Single Bidder Rule.  A representative sample of those mailings is identified in Exhibits G through T.  Further, each of the defendants to this Count has conducted and/or participated in the conduct of the Rigged Bidding Enterprise's affairs through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), by engaging in numerous acts of mail fraud.

ANSWER:

Defendants admit that Cook County mailed notices like Exhibits G through T.  They

deny the remaining allegations of this Paragraph.

148.    Plaintiffs have suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had these defendants not implemented their scheme and acquired liens inappropriately by obtaining access to the annual tax sales by defrauding the County.  If defendants had not engaged in such conduct, Plaintiffs would have been able to obtain additional liens, additional deeds to property, and additional sums based on the statutory penalty of 12% on subsequent taxes that could have been paid.  Plaintiffs do not have access to sufficient information to identify the amount of damages they have incurred because that information, the Rigged Bidding Enterprise's profits from penalties and deeds, is in the sole possession of the Defendants.

ANSWER:

Defendants deny the allegations of this Paragraph.

## COUNT II
### Racketeering Conspiracy
### 18 U.S.C. §§ 1962(d) and 1964
### Against All Defendants

149.    Plaintiffs incorporate by reference the allegations of paragraph 1 through 146 of the Complaint as though fully set forth herein.

ANSWER:

Defendants reallege and reassert their answers to the allegations of Paragraphs 1

through 146 of the Complaint as though fully set forth herein.

150.    Defendants Sabre, Regal, DRN II, DRN 2, Cronus, CCJ, Georgetown, Optimum, L.C.C., Jeshay, BRB, Mud Cats, Carpus, GJ, John Bridge, B. Rochman, Jeffrey Bridge, Christopher Rochman, Jesse Rochman, Corinne Rochman, Robert Jensen, Joseph Varan, Francis Alexander, Jason Baumbach, Gregory Ellis, and Douglas Nash have, along with Heartwood, Bamp, Richarony, Sass IV, Sass V, Turer, and DeLaurentis, willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of the Rigged Bidding Enterprise's affairs through a pattern of racketeering activity based upon numerous acts of mail fraud, in violation of 18 U.S.C. § 1962(d).

ANSWER:

Defendants deny the allegations of this Paragraph.

151.    An object of the conspiracy was to defraud the County and other tax buyers and improperly acquire liens by obtaining access to the tax sales through the filing of fraudulent registrations with the County Treasurer.  A further object of the conspiracy was to hide the fraud and scheme from discovery by the Collector, the Clerk, other tax buyers including Plaintiffs, property owners, lenders and financial institutions and others.  Each defendant embraced the object of the conspiracy and knowingly acted to support and facilitate the accomplishment of its goals.  The conspiracy and fraudulent scheme began at least in 2002 and continues to the present.

ANSWER:

Defendants deny the allegations of this Paragraph.

152.    Plaintiffs have suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had these defendants not implemented their scheme and obtained access to the tax sales by defrauding the County, thus enabling them to acquire liens in excess of the number of liens they would have been able to obtain.  If defendants had not engaged in such conduct, Plaintiffs would have been able to obtain

additional liens, additional deeds to property, and additional sums based on the statutory penalty of 12% on subsequent taxes that could have been paid. Plaintiffs do not have access to sufficient information to identify the amount of damages they have incurred because that information, the Rigged Bidding Enterprise's profits from penalties and deeds, is in the sole possession of the Defendants.

ANSWER:

Defendants deny the allegations of this Paragraph.

**COUNT III**
**Substantive Racketeering – 18 U.S. C. §§ 1962(c) and 1964**
**(Against Defendants John Bridge and B. Rochman)**

153. Plaintiffs incorporate by reference the allegations of paragraph 1 through 138 of the Complaint as though fully set forth herein.

ANSWER:

Defendants reallege and reassert their answers to the allegations of Paragraphs 1 through 138 of the Complaint as though fully set forth herein.

154. At all relevant times, John Bridge and B. Rochman were "persons" within the meaning of RICO, 18 U.S.C. § 1961(3).

ANSWER:

The allegations of this Paragraph do not relate to these Defendants nor require an admission or denial on behalf of these Defendants. To the extent that this Paragraph does contain well-pleaded allegations of fact to which an answer is required of these Defendants, Defendants deny them.

155. Sabre is an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

ANSWER:

The allegations of this Paragraph do not relate to these Defendants nor require an admission or denial on behalf of these Defendants. To the extent that this Paragraph does

contain well-pleaded allegations of fact to which an answer is required of these Defendants,

Defendants deny them.

156. Sabre's activities affect interstate commerce. Participants in the auction, including Sabre's Nominees, are entities located outside the State of Illinois. Additionally, parties with interest in the property subject to the liens sold at the tax sale, who received the 22-5, 22-10 and 22-25 notices caused to be sent by lien buyers, including Sabre, are located outside the State of Illinois.

ANSWER:

The allegations of this Paragraph do not relate to these Defendants nor require an

admission or denial on behalf of these Defendants. To the extent that this Paragraph does

contain well-pleaded allegations of fact to which an answer is required of these Defendants,

Defendants deny them.

157. John Bridge and B. Rochman have each mailed or caused to be mailed hundreds of mailings in furtherance of the scheme to obtain liens for the benefit of Sabre greatly in excess of the number of liens Sabre would have been allowed under the Single Bidder Rule by utilizing other entities to purchase liens for Sabre. A representative sample of those mailings is identified in Exhibits G through T. John Bridge and B. Rochman began implementing the fraud and scheme in or before 2002, and they have continued to execute the fraud and scheme through the present. John Bridge and B. Rochman each has conducted and/or participated in the conduct of the Rigged Bidding Enterprise's affairs through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), by engaging in numerous acts of mail fraud. Throughout the period beginning in 2002 through the present, John Bridge and B. Rochman have taken affirmative steps to hide their fraud and scheme from discovery by the Collector, the Clerk, other tax buyers including Plaintiffs, property owners, lenders and financial institutions and others.

ANSWER:

The allegations of this Paragraph do not relate to these Defendants nor require an

admission or denial on behalf of these Defendants. To the extent that this Paragraph does

contain well-pleaded allegations of fact to which an answer is required of these Defendants,

Defendants deny them.

158. Plaintiffs have suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had these defendants not implemented

their scheme and acquired liens in excess of their appropriate share through their violation of the Single Bidder Rule. If defendants had not engaged in such conduct, Plaintiffs would have been able to obtain additional liens, additional deeds to property, and additional sums based on the statutory penalty of 12% on subsequent taxes that could have been paid. Plaintiffs do not have access to sufficient information to identify the amount of damages they have incurred because that information, the Rigged Bidding Enterprise's profits from penalties and deeds, is in the sole possession of the Defendants.

ANSWER:

Defendants deny the allegations of this Paragraph.


**COUNT IV**
**Racketeering Conspiracy**
**18 U.S.C. §§ 1962(d) and 1964**
**(Against All Defendants Other Than Sabre)**

159.    Plaintiffs incorporate by reference the allegations of paragraph 1 through 138 of the Complaint as though fully set forth herein.

ANSWER:

Defendants reallege and reassert their answers to the allegations of Paragraphs 1 through 138 of the Complaint as though fully set forth herein.

160.    At all relevant times, each Defendant was a "person" within the meaning of RICO, 18 U.S.C. § 1961(3).

ANSWER:

The allegations of this Paragraph do not contain well-pleaded allegations of fact, but Plaintiffs' legal conclusions to which an admission or denial is not required. To the extent that this Paragraph does contain well-pleaded allegations of fact, Defendants deny them.

161.    Sabre is an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

ANSWER:

The allegations of this Paragraph do not contain well-pleaded allegations of fact, but

Plaintiffs' legal conclusions to which an admission or denial is not required. To the extent

that this Paragraph does contain well-pleaded allegations of fact, Defendants deny them.

162.     Defendants Regal, DRN II, DRN 2, Cronus, CCJ, Georgetown, John Bridge, B. Rochman, Jeffrey Bridge, Christopher Rochman, Jesse Rochman, Corinne Rochman, Robert Jensen, Joseph Varan, Francis Alexander, Jason Baumbach, Gregory Ellis, Douglas Nash, Sabre, Regal, DRN II, Cronus, CCJ, Georgetown, Optimum, L.C.C., Jeshay, BRB, Mud Cats, Carpus, and GJ have willfully combined, conspired and agreed to violate 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of Sabre's affairs through a pattern of racketeering activity based upon numerous acts of mail fraud, in violation of 18 U.S.C. § 1962(d).

ANSWER:

Defendants deny the allegations of this Paragraph.

163.     An object of the conspiracy was to defraud the County and other tax buyers and improperly acquire liens by obtaining access to the tax sales through the filing of fraudulent registrations with the County Treasurer. A further object of the conspiracy was to hide the fraud and scheme from discovery by the Collector, the Clerk, other tax buyers including Plaintiffs, property owners, lenders and financial institutions and others. Each defendant embraced the object of the conspiracy and knowingly acted to support and facilitate the accomplishment of its goals. The conspiracy and fraudulent scheme began at least in 2002 and continues to the present.

ANSWER:

Defendants deny the allegations of this Paragraph.

164.     Plaintiffs have suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had these defendants not implemented their scheme and acquired liens in excess of their appropriate share through the filing of fraudulent registrations with the County Treasurer. If defendants had not engaged in such conduct, Plaintiffs would have been able to obtain additional liens, additional deeds to property, and additional sums based on the statutory penalty of 12% on subsequent taxes that could have been paid. Plaintiffs do not have access to sufficient information to identify the amount of damages they have incurred because that information, the Rigged Bidding Enterprise's profits from penalties and deeds, is in the sole possession of the Defendants.

ANSWER:

Defendants deny the allegations of this paragraph.

## COUNT V
## Tortious Interference With Prospective Business Advantage
## (Against All Defendants)

165.     Plaintiffs incorporate by reference the allegations of paragraph 1 through 138 of the Complaint as though fully set forth herein.

ANSWER:

Defendants reallege and reassert their answers to the allegations of Paragraphs 1

through 138 of the Complaint as though fully set forth herein.

166.     As indicated in detail above, Sabre, Regal, DRN II, DRN 2, CCJ, Cronus, Georgetown, Optimum, L.C.C., Jeshay, BRB, Mud Cats, Carpus and GJ each participated in one or more of the tax sales held in 2002, 2003, 2004 and 2005, each bidding on and purchasing liens for Sabre's benefit in violation of the Single Bidder Rule.

ANSWER:

Defendants reallege as though fully set forth herein their answers above to the

allegations regarding Sabre's, CCJ's and BRB's participation in the 2002-2005 sales.

Defendants deny the remaining allegations of this Paragraph.

167.     Phoenix and BCS were registered tax buyers at the 2002, 2003, 2004 and 2005 annual tax sale tax sales.

ANSWER:

Defendants deny that Phoenix was a registered bidder at the 2002 tax sale.  They

admit the remaining allegations of this Paragraph.

168.     Phoenix and BCS had a reasonable expectation of entering into respective, valid business relationships with the Cook County Treasurer's Office at the 2002, 2003, 2004 and 2005 annual tax sale tax sales.

ANSWER:

Defendants deny that Phoenix had a reasonable expectation of entering into a valid

business relationship with the Cook County Treasurer's Office at the 2002 tax sale.  They are

without sufficient information with which to admit or deny the remaining allegations of this

Paragraph and, thus, deny them.

169.    John Bridge, B. Rochman, Sabre, Christopher Rochman, J. Rochman, Corinne Rochman, CCJ, Francis Alexander, DRN II, DRN 2, Georgetown, Optimum, Jeffrey Bridge, Regal, Ellis, L.C.C., Jeshay, Jensen, Varan, Nash, Baumbach, Cronus, BRB, Mud Cats, Carpus and GJ knew of the Plaintiffs' expectancies for the tax sales in which each of the respective defendants participated.

ANSWER:

Defendants deny the allegations of this Paragraph regarding them, respectively.  They are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and, thus, deny them.

170.    Nevertheless, John Bridge, B. Rochman, Sabre, Christopher Rochman, J. Rochman, Corinne Rochman, CCJ, Francis Alexander, DRN II, DRN 2, Georgetown, Optimum, Jeffrey Bridge, Regal, Ellis, L.C.C., Jeshay, Jensen, Varan, Nash, Baumbach, Cronus, BRB, Mud Cats, Carpus and GJ purposefully interfered in the respective tax sales in which each participated by filing false registrations and conspiring to violate the Single Simultaneous Bidder Rule, thereby usurping Plaintiffs' opportunity to obtain a much larger number of liens and preventing the Plaintiffs' legitimate expectancies from ripening into valid business relationships with the Cook County Treasurer's Office.   Among the specific expectancies that defendants purposefully usurped were liens that defendants simultaneously bid on and that plaintiffs also bid on, as identified in Exhibits B1, B2, B3, and B4.

ANSWER:

Defendants deny the allegations of this Paragraph regarding them, respectively.  They are without sufficient information with which to admit or deny the remaining allegations of this Paragraph and, thus, deny them.

171.    Absent the respective frauds and collusive bidding schemes of the defendants, Phoenix and BCS would have had an opportunity to obtain a much larger number of liens and would have enjoyed the financial benefits flowing from those purchases opportunity to bid successfully on a larger number of liens and would have enjoyed the financial benefits flowing from those purchases.

ANSWER:

Defendants deny the allegations of this Paragraph.

## **AFFIRMATIVE DEFENSES**

**AFFIRMATIVE DEFENSE NO. 1.**

Defendants are not and do not constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1964(4), that engages in, and the activities of which affect, interstate commerce.

**AFFIRMATIVE DEFENSE NO 2.**

Defendants are not and have not been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate any alleged purpose other than each wanted to purchase liens at Cook County tax sales.

**AFFIRMATIVE DEFENSE NO. 3.**

The alleged actions of the Defendants do not affect interstate commerce.

**AFFIRMATIVE DEFENSE NO 4.**

Under Illinois law there is no such thing as "simultaneous bids" where the lien allegedly subject to said bid is then awarded to a tax buyer.

**AFFIRMATIVE DEFENSE NO 5.**

Plaintiffs have not been harmed as a result of any actions taken by the Defendants or any actions alleged herein.

**AFFIRMATIVE DEFENSE NO 6.**

The Cook County Treasurer's Office does not have a system, rule, or policy that if more than one tax buyer bids at the same lowest penalty rate, the auctioneer will allocate the liens on a rotational basis to ensure that there is an equal apportionment of liens among the lowest bidding tax buyers.

**AFFIRMATIVE DEFENSE NO. 7**

Plaintiffs cannot show that they would have been the successful bidder on any and all tax liens purchased by the Defendants at any tax sale.

**AFFIRMATIVE DEFENSE NO 8.**

Plaintiffs cannot show that two or more of the Defendants bid on the same tax lien as the Plaintiffs.

**AFFIRMATIVE DEFENSE NO 9.**

Plaintiffs have unclean hands in that at least one of the Plaintiffs provided services, management, and data to prospective purchasers at the tax auctions in return for ultimately obtaining certificates after the tax auctions from said purchasers.

**AFFIRMATIVE DEFENSE NO. 10.**

The Defendants have never violated the Single Simultaneous Bidder Rule or made any false representations to the Cook County Treasurer's Office.

**AFFIRMATIVE DEFENSE NO 11.**

Plaintiffs did not have a reasonable expectancy of entering into a valid business relationship with the Cook County Treasurer which was intentionally and/or unjustifiably interfered with by the Defendants that induced or caused a breach or termination of the expectancy and which caused damage to the plaintiff resulting from the Defendants' alleged interference.

**AFFIRMATIVE DEFENSE NO. 12.**

Defendants' actions were privileged as they were acting to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights alleged involved with the Plaintiffs.

**AFFIRMATIVE DEFENSE NO. 13.**

Plaintiffs' claims are barred by the equitable doctrine of laches.

WHEREFORE, Defendants pray that the Court award them judgment against Plaintiffs Phoenix and BCS; award them the costs of defending this action including reasonable attorneys' fees; and that the Court award them such other relief as the Court deems just and proper.

Respectfully submitted,

**CCJ Investments, LLC,**
**BRB Investments, LLC, Corrine Rochman,**
**Jesse Rochman, and Christopher Rochman,**
Defendants

By:___/s/  Donald B. Levine_____
　　　　One of their Attorneys

Donald B. Levine, ARDC 1637355
Saskia Nora Bryan, ARDC 6255682
LATIMER LeVAY JURASEK LLC
55 W. Monroe St., Suite 1100
Chicago, Illinois 60603
Telephone:  312-422-8000
Fax:   312-422-8001

Harold L. Moskowitz, ARDC  3128347
Law Offices of Harold L. Moskowitz
55 W. Monroe St., Suite 1100
Chicago, Illinois  60603
Telephone:  312-419-3016
Fax:  312-422-8001