IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| PHOENIX BOND & INDEMNITY CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 05 C 4095 |
| v. | ) | Consolidated with No. 07 C 1367 |
| | ) | |
| JOHN BRIDGE, *et al.* | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | |

## THE SASS DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW

The Sass Defendants[1] respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law.

### INTRODUCTION

The Sass Defendants do not fit the mold that surrounded Plaintiffs' efforts, in opening statements, to elevate a commercial dispute into criminal racketeering by targeting "shills" who: (1) typically sold "all or the vast majority of liens that it got at the tax sale"; (2) sold them "shortly after the [tax] sale"; (3) were provided lien diligence "information for free"; and, (4) were "either family members or friends." Tr. at 239. None of these flags applies to the Sass Defendants, who resold only a small fraction of liens, waited two years to do so in lieu of foreclosures, were charged arms-length fees, and were not relatives or friends of other bidders.

Several grounds mandate judgment as a matter of law. First, the trial record lacks sufficient evidence that the Sass Defendants participated in material misrepresentations with scienter or knew about any misconduct by others, let alone shared a common conspiratorial purpose with them. Second, the predicate acts of mail fraud require proof of an intentional "deprivation of property rights," and courts have held that "fair bidding opportunities" at

---

[1] Defendants Sass Muni–IV, LLC; Sass Muni–V, LLC; MD Sass Investors Services, Inc.; MD Sass Tax Lien Management, LLC; MD Sass Municipal Finance Partners-IV, LLC; MD Sass Municipal Finance Partners-V, LLC; Vinaya Jessani and Kirk Allison are referred to collectively herein as the "Sass Defendants" for convenience.

auctions simply do not qualify. Third, the Plaintiffs have failed to prove the requisite "enterprise" under RICO beyond the alleged "racketeering" or "conspiracy" itself. Fourth, the Plaintiffs have failed to prove a threat of continuing criminality sufficient to satisfy the "pattern" prong of RICO. Fifth, the Plaintiffs have employed a damages model that lacks "but for" causation by seeking what they would have earned had the Treasurer barred *all* alleged wrongdoers from the auction rather than if each alleged group had only a *single* bidder at each auction. Sixth, with respect to the tortious interference claim, there is no evidence that the Sass Defendants targeted interference specifically at the Plaintiffs at any particular auction. Seventh, the trial record cannot support an award of punitive damages against the Sass Defendants. Eighth, MD Sass Investors Services, Inc. ("MDSIS) is not a proper corporate defendant.

## Background

In connection with annual tax lien auctions,[2] Cook County has adopted a Single Simultaneous Bidder Rule, which "requires each 'tax buying entity' to submit bids in its own name and prohibits it from using 'apparent agents, employees, or related entities' to submit simultaneous bids for the same parcel." *Bridge v. Phoenix Bond & Indem. Corp.*, 553 U.S. 639, 643 (2008). "The determination of whether registered entities are related, so as to prevent the entities from bidding at the same time, is in the sole and exclusive discretion of the Cook County Treasurer or her designated representatives." *Id.* at 643 n.2. "Upon registering for an auction, each bidder must submit a sworn affidavit affirming that it complies with the Single, Simultaneous Bidder Rule." *Id.* at 643. The form of affidavits have varied over time.

Significant diligence before an auction can help identify better liens on which to bid. At trial, Stanford Marks of Plaintiff Phoenix Bond & Indemnity Co. ("Phoenix Bond") testified

---

[2] Auction processes at issue in this case have been described in prior opinions addressing the scope of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"). *Bridge v. Phoenix Bond & Indem. Corp.*, 553 U.S. 639, 642 (2008); *BCS Serv., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 752-53 (7th Cir. 2011). Simultaneous "zero penalty" bids have been mollified by the use of computerized auctions since 2008. Tr. at 652.

about important diligence efforts: computer research to uncover prior tax liens or bankruptcy proceedings, (Tr. at 613), investigation of areas in which a property is located, (*id.*), and data manipulation to generate reports from information that the Treasurer provides. Tr. at 597-98, 632-33. A Plaintiff paid a vendor for this latter service. Tr. at 597-98.

MDSIS is involved in multiple investment management businesses. Tr. at 2147-48. Based in New York, the Sass Defendants engage the assistance of local vendors to help them with diligence efforts to identify the best liens. In Cook County, the Sass Defendants engaged CMS as such a local vendor, and CMS charged the Sass Defendants for its services. The record lacks evidence that the Sass Defendants shared profits, ownership or sources of funding or the like with CMS or any other entity related to Cook County tax liens. There is no evidence that the Sass Defendants engaged in anything other than arms-length transactions with CMS. Tr. at 2047-51, 2054-56.

For the Cook County tax liens, funds ("Muni IV and Muni V") managed by a subsidiary of MDSIS, Defendant MD Sass Tax Liens Management, LLC ("Tax Liens LLC"), held liens until they redeemed or for approximately two years. Tr. at 2178-80, 2395. There is no evidence that Muni IV and Muni V sold liens shortly after winning them. Re-sales occurred approximately two years after the auction and only for a small minority of liens as an exit strategy in lieu of foreclosures. *Id.* With virtually all liens, the taxpayer clears up the debt, leaving only a small fraction heading to a potential foreclosure at the two year mark. Tr. at 2170-71. John Bridge of the Sabre Group testified about its unsuccessful efforts to bind the Sass Defendants to a written contract covering a resale of liens obtained in a previous auction. The Sass Defendants refused to sign a draft services or sales agreement or otherwise to commit in advance to sell tax liens. Tr. at 2028, 2038-39, 2048, 2061.

Each of the principals of the Plaintiffs described a similar theory of their claims, namely that they were deprived of fair bidding opportunities. Stanford Marks explained: "[w]e filed it because we wanted a level playing field" and "[i]t was not level because there were multiple bidders that we had seen from the activities of the sale ...." Tr. at 396. Andrew Marks testified: "[w]e want a level playing field. We want everyone to play by the same rules that the treasurer has imposed." Tr. at 696. Also, Jocelyn Stoller testified to the same view of unfair bidding opportunities: "[a]nd as a result of all those other bidders we were not getting our fair share of the product." Tr. at 1238.

The same witnesses acknowledged their repeated resort, including numerous letters, to the Treasurer detailing their complaints against the Sass Defendants and others about alleged violations of the Single Simultaneous Bidder Rule. Tr. at 745-53. The Court overruled Plaintiffs' relevancy objection to the use of the letters, stating "I've got to cut you off there, the Seventh Circuit has not dealt with whether the elements of mail fraud have been met, one of which is materiality." Tr. at 529-30. Notwithstanding the Plaintiffs' letters and complaints to the Treasurer, she exercised her "sole and exclusive discretion" when determining <u>not</u> to bar any of the accused. Andrew Marks admitted that "[d]espite all of these letters," the Treasurer's office "never barred [the accused] from the sale." Tr. at 752.

Plaintiffs' expert witnesses have measured damages by assuming that all allegedly related bidders were excluded from the sale. Tom Dunn testified that he assumed all "defendants would have been ineligible for the tax sales between 2002 and 2007" based on "an instruction given to [him] by the plaintiffs' counsel. Tr. at 1029. Dunn confirmed that "the list of people or bidders that [he] excluded came from Mr. Shaffer's report," which relied on "a total of over 70 bidders who were excluded" from their calculations, including all those "already grouped into Sabre,

4

Salta and Grays." Tr. at 1076-77. Plaintiffs' fraud theory is that defendants should have disclosed their related parties. A true "but for" analysis would consider the Treasurer barring related parties while allowing a single bidder from each alleged group to participate, as the rules allow. The Plaintiffs' expert witnesses never opined on what would have happened if a single bidder from each alleged group remained at the auction.

## ARGUMENT

### I. THERE IS NO EVIDENCE THAT THE SASS DEFENDANTS PARTICIPATED IN MATERIAL FALSE STATEMENTS WITH SCIENTER OR SHARED A COMMON PURPOSE WITH OTHER BIDDERS.

Judgment as a matter of law[3] should enter for the Sass Defendants on the RICO claims. Substantive or conspiratorial liability under RICO requires a showing that the Sass Defendants participated in material false statements with scienter and a common fraudulent purpose. *See United States v. Gee*, 226 F.3d 885, 891-92 (7th Cir. 2000); *Meier v. Musburger*, 588 F. Supp. 2d 883, 909, 913 (N.D. Ill. 2008) (lack of materiality and scienter because "RICO was not intended by Congress to establish a code of business or professional ethics, the breach of which permits suit in federal court for treble damages and attorneys' fees"). There is no evidence the Sass Defendants intentionally participated in a RICO enterprise or mail fraud.

The record does not support an inference that the Sass Defendants shared a common purpose to accomplish the so-called Sabre Group's goal of increasing its wins at the auction. "While it is not necessary for the government to prove that an alleged conspirator was aware of every aspect of the conspiracy, it must show that he was aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Bruun*, 809 F.2d 397, 410

---

[3] Rule 50(a)(1) provides that once "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may ... grant a motion for judgment as a matter of law against the party on a claim that ... can be maintained ... only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). Judgment as a matter of law is proper "if no reasonable juror could have found in favor of" a non-moving party. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009).

5

(7th Cir. 1987). Even if the Sass Defendants acted improperly to benefit themselves, which they did not, such efforts lack a common purpose to make them a part of a Sabre conspiracy. *See United States v. Peoni*, 100 F.2d 401, 403 (2d Cir. 1938) ("[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it …").

Unlike evidence against other defendants, there is no evidence that the Sass Defendants used any "apparent agents, employees, or related entities' to submit simultaneous bids for the same parcel" contrary to an affirmation of compliance. The Sass Defendants did not utilize multiple bidders at auctions. The Sass Defendants did not sell most liens, nor did they sell liens to others shortly after winning them, nor did they receive free services (or any other than at arms-length) from others, nor did the Sass Defendants have relatives or friends at the auction. It was against the Sass Defendants' financial interests for the Sabre Group to obtain more liens.

Plaintiffs argue that an exit strategy or possible future transaction with an affiliate of another bidder (Tr. at 2028, 2038-39, 2048, 2061) should have been disclosed to the Treasurer as a "contract" with another bidder. Such a debatable interpretation cannot elevate ordinary competitive practices into racketeering activity. Plaintiffs rely on an email reflecting a potential "exit strategy" and an unsigned and unenforceable draft services agreement (which was presented post sale and purported only to deal with liens acquired in a previous sale). Neither of these exhibits contradicts the verification by any of the Sass Defendants about compliance with the auction rules. Even if technical non-compliance occurred, there is no evidence of knowledge by any of the Sass Defendants that they or others violated any rule, thereby foreclosing the requisite scienter. The RICO claims against the Sass Defendants should be dismissed because of the lack of false statements, let alone a material one with scienter or common purpose.

## II. AN ELEMENT OF MAIL FRAUD IS A "DEPRIVATION OF PROPERTY," WHICH IS NOT SATISFIED BY A LOSS OF FAIR BIDDING OPPORTUNITIES.

An essential element of mail fraud is the "deprivation of property rights." In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute did not prohibit a scheme to defraud a municipality and its citizens of intangible rights to honest services. *Id.* at 358-59. Subsequently, in *Carpenter v. United States*, 484 U.S. 19 (1987), the Court suggested that intangible property rights like trade secrets, can be protectable, while reaffirming that mail and wire fraud statutes did not reach intangible non-property rights. *Id.* at 25; *cf. Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010) (vacating conviction, and narrowing honest services amendment in 18 U.S.C. § 1346 to bribery and kickbacks).

The Seventh Circuit has held that "*McNally* made it clear that the mail and wire fraud statutes protect *property rights* only" and not mere intangible rights to honest or fair dealings. *United States v. Ashman*, 979 F.2d 469, 477 (7th Cir. 1992). In a bidding process for the trade of certain commodities, the *Ashman* court drew a line between a "failure to obtain a better price" through a form of "open outcry," which could be protected by the mail fraud statute, and unprotected situations in which "fraud was impossible because there was no chance for the customer to obtain a better price." *Id.* at 477-79 (loss of an expected opportunity at no different price "strikes us as the kind of intangible deprivation that *McNally* held could not constitute mail or wire fraud"). The *Ashman* court addressed the inadequacy of competitive injury:

> [T]he government argues that the defendants violated the mail and wire fraud statutes by depriving other traders in the pit-those that were not quietly selected by the defendant brokers-of money or property: "By keeping valuable orders to themselves, defendants deprived other traders and customers of other brokers the opportunities for profits from trading on them." We are not persuaded. As the defendants accurately point out, the government's argument boils down to an assertion that open outcry trading by itself constitutes a property right protected under the mail and wire fraud statutes. We hold that the failure to execute trades by open outcry does not constitute a deprivation of money or property under the

7

fraud statutes. The customer would have received the same price-the limit price-whether or not the trade was offered openly in the pit.

*Id.* at 479 (citations omitted). As in *Ashman*, here pricing is not at issue because Plaintiffs' theory concerns only who received "zero penalty" rate bids, not anyone suffering inflated rates.

Citing to the Seventh Circuit's opinion in *Ashman*, the Third Circuit has also held that the loss of a "fair bidding opportunity" does not constitute a "deprivation of property" for mail fraud purposes. *See United States v. Henry*, 29 F.3d 112 (3d Cir. 1994). The *Henry* court explained:

> The competing banks' interest in a fair bidding opportunity does not meet this test. Clearly, each bidding bank's chance of receiving property-the deposits if its bid were accepted-was, at least in part, dependent on the condition that the bidding process would be fair. This condition, which is all that the bidding banks allegedly lost, was thus valuable to them, but it is not a traditionally recognized, enforceable property right. At most, the condition is a promise to the bidding banks from those in charge of the process that they would not interfere with it. It is not a grant of a right of exclusion, which is an important aspect of traditional property. *See Carpenter*, 484 U.S. at 26-27, 108 S.Ct. at 321. Violation of this condition may have affected each bidding bank's possible future receipt of property, but that does not make the condition property.
> 
> \* \* \* \*
> 
> It is irrelevant that, as the government points out, the scheme allegedly afforded its participants tangible benefits-over $34,000,000 in deposits for Bank A ….

*Id.* at 115-16. The rule that a "fair bidding opportunity is not a property right" is not an aberration, but rather still an expressly recognized limit on mail fraud prosecutions that appears in the United States Department of Justice Criminal Resource Manual at 946 (section on "Tangible Versus Intangible Property Rights" within the chapter on "Mail Fraud and Wire Fraud") (http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00946.htm); *see also United States v. Alkaabi*, 223 F. Supp. 2d 583, 590 (D. N.J. 2002) (citing to *Henry* and dismissing mail fraud charges based on the lack of "two of the hallmarks of traditional property – exclusivity and transferability"); *United States v. Berlin*, 707 F. Supp. 832, 835 (E.D. Va. 1989) (for mail or wire fraud purposes post-*McNally*, there is no "deprivation" of property when

8

all that is "lost was the opportunity to compete on a level playing field for a chance at a property right").

As in *Ashman* and *Henry*, here competitors of the accused cannot rely on the alleged loss of fair bidding opportunities to establish a cognizable "deprivation of property rights" under mail fraud laws. The testimony of Stanford Marks, Andrew Marks and Ms. Stoller confirm their hope for a fair and "level playing field" is at the crux of their complaint. Tr. at 396, 696 & 1238. But a valuable chance at fair bidding opportunities is not a traditional or enforceable property right.

These fundamental limits on mail fraud crimes pose no inconsistency with prior appellate rulings in this case, which focused on RICO "injury" to business or property "by reason of" a pattern of racketeering activity. None of the defendants posed the present challenge to the Plaintiffs' mail fraud theory in prior appeals. Facing a portion of the present dispute, in *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007), the court refused to impose a categorical bar on the use of mail fraud for RICO claims by parties who are not the direct recipients of false statements, finding that extra bids "reduce plaintiffs' chance of winning any given auction, and loss of a (valuable) chance is real injury" under RICO. *Id.* at 930. Regardless of the breadth of such RICO "injury," under *Ashman*, *Henry* and their progeny, a reduction in "plaintiffs' chance of winning any given auction" does not qualify as a "deprivation of property rights" because of the absence of the requisite "traditionally recognized, enforceable property right."[4] In *Phoenix Bond*, the Seventh Circuit did not touch upon the mail fraud element of "deprivation of property" or purport to limit the earlier panel's holding in *Ashman* about mail fraud. The Supreme Court has historically interpreted RICO broadly, while narrowly

---

[4] In other words, the broad reach of "by reason of" language in RICO led the *Phoenix Bond* court to consider various types of evidence to determine whether Plaintiffs suffered RICO-type injury. When assessing the viability of mail fraud charges, however, *Ashman*, *Henry* and their progeny have found lost bidding opportunities inadequate. The difference is the focus on the requirement of a "deprivation of property rights" under mail fraud, which is more than a loss of "intangible rights" to fair dealing.

circumscribing mail and wire fraud in *McNally* and *Carpenter,* and again last year in *Skilling* in response to efforts by Congress to revive the criminality of mail fraud based on a loss of "intangible rights to honest services" beyond traditional bribery and kickbacks.

This is not a case in which the activities at issue raised the penalty rates for property owners, as occurred in *Phoenix Bond & Indem. Co. v. Pappas*, 194 Ill. 2d 99, 107 (2000) ("*Pappas*"). Prior to the years at issue here, Phoenix Bond, the same lead plaintiff in the present case, unsuccessfully sought to enjoin the Cook County Treasurer from applying an auction rule that disallowed its efforts to obtain liens at maximum 18% penalty rates by bidding them simultaneously with a limited number of competitors. *Id.* at 102-03 ("[t]he controversy before us today arose when bidders [including Phoenix Bond] at Cook County's 1996 annual tax sale, held in January of 1998, began making multiple, simultaneous, identical bids for the maximum statutory penalty percentage rate of 18%."). The Illinois Supreme Court explained that the purpose of the auction process was to facilitate lower penalty rate bids, with "zero penalty" rates as the ultimate goal. *Id.* at 107 ("[t]he public sale provisions of the Property Tax Code were designed to foster competition in bidding in order to enable owners to exercise their right of redemption, as guaranteed by our constitution, at the lowest possible cost.") (citations omitted). The Illinois Supreme Court rejected Phoenix Bond's efforts to secure the maximum allowable penalty rate or otherwise causing them "to be higher than otherwise possible" because "owners would be deprived of the opportunity to redeem at the lowest possible rate." *Id.* at 107.

Here, Plaintiffs challenge only their fair opportunity to obtain *zero-penalty* rate liens, without any deprivation of favorable pricing for Cook County or property owners. The prevalence of zero-penalty rate bids during the years at issue in this case explains the Treasurer's

inaction in response to Plaintiffs' "nudginess." The record lacks evidence of a "deprivation of property rights," under mail fraud laws, requiring in turn dismissal of the RICO claims.

## III. PLAINTIFFS HAVE FAILED TO PROVE THE REQUISITE RICO "ENTERPRISE" BEYOND THE PREDICATE ACTIVITY ITSELF.

"Congress enacted RICO to help combat organized, long-term criminal activity, and granted victims of such activity a private right of action." *420 East Ohio Ltd. P'ship v. Cocose*, 980 F.2d 1122, 1123 (7th Cir. 1992). "The elements of a RICO violation, in shorthand form, are '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Id.* (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). A plaintiff must prove a RICO "enterprise" that "is distinct, separate, and apart from a pattern of racketeering activity." *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990); *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995) (similar effect).

In *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382 (7th Cir. 2010), Judge Posner explained that a "RICO offense is *using* an enterprise to engage in a pattern of racketeering activity" and "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Id.* at 389 (no enterprise because "defendants did not use the conspiracy (the enterprise); they were the conspiracy"); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000); *LaFlamboy v. Landek*, No. 05C4994, 2006 U.S. Dist. LEXIS 11595, at *14 (N.D. Ill. Mar. 21, 2006); *Timm, Inc. v. Bank One Corp., N.A.*, No. 04C3541, 2005 U.S. Dist. LEXIS 21039, at *11 (N.D. Ill. Sept. 22, 2005); *Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 770 (N.D. Ill. 2005); *Sears Roebuck & Co. v. Emerson Elec. Co.*, No. 02C5771, 2003 U.S. Dist. LEXIS 332, at *16 (N.D. Ill. Jan. 7, 2003) (must prove more than "the very predicate acts that [plaintiff] alleges

have caused its injuries," and enterprise beyond "a name for the fraudulent acts alleged, or for the agreement to commit these acts").

Here, the Plaintiffs have failed to prove an enterprise beyond the alleged conspiracy or racketeering activities themselves. There is no evidence of an alleged structure that the Sass Defendants joined, operated or managed. Plaintiffs even coined the name "Sabre Enterprise" to describe the conspiracy it seeks to prove. Plaintiffs have not proven an enterprise beyond the conspiracy or racketeering activities themselves, thereby requiring dismissal of all RICO claims.

## IV. THE PLAINTIFFS HAVE FAILED TO PROVE THE REQUISITE THREAT OF CONTINUED CRIMINAL ACTIVITY TO SATISFY THE ELEMENT OF "PATTERN" OF RACKETEERING ACTIVITY UNDER RICO.

The Plaintiffs have failed to prove the "pattern" element of RICO. While the RICO statute refers to two minimum predicate acts of racketeering within ten years of each other, *see* 18 U.S.C. § 1961(5), Plaintiffs bear a well-established burden to prove a "pattern" of "continuity plus relationship" that poses a threat of "continued criminal activity." *420 East Ohio Ltd.*, 980 F.2d at 1123-24. Relevant factors include "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.* "The requisite threat of continued criminal conduct can be proven in two ways: 'a RICO plaintiff can prevail by either (1) demonstrating a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future'" through a regular way of doing business. *Id.* at 1124.

The trial record contains no evidence of a threat of continued criminal conduct. Even assuming predicate acts occurred before the Treasurer received the series of letters from Plaintiffs detailing the alleged relationships among defendants, a threat of continued criminal activity could no longer exist once the Treasurer was fully informed. There can be no mail or

wire fraud committed against a fully-informed victim but rather just, at most, a commercial dispute about the application of industry rules. Courts "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) ("'the heightened civil and criminal penalties of RICO are reserved for schemes whose scope and persistence set them above the routine,' we believe that the scheme in the present case does not rise above the routine, and does not resemble the sort of extended, widespread, or particularly dangerous pattern") (citations omitted). The RICO claims must be dismissed based on the lack of a "pattern" of racketeering.

## V. PLAINTIFFS' MEASURE OF DAMAGES LACKS "BUT FOR" CAUSATION.

In support of their damages theory, Plaintiffs have failed to prove "but for" causation, a requisite element of each of their claims. Plaintiffs seek the amount of profits they would have earned had the Treasurer *barred all* alleged wrongdoers from the auction rather than if each alleged group had only a *single* bidder at each auction. Tr. at 1029, 1076-77. The proper "but for" question is: What would have happened had defendants adequately disclosed relationships on registration forms? *See Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004).

Based on Plaintiffs' claims and the auction rules, the proper disclosure of related parties would have caused the Treasurer to limit each group to a single bidder. The auction rules never prohibited related parties from registering, only from having multiple bidders participate in the auction. The "but for" world on which Plaintiffs' expert witnesses should have focused would have considered the presence of a single member from each group of related parties still in the auction room, rather than the exclusion of all defendants. The record lacks "but for" causation evidence consistent with the proffered measure of damages, precluding Plaintiffs' claims.

## VI. PLAINTIFFS LACK EVIDENCE THAT THE SASS DEFENDANTS TARGETED THEM SPECIFICALLY OTHER THAN WITH JUSTIFIABLE COMPETITION.

With respect to the claim for tortious interference claim, there is no evidence from which a reasonable jury could find that the Sass Defendants intentionally interfered specifically with the Plaintiffs. The last appellate decision in this matter rejected an argument that Plaintiffs could not identify specific customers that they lost because Plaintiffs had an identifiable "expectancy of receiving liens from their owner, the County ...." *BCS Serv., Inc.*, 637 F.3d at 761. On the present trial record, a more fundamental problem exists. The Plaintiffs have failed to prove that they themselves were a specific target of interference by the Sass Defendants. There is no evidence that the Sass Defendants knew anything significant about Plaintiffs' participation and strategies in the tax sale auctions, let alone targeted anything other than lawful and justifiable competition at other bidders generally, requiring dismissal of the tortious interference claim.

## VII. PUNITIVE DAMAGES ARE UNWARRANTED ON THE SASS DEFENDANTS.

"The mere fact that interference with contract is an intentional tort does not make an award of punitive damages permissible in Illinois; the defendant's misconduct must be worse than the minimum required to be guilty of the tort for an award of punitive damages to be proper." *Sufrin v. Hosier*, 128 F.3d 594, 598-99 (7th Cir. 1997) (distinguishing "garden-variety" intentional interference from requisite "aggravated" and "outrageous" misconduct) (citing to *Anthony v. Security Pacific Financial Services, Inc.*, 75 F.3d 311, 316-17 (7th Cir. 1996) (collecting Illinois cases)). Based on the same lack of culpability of the Sass Defendants discussed in Point II, *supra* at 5-6, punitive damages are unavailable against them.

## VIII. MDSIS IS NOT THE PROPER CORPORATE DEFENDANT.

None of the documentary or testimonial evidence presented to the jury could justify the imposition of liability on MDSIS as the owner of Tax Liens LLC, a New York corporation. Tr. at 2162-65. "The general rule, of course, in Illinois as elsewhere, is that a shareholder . . . and a

parent, subsidiary, or other affiliate . . . is not liable for a corporation's debts." *Browning-Ferris Indus. of Illinois, Inc. v. Maat*, 195 F.3d 953, 959 (7th Cir. 1999) (citations omitted); *see Elenkrieg v. Siebrecht*, 238 N.Y. 254, 262 (1924); *see also New York v. Solvent Chem. Co.*, 685 F. Supp. 2d 357 (W.D.N.Y. 2010) (disregarding former employee's testimony about a parent company's liability, noting that even on federal claims, liability is "rooted in state corporation law, 'that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries'"). Rather than prove direct culpable participation by MDSIS at trial, the Plaintiffs desperately attempted to twist ambiguous testimony by a former employee about a parent and subsidiary appearing "one and the same" to him. If a corporate veil could be so easily pierced, then parent corporations would never have insulation from its subsidiaries' former employees. Notwithstanding repeated ambiguous use by Plaintiffs' counsel of the name "MD Sass" in questions, Plaintiffs failed to elicit any *factual* testimony that would indicate the direct participation of MDSIS in the tax lien auctions, other than as an owner of Tax Liens LLC. While MDSIS originally recruited and employed Vinaya Jessani and Kirk Allison, they have acknowledged that they later worked for Tax Liens LLC when participating in the tax lien auctions for the years at issue. Tax Liens LLC is the proper corporate entity, not MDSIS, which should be granted judgment as a matter of law.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Sass Defendants respectfully request that the Court grant them judgment as a matter of law dismissing all of the claims against them.

Dated: October 27, 2011

Respectfully submitted,
/s/ Theodore M. Becker
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312) 324-1000
*Counsel for the Sass Defendants*

15

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he caused the foregoing The Sass Defendants' Memorandum of Law in Support of Their Motion for Judgment as a Matter of Law to be filed and served on all counsel of record by way of automatic notification using the Court's electronic filing system on this 27th day of October, 2011.

/s/ Tedd M. Warden