IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| PHOENIX BOND & INDEMNITY CO., et al. | ) | |
|---|---|---|
| Plaintiffs, | ) | |
| vs. | ) | |
| JOHN BRIDGE, et al., | ) | Case No. 05 C 4095 |
| Defendants. | ) | Consolidated with Case No. 07 C 1367 |
| BCS SERVICES, INC., et al. | ) | Judge Matthew F. Kennelly |
| Plaintiffs, | ) | |
| vs. | ) | |
| HEARTWOOD 88, LLC, et al. | ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS FOR JUDGMENT AS A MATTER OF LAW**

The Defendants face a high bar in their requests for judgment as a matter of law under Federal Rule of Civil Procedure 50. Courts grant Rule 50 motions "sparingly" and with caution, as granting judgment as a matter of law "deprives the party opposing the motion of a determination of the facts by a jury." 9A C. Wright & A. Miller, Federal Practice and Procedure § 2524, at 252 (1995). Given these concerns, the Seventh Circuit has held that "[j]udgment as a matter of law is proper only where there is no legally sufficient basis for a reasonable jury to find for the nonmoving party." *Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004). As a result, Rule 50 motions can be granted "only when there can be but one conclusion from the evidence." *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 636 (7th Cir. 1996).

The Supreme Court has stated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). Thus, when considering a motion for judgment as a matter of law, courts "view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in that party's favor." *Zimmerman*, 360 F.3d at 623 (citing *Reeves*, 530 U.S. at 150-51). A court considering a Rule 50 motion is to "weigh the evidence or pass on the credibility of witnesses, nor may [the court] substitute [its] view of the contested evidence for the jury." *Id*. This stringent standard requires that Defendants' motions be denied.

I. **THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATES THAT DEFENDANTS MISREPRESENTED THEIR COMPLIANCE WITH THE RULES AND REGULATIONS GOVERNING THE ANNUAL TAX SALES TO PUT RELATED BIDDERS IN THE SALES.**

Defendants' motions all assert, in some form, that they did not have related bidders bidding at the Cook County Annual Tax Sales, and use that erroneous assertion to argue that they are not liable for Plaintiffs' claims. As an initial matter, Defendants' arguments fail because they mischaracterize the basis of Plaintiffs' RICO claims. In their motions, Defendants claim that Plaintiffs failed to prove a violation of the Cook County Treasurer's Office's Single, Simultaneous Related Bidding Entity Rule (the "Single Bidder Rule"). Plaintiffs' RICO claims, however, are based on Defendants' participation in mail fraud schemes, not violations of the Single Bidder Rule. "The mail fraud statute … defines a fraudulent *scheme*, rather than a particular false statement, as the crime." *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007), *aff'd*, 553 U.S. 639 (2008).

By focusing on violations of the Single Bidder Rule, rather than on mail fraud, Defendants ignore critical evidence showing that they committed mail fraud, and thus

establishing the predicate acts that are the basis for their RICO liability. That evidence demonstrates that each member of each of the three enterprises participated in the schemes at issue here by misrepresenting their compliance with representations and warranties well beyond just the Single Bidder Rule.

### A. Defendants' Arguments Fail Because They Rely On An Unreasonable And Impermissibly Narrow Interpretation Of The Single Bidder Rule.

Defendants' motions all seek judgment as a matter of law by arguing that there is no evidence of "relatedness" that violates the Single Bidder Rule. Defendants effectively argue that the schemes to defraud Plaintiffs proved at trial do not violate the Single Bidder Rule because their bidding entity did not have another bidder participating in the Annual Tax Sales. These arguments fail because Defendants' interpretation of the rules and regulations—which the jury can, and should, reject as contrary to the evidence presented at trial—is not the only possible interpretation of those rules and regulations, including the Single Bidder Rule. This failure is particularly problematic for Defendants under the standards governing Rule 50 motions, since it means that it is possible for the jury, acting reasonably, to conclude that Defendants' arguments fail. This, in turn, means that Defendants' motions must now fail.

To succeed, Defendants' arguments require that the jury accept their interpretation of the Single Bidder Rule and find that it bars a "bidder" at the Annual Tax Sales from having another related entity bidding at the same sale. This is not, though, the only reasonable interpretation of the Single Bidder Rule—and, in truth, it is not itself a reasonable interpretation at all. To the contrary, it is contradicted by the language of the rule itself, which recognizes that a "tax buying entity (principal)" is not limited to a "bidder." The jury is entitled to read the Single Bidder Rule and conclude that the "tax buying entity (principal)" need not be a bidder at the sale, and,

instead, extends to the central figure or figures or entity or entities running a broader tax buying enterprise.

This reading of the Single Bidder Rule not only is possible, the evidence presented at trial demonstrates it is the best reading. For instance, Martha Mills, a former Chief Legal Officer at the Treasurer's Office and now a judge in the Circuit Court of Cook County, testified that the Treasurer's Office drafted the language of the Single Bidder Rule broadly. Judge Mills explained this was because the Treasurer's Office could not address each of the "probably six million schemes" by which a tax buyer might try to gain an advantage by putting multiple bidders in the room. (Trial Tr. 2783:4-18.) Judge Mills further testified that the Treasurer's Office made significant efforts to identify and prevent related entities from participating in the sale. (Trial Tr. 2741:1-10; 2748:9-2750:11; 2775:19-2777:18; 2783:4-18; 2787:10-2788:10.) From this, and other evidence presented at trial, the jury could—and indeed should—conclude that the Treasurer's Office did not intend the narrow interpretation of the Single Bidder Rule urged by Defendants.[1] Because the jury could, and indeed should, reject that interpretation of the Single Bidder Rule, Defendants' arguments must fail.

### B. Defendants' Arguments Also Fail Because The Evidence Presented At Trial Shows Defendants Misrepresented Their Compliance With Other Applicable Rules And Regulations.

Defendants' arguments also fail because they fail to acknowledge numerous other applicable rules and regulations about which Defendants misrepresented their compliance. While the misrepresentations contained in the bidding defendants' Acknowledgement of the Single Bidder Rule are *part of* the scheme to defraud underlying the RICO violation, the

---

[1] The interpretation Defendants seek also defies common sense. This interpretation would allow a husband to create an entity in his name and an entity in his wife's name, run both entities, and receive the proceeds of each entity without violating the Single Bidder Rule. While Defendants can argue this should be how the Single Bidder Rule is read, the jury need not accept such a ridiculous proposition.

evidence presented at trial showed that Defendants' schemes included other misrepresentations. The registration materials for the tax sale expressly included sworn representations and warranties that a prospective bidder did not have finances in common, a common source of funding, or an agreement to sell certificates it won to any other bidder. (*See, e.g*., PX 1 at CCT 00104, 134.) As Judge Mills made clear, the Treasurer's Office was actively looking through those representations and warranties, as well as the rest of the registration materials, for any indication that bidders were working in concert. (Trial Tr. 2748:9-2749:5; 2757:12-2758:14.)

The evidence at trial showed that, in addition to the false acknowledgement that they would comply with the Single Bidder Rule, the members of each enterprise omitted information from their registration packets that showed they were working in concert with other members of their enterprises. For the Sass Defendants, the evidence showed that they reached pre-sale agreements to sell liens they obtained to Sabre and John Bridge, in violation of the representations and warranties they made as part of their registration packages. (Trial Tr. 2099:23-2102:2.) While the Sass Defendants refused to execute a finalized and signed contract, that refusal does not mean there was no such agreement. (*Id*.) Indeed, the evidence at trial demonstrates overwhelmingly that there was just such an agreement.

The evidence demonstrates that after the penalty rates dropped at the Annual Tax Sale in 2000, the Sass Defendants sat out sale that took place in 2001. They decided to come back in for the sale in 2002 only after John Bridge, who they knew was affiliated with The Sabre Group, one of the largest tax buyers in Cook County, approached them offering a variety of services to make participation in the Annual Tax Sales easier. Those services included Bridge providing the same bid sheets he used at the sales for the Sabre Group to the Sass Defendants prior to the sale, identifying for the Sass Defendants the liens to bid on and, perhaps even more importantly, those liens they should not bid on. (Trial Tr. 1885:24-1887:19.) The evidence also shows that Bridge

provided the Sass Defendants their exit strategy for Cook County, buying any liens that had not redeemed by the end of the redemption period. (PX 600.) And because they agreed to that exit strategy in advance of the sales—a fact confirmed by the fact that Sass could not increase its yields in Cook County by taking properties to deed as it did elsewhere—the evidence shows that the Sass Defendants knowingly and intentionally misrepresented their compliance with the required representations and warranties.[2]

For the Grays Enterprise Defendants, meanwhile, the uncontested evidence shows that they have common funding for each year 2003 through 2007, also in contravention of the representations and warranties they made as part of their registration materials. During the years that BG and Atlantic Municipal bid, respectively, each had an outstanding balance drawn against the Midwest Real Estate Investments Company joint line of credit. (PX 417-421, n.7.) That line was obtained with David Gray's guarantee. (*Id*.) At the same time, Wheeler-Dealer had a line it obtained as a result of another guarantee provided by David Gray, one that was also backed by the pledge of 100% of the MREIC stock as collateral. (PX 439-443, n.5.) Additionally, when Wheeler-Dealer bid in 2003 through 2005, it had an outstanding loan balance with Atlantic Municipal which Atlantic Municipal funded by drawing on the MREIC joint line at the same time that BG was bidding at the sales using funds from that same loan. (PX 417-419 at 38-39.)

Finally, the Salta Enterprise Defendants not only admitted that they had common funding, the evidence also shows that they concealed that Josh Atlas and Arlene Atlas were shareholders of HBZ and that HBZ operated out of the Salta Group's offices. (PX 446, 448, 449, 450, 451, 452.) Even ignoring Judith Berger's and Lori Levinson's prior assertions of their Fifth

---

[2] Hoping to avoid this, the Sass Defendants focus on the absence of a written agreement. This, however, misses the mark, as the absence of a written agreement does not prove there was no agreement—dooming the Sass Defendants' motion since the jury could, and indeed should, find that there was just such an agreement.

Amendment right against self-incrimination regarding that concealment, the jury can reasonably conclude that the Salta Enterprise Defendants intentionally hid the Atlas surname in HBZ's registrations each year from 2003 through 2007 to conceal their relationship.

Because each of the three enterprises made false statements regarding their compliance with the rules and regulations governing the Annual Tax Sales generally, and not just as to their compliance with the Single Bidder Rule, the jury could easily find that each member of each enterprise participated in a scheme to defraud that injured Plaintiffs. As a result, Defendants' motions must be denied.

> **C.  Even If Theirs Was The Only Interpretation Of The Single Bidder Rule A Reasonable Jury Could Adopt, Defendants' Arguments Still Fail Because The Evidence Established That Each Enterprise Benefited A Principal.**

Defendants' arguments also fail because the evidence presented at trial contradicts them. Indeed, the evidence presented at trial shows that each enterprise had a central figure/entity running its tax buying operations, *i.e.*, the principal. Evidence shows the significant amount of work necessary to prepare for the tax sale and how it was critical to identify the liens not to buy. (Trial Tr. 765:22-767:5; 820:14-821:8; 895:25-896:5; 1383:21-1384:5; 2009:9-21.) It was a critical and costly component of the tax buying operations. Each enterprise did that work once by centralizing that process and having one entity perform the bulk of the research: Sabre, CMS, and John Bridge performed the research for the Sabre Enterprise; Salta and Marshall Atlas, with help from Joshua Atlas, performed the work for the Salta Enterprise; and MREIC and David Gray, with help from Tim Gray, performed the work for the Grays Enterprise.

Once that sunk cost was incurred, each enterprise leveraged the cost by providing the research to multiple bidders. Thus, the Sabre research was distributed to Sabre and each of the "CMS customers," the Salta research was given to Salta and HBZ, and the MREIC research was given to Wheeler-Dealer and, depending on the year, either BG or Atlantic Municipal. (Trial Tr.

765:22-766:10; 771:24-772:2; 821:16-823:3; 824:12-17; 839:20-840:7; 892:7-12; 1324:9-18; 1887:14-19.)  The evidence shows that providing such research to a true competitor made no sense, as the tax sale was a zero sum game.  At the Annual Tax Sales, regardless of how liens were awarded, any additional bidder in the room would reduce the number of 0% liens the other participants would obtain.  Thus, when a tax buying enterprise provides its research to multiple bidders and it directly controls and benefits from one of those bidders, providing the research alone is a sufficient basis for the jury to conclude that the multiple bidders using the research were operating for the tax buying enterprise and, thus, were violating the Rule.

That conclusion is also supported by additional evidence presented at trial.  Bidders with common funds violated the rules and regulations, including the Single Bidder Rule, governing the Annual Tax Sales.  At trial, the evidence showed that, in the Salta Enterprise, Marshall Atlas and Salta funded HBZ and, in the Grays Enterprise, David Gray, either through direct loans or guarantees of lines of credit, funded both Wheeler-Dealer, BG, and Atlantic Municipal.  (Trial Tr. 1325:13-1326:17; 889:12-23; 2788:4-10; PX 417-421, pp. 38-39 and n.7; PX 439-443, n.5.[3])  Where a tax buyer provides funding to a purported competitor to whom it provided its research, a reasonable jury could conclude that the entities are working together, rather than as competitors, thereby violating the rules and regulations governing the sales.

---

[3] In addition, the failure of the Grays Enterprise Defendants' claims regarding the "management fee" paid for services paid for or provided by MREIC further shows that they are all related entities.  While the Grays witnesses, including Mr. Palasz, testified that the management fee allocated the MREIC operational expenses among the Grays entities, the financial statements refute that assertion, since the spreadsheet used for that allocation does not accurately reflect the various entities use of those services.  (Trial Tr. 819:13-19;1773:4-1775:14; 1801:20-1802:9.)  For instance, in 2005, Wheeler-Dealer and BG had the most significant usage of MREIC time according to Palasz's spreadsheet, yet BG was allocated none of the costs and Wheeler-Dealer was allocated 1/3 of the costs charged to Hawkeye.  (PX 426, Palasz 000196-197; PX 419, n. 12.)  Similarly, in 2007, Atlantic Municipal and Wheeler-Dealer had the most significant usage of MREIC time, but BG is charged over two and a half times Wheeler-Dealer's allocation and eight times what Atlantic Municipal is charged.  (PX 426, Palasz 000200; PX 421, n. 12.)

Similarly, evidence showing that the same people/entity are benefiting from the liens won by two bidders supports the conclusion that they were multiple bidders. Josh Atlas, Arlene Atlas, Judy Berger and Lori Levinson benefit from both the HBZ liens and the Salta liens, as a result of Marshall transferring the Salta's liens to The Atlas Family Holdings, LLC, an entity of which all four HBZ shareholders are members. (Trial Tr. 1396:6-1397:11.) In the Sabre Enterprise, on the other hand, Sabre benefited from the liens the Sass entities transferred to it, as well as from the liens it bought at the sale and from all the other bidders who used its research. (Trial Tr. 1969:14-1971:6; 1990:11-24.) The Grays have both the direct benefit, where Wheeler-Dealer transferred liens to the MREIC Profit Sharing Plan, from which David Gray later withdrew over $6 million, as well as a more discrete benefit since the liens won by Wheeler-Dealer and BG/Atlantic Municipal still go to the same group of people who were related prior to the enactment of the rules and regulations designed to prevent multiple bidding. (Trial Tr. 844:9-24; 847:17-850:4.)

## II. PLAINTIFFS PRESENTED EVIDENCE SUFFICIENT TO ESTABLISH A REASONABLE BASIS FOR THEIR DAMAGES, INCLUDING SETTLED PARTIES' INELIGIBILITY TO PARTICIPATE IN THE ANNUAL TAX SALES.

In their motions, each of the Defendant Enterprises attempts to argue that Plaintiffs cannot establish that they were damaged. (Dkt. 860 at ¶¶ 3-6.) In purported support, Defendants argue that Plaintiffs' damages expert, Scott Shaffer, based his calculations on unsupported assumptions that certain entities were ineligible to participate in some or all of the Tax Sales at issue. Defendants' arguments fail, both legally and factually.

### A. Plaintiffs Need Only Provide A Reasonable Basis For Their Damages, And The Determination Of Whether They Have Done So Is A Question That Can Only Be Resolved By The Jury.

In the context of Rule 50 motions, these standards set a particularly high hurdle that Defendants cannot clear. *See, e.g.*, *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 219 F.

Supp. 2d 600, 606 (D.N.J. 2002) (denying Rule 50 motion because fact that plaintiff did not have invoices that might have gone into determining its damages "only mean[t] that the jury [would] have to decide what weight, if any, should be accorded to these summaries in light of the fact that the underlying documentation upon which they are based no longer exists"). This means all Plaintiffs have to do to show that they were damaged is prove that, but for Defendants' misconduct, they would have gotten *one more* lien than they did. There is more than ample evidence in the record for this, including the unrebutted expert testimony of Dr. Thomas Dunn (Trial Tr. starting at 1019:10), meaning Defendants' motions fail as a matter of law.

Because there is evidence establishing that Plaintiffs were damaged, Defendants' motions really address the reasonableness of the damages that they now claim. The reasonableness of Plaintiffs' damages, including the expert opinions offered by Scott Shaffer, however, is an issue that only the jury can decide. And in reaching that decision, the jury considers the evidence employing a standard under which "the plaintiff has a more relaxed burden of proof … especially if **as in this case** the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages." *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-66 (1931); *Haslund v. Simon Prop. Group, Inc.*, 378 F.3d 653, 657-59 (7th Cir. 2004); *BE & K Constr. Co. v. Will & Grundy Counties Building Trades Council*, 156 F.3d 756, 769-70 (7th Cir. 1998); *Computer Sys. Engingeering, Inc. .v Qantel Corp.*, 740 F.2d 59, 67 (1st Cir. 1984). As a result, "broad latitude is allowed in quantifying damages." *Haslund*, 378 F.3d at 658; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 465-67 (2006); *BCS Services*, 637 F.2d at 759. This means that "'[s]peculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.'" *Mid-

*America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996) (quoting *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir. 1986). Otherwise, as the Supreme Court wrote long ago, "the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow*, 327 U.S. at 265.

As one court in this district explained in assessing arguments about the reasonableness of assumptions made by a damages expert, because there are often fact disputes "[e]xperts routinely base their opinions on assumptions that are necessarily at odds with their adversary's view of the evidence." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). And while there does need to be some—but only some—factual support for those assumptions, "[i]f there is, it is for the jury, properly instructed, to determine the credibility of the witnesses and thus the *weight* to be given to the expert opinion." *Id.* (emphasis added). Here, as discussed in the next section, there is indeed some evidence supporting these assumptions.

Applying these standards here shows that Defendants' arguments based on the supposed failure of Plaintiffs to support Mr. Shaffer's assumptions fail. As one court in this district has addressed similar arguments in denying a motion for summary judgment (and therefore applying the same standards this Court must apply in resolving Defendants' Rule 50 motions):

> Defendants assert that Plaintiffs' causation expert and statistician rely on faulty analytical methods or mere guesswork. But the arguable inaccuracy of Plaintiffs' damages calculations is not grounds for granting summary judgment. The credibility and persuasiveness of Plaintiffs' expert witnesses are issues best left to a factfinder.

*In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 866 (N.D. Ill. 2010). Ultimately, Defendants' arguments boil down to a question as to the reasonableness of assumptions that Plaintiffs' damages expert made. This means, though, those arguments are about the credibility and persuasiveness of Mr. Shaffer, and therefore must be resolved by the jury as the factfinder and are not the proper basis for a Rule 50 motion.

B.  **There Is More Than Sufficient Evidence To Allow The Jury To Conclude It Was Reasonable For Plaintiffs' Damages Model To Assume That The Settled Parties Were Ineligible To Participate In The Sales.**

Even though Defendants' arguments regarding damages fail legally, if they did not, Defendants still would not be entitled to judgment as a matter of law, as there is more than enough evidence for the jury to determine that the bidders that Mr. Shaffer assumed to be ineligible were indeed ineligible. The evidence in the record demonstrates that both the other members of the Sabre Enterprise and the members of the so-called Peters Group were ineligible to participate in the Annual Tax Sales.[4]

1.  **There is evidence showing it reasonable to assume that the other members of the Sabre Enterprise were all ineligible for the Tax Sales at which they bid and obtained liens.**

As Plaintiffs proved at trial, the Sabre Enterprise existed to get multiple bidders in the Annual Tax Sales so that settled defendant John Bridge or entities that he owned or controlled could obtain more than their share of the liens being sold. Despite this, Defendants now argue that there is not sufficient evidence as to 22 entities that were members of the Sabre Enterprise (and also were defendants) to allow the jury to find it reasonable for Mr. Shaffer's damages model to assume they were ineligible. Defendants are simply, and clearly, wrong.

The evidence presented at trial demonstrated that John Bridge used the Sabre Enterprise to obtain as many liens from the Annual Tax Sales for his company, the Sabre Group ("Sabre"), as he could. Indeed, that evidence showed that the Sabre Enterprise existed so that its members could purchase liens at the tax sales and then funnel those liens to Sabre and other entities owned

---

[4] Some of the Defendants appear to also argue that there is not sufficient evidence to support Mr. Shaffer's assumption that each of the Defendants still at trial was ineligible. Plaintiffs did not understand the Court to request briefing on that issue, and so have not addressed it in this Consolidated Response beyond the explanations provided in Section I above.

by John Bridge, all in violation of the rules and regulations governing those sales. (Trial Tr. 1863:25-1864:7; 1911:13-16.)

Perhaps the best and clearest evidence of the Sabre Enterprise comes from an email exchange between two of its members. (PX 168 and 169.) In that exchange, which occurred before the Annual Tax Sale held in 2004, Bridge wrote to settled defendant Michael DeLuca about the results from the Annual Tax Sale held in 2003. Bridge presented those results in an Excel spreadsheet that put certain tax buyers from the 2003 sale into groups. The first group included the members of Sabre Enterprise that participated in the 2003 Tax Sale—DeLuca's company, Heartwood 88 LLC, Sabre itself, Defendant Sass Municipal Finance Partners IV, Regal One, Cronus, CCJ, DRN II, Prespa, and Gothic—and showed that, together, they got over 30% of the liens sold that year. (PX 168 at HWED 00108833.) DeLuca responded by writing:

> John,
>
> YOU DID IT !!!!!!!!!!!!!!
>
> Amazing. Thank you.
>
> Michael DeLuca, Vice President
> BankAtlantic/Heartwood 88 LLC
> Florida's Most Convenient Bank

(PX 169.) On its own, this exchange and John Bridge's testimony about it, provides a reasonable basis for concluding that each of the entities grouped as members of the Sabre Enterprise—6 of the 22 for which Defendants claim there is no evidence on ineligibility[5]—in the spreadsheet were ineligible for the Tax Sales in which they participated. (PX 168-169; Trial Tr. 1950:24-1951:25; Tr. 1968:13-20.)

---

[5] The spreadsheet in PX 168 includes both Prespa and Gothic in the grouping of entities related to the Sabre Enterprise. Defendants' Motions appear not to be arguing that there was insufficient evidence as to those two entities, though both are listed as ineligible bidders in Shaffer's analysis.

This exchange, however, is not the only evidence, either as to these entities or to the remaining 14 entities. The evidence presented at trial showed that Bridge also created a new entity, CMS, as part of his scheme. That entity was ultimately owned by the wives of two owners of Sabre, neither of whom knew anything about the company or its business. (Trial Tr. 1884:7-14; Joint Ex. 4.) The evidence further shows that CMS had no employees, and instead did all of its work through yet another Sabre-related entity, SI Securities Management LLC. (Trial Tr. 1886:12-19.) CMS then provided bid books to its "customers," each of which was a member of the Sabre Enterprise. The CMS bid books contained an identical 5-point risk evaluation ranking system to identify liens on which entities within the Sabre Enterprise were approved to bid. (Trial Tr. 1888:9-19; 1889:24-1891:19; 1897:14-21.) CMS provided bid books to the following Defendant entities for the following Cook County tax sales:

- Aztek Partners LLC (2005) and Chonus, Inc. (2007), each of which was owned by Greg Bingham, a business associate of Bridge. (Trial Tr. 1891:17-19; 1900:18-1901:9; PX 220, 221, 224.)

- Bamp LLC (2004) and Richarony LLC (2004), each of which was effectively controlled by BankAtlantic and Heartwood 88 LLC and which BankAtlantic referred to as its "bidders in Illinois." (PX 182, 184.)

- BRB Investments, LLC (2005-2007) and CCJ Investments, LLC (2003-2004), each of which was owned by Jesse Rochman, Christopher Rochman, and Corinne Rochman, the barely adult children of Barrett and Marilyn Rochman, owners of Sabre and CMS, respectively. (PX 168 at HWED 00108833; PX 67, 68, 71, 74, 146 at ¶ 1, 147 at ¶ 1.)

- Carpus Investments, LLC (2003) and Optimum Financial, Inc. (2004), each of which was owned by Jason Baumbach, John Bridge's nephew who obtained funding to participate in the sales using Bridge. (Trial Tr. 1902:12-17; PX 168 at HWED 00108833, PX 43, 47, 48.)

- Cronus Projects, LLC (2003-2007) and Varan Realtors, Inc. dba Goin Realty ("Goin") (2007), each of which was owned, at least in part, by Joseph Varan. (PX 168 at HWED 00108833, PX 251, 252, 255, 258, 262, 265, 269, 272 at ¶ 1.)

- DRN II, Inc. and DRN 2, LLC (2002-2003), Jeshay, LLC (2004), and Mudcats Real Estate, LLC (2005-2006), each of which was owned and/or controlled by Doug Nash. (PX 168 at HWED 00108833, PX 213, 215, 217.)

- G3 Holdings, LLC (2004). (PX 273, 277.)

- Georgetown Investors, LLC (2004-2006), owned by John Bridge's neighbor, Frances Alexander. (Trial Tr. at 1907:19-1908:2; PX 5, 9, 10, 13.)

- GJ Ventures, LLC (2005-2007) and L.C.C. Ventures, LLC (2004), each of which was owned, at least in part, by Greg Ellis. (PX 234, 237, 238, 242, 246, 250 at ¶¶ 2, 5.)

- Heartwood 88, LLC (2003-2007), the BankAtlantic subsidiary that, among other things, concocted the scheme to use Bamp and Richarony. (Trial Tr. at 1937:25-1938:4; 1940:12-21; PX 148, 149, 180.)

- Regal One, LLC (2002-2005), owned by Jeff Bridge, John Bridge's brother. (Trial Tr. 1901:25-1902:1; PX 26, 29.)

- Sabre Group, LLC (2002-2004). (Trial Tr. 1891:14-19; *see also, e.g.*, PX 297, 299.)

- Tax Capital, LLC (2005-2006) and Tax Play, Inc. (2004), each of which was owned by Pat Quinn. (Trial Tr. 1920:18-1921:11; PX 282, 283, 288.)

Additionally, for many of these entities, the Sabre Enterprise also arranged for the funding used to acquire the liens at the Annual Tax Sales. Perhaps the most egregious of these examples is illustrated in Plaintiffs' Exhibits 52 and 54, which show that John Bridge provided a $500,000 CD as collateral to enable Optimum, a company created by Bridge's nephew Jason Baumbach, to secure a loan and participate in the 2004 tax sale. (PX52; Trial Tr. 1902:20-23.) In relevant part, PX 52 states:

> Principal and interest will be paid at the end of six months. It will be paid by John Bridge, who is Jason's boss. Would have $500,000 CD to reduce debt and tax certificates if needed. Jason will be buying the certificates with the help of his boss, John Bridge, who has been in the business buying Cook County taxes for ten years. Per Doug Johnson, John is the expert. John Bridge is pledging the $500,000 CD on this loan. He will also be buying these tax certificates from Jason in approximately 120 days. John needs Jason to purchase these certificates in his name, and then John will buy them from him. Not sure the reason Jason needs to be the purchaser. John cannot be on the loan.

- 15 -

(PX 52.) Further evidence of the relatedness of John Bridge, Jason Baumbach, and Optimum (and by extension, Carpus) is provided in Plaintiffs' Exhibit 54, an April 21, 2004 commercial security agreement entered into between Optimum Financial and Citizens First National Bank for the $1 million note provided to Optimum and Carpus. John Bridge signed the agreement as a promise that he was placing his $500,000 CD as collateral for Baumbach's loan to enable Optimum to participate in the Cook County tax sale. (Trial Tr. 1905:23-1906:20; PX 54.)

Further, all of the CMS "customers" that comprise the Sabre Enterprise sold the liens acquired at the annual tax sales to Sabre or other Bridge-related entities within two years, and often did so either during or just after the sales at which they bought those liens. (Trial Tr. 1910:13-1911:16; PX 223, 226-227 (re: Aztek Partners and Chonus); PX 183, 186 (re: Bamp and Richarony); PX 69, 146 at ¶ 5; PX 147 at ¶ 5 (re: BRB Investments and CCJ Investments); PX 45, 50 (re: Carpus Investments and Optimum Financial); 1915:12-1917:1 and PX 254, 257, 260-261, 264, 267, 268 at ¶ 6, 270-271, 272 at ¶ 4 & Ex. 1 (re: Cronus Projects and Goin); PX 211 at ¶¶ 11, 14, 212, 214-219 (re: DRN II, DRN 2, Jeshay, and Mudcats); (PX 275 (re: G3 Holdings); 1923:6-1924:24 and PX 7- 8, 12, 16 (re: Georgetown Investors); PX 236, 240-241, 244-245, 248-249, 250 at ¶ 8 (re: GJ Ventures and L.C.C. Ventures); 1933:23-1934:15; 1936:15-1937:18 and PX 165-167 (re: Heartwood 88); 1927:7-19 and PX 25, 28, 31(re: Regal One); 1910:13-1911:16 (re: Sabre); and PX 286-287, 290 (re: Tax Capital and Tax Play).) These sales, and the timing of them, provide a more than sufficient basis for the jury to believe they were done pursuant to pre-sale agreements. This, in turn, would provide a more than sufficient basis for the jury to conclude that it was reasonable for Mr. Shaffer to assume that these entities were all ineligible. And, taken together, all of this evidence is more than sufficient to provide the reasonable basis the jury needs to award the damages that Plaintiffs seek.

### 2. The Peters Group entities were also ineligible for the Tax Sales at which they bid and obtained liens.

Defendants' motions also claim that Plaintiffs cannot show that there is a reasonable basis for Mr. Shaffer to assume that the Peters Group entities were ineligible to bid at the Tax Sales. Once again, Defendants are wrong. Like the Atlas and Gray families, the Peters Group is comprised of members of a family that have participated in Tax Sales for years. The Peters Group used different entities to put multiple bidders in the Tax Sales at issue in this trial. Specifically, the Peters Group includes four entities registered for Tax Sales: Interstate Funding Corporation and Central Buyer Corporation, which registered for both the 2003 and 2004 sales, and Diamond Quest Realty and Union Tax Investors, which registered for the 2004 sale. (PX 619, 621, 623, 625, 627, 629.) Once again, John Bridge's email exchange with Michael DeLuca evidences the relationship of these entities, as he lists Interstate Funding and Central Buyer as related entities on his spreadsheet. (PX 168.) Combined, these facts provide more than a basis to support the reasonableness of Mr. Shaffer's damages calculations, including his assumption that the members of the Peters Group were also ineligible to bid at the Tax Sales.

## III. THE EVIDENCE SHOWS THAT MIDWEST REAL ESTATE INVESTMENT COMPANY PARTICIPATED IN THE GRAYS ENTERPRISE.

The evidence shows that Midwest Real Estate Investment Company ("MREIC") actively participated in the Grays Enterprise through its control of both BG's and Atlantic Municipal's participation in the tax sales. Despite this, the BG Defendants argue that MREIC, the entity at the center of the Grays Enterprise, cannot be held liable because there is no evidence that it directly engaged in multiple bidding. As noted above, this argument ignores that the predicate act underlying Plaintiffs' RICO claim is mail fraud, not a violation of the Single Bidder Rule. In addition, however, the BG Defendants' argument regarding MREIC ignores the facts that show that it directly participated in the Grays Enterprise. MREIC did so in multiple ways: It

identified the liens on which both its bidding entities, BG and Atlantic Municipal, and the supposedly independent Wheeler-Dealer bid. It actually did the bidding at the Annual Tax Sales for BG and Atlantic Municipal. And it prepared and delivered countless mailings, including the so-called "22-5 Notices" or "Take Notices." (Trial Tr. 779:7-17; 804:14-805:17; 815:7-817:1; 832:2-833:5; 833:18-22; 984:14-18) Indeed, the evidence shows that BG and Atlantic Municipal—the bidding entities—were run entirely by MREIC's employees. (Trial Tr. 827:4-7; 830:19-831:7; 1004:15-1005:4.) Taken together, this evidence demonstrates that MREIC was itself an active participant in the Grays Enterprise, thereby establishing its liability.

## IV. THE EVIDENCE ALSO SHOWS THAT MD SASS INVESTORS SERVICES IS LIABLE FOR ITS ROLE IN THE SABRE ENTERPRISE'S MAIL FRAUD SCHEME.

Similarly, the evidence shows that the entity at the top of the MD Sass organization, MD Sass Investors Services, participated in the Sass Defendants' misconduct, meaning it too is liable, and liable because of its own actions. The Sass Defendants apparently believe that Plaintiffs seek to hold MD Sass Investors Services liable only as a parent corporation. (Dkt. 858 at 14.) Not so. The documentary evidence shows that MD Sass Investors Services was involved. For example, Plaintiffs' Exhibit 201, the registration package for the Sass Defendants' participant at the 2002 Annual Tax Sale, includes at least one letter sent on MD Sass Investors Services letterhead. (PX 201 at CCT 000997.) But even more significantly, both of the individual Sass Defendants, Vinaya Jessani and Kirk Allison, testified that they were employed by MD Sass Investors Services, went through their work history with MD Sass Investors Services, and never once made any attempt to differentiate the work that they did for MD Sass Investors Services from any work they might have done for any other MD Sass entity. (*See, e.g.*, Trial Tr. at 2151-52, 2158-62, 2564-66.) Further, as Kirk Allison made clear during his testimony, he is, and was during the relevant period, employed by both MD Sass Investors Services and MD Sass Tax Lien

Management, and "through [his] capacity at those companies, do[es] work for multiple MD Sass funds," including those that are defendants here. (Trial Tr. at 2566:6-8.) While it is true that Vinaya Jessani testified at his deposition that MD Sass Investors Services and MD Sass Tax Lien Management were "one and the same"—and was impeached with that testimony at trial (Trial Tr. at 2162-2165)—that testimony is not, as the Sass Defendants' argument suggests, the sole basis for liability against MD Sass Investors Services; to the contrary, Plaintiffs' claims against MD Sass Investors Services, Inc. are based on the actions that it, through employees acting on its behalf, took itself. Because there is sufficient evidence for the jury to decide that MD Sass Investors Services, through its employees, not simply its subsidiaries, participated in the Sabre Enterprise, the Court should now rule that there is sufficient evidence for the jury to consider its liability.

## CONCLUSION

Defendants' Rule 50 motions should be denied in their entirety, as there is more than sufficient evidence to allow the jury to find each Defendant liable for Plaintiffs' claims.

Dated: October 31, 2011               Respectfully submitted,

                                      PLAINTIFFS PHOENIX BOND & INDEMNITY
                                      CO. and BCS SERVICES, INC.

                                      By:   /s/ Max A. Stein
                                             One of Their Attorneys

                                      Lowell E. Sachnoff (ARDC No. 2438062)
                                      Jonathan S. Quinn (ARDC No. 6200495)
                                      Max A. Stein (ARDC No. 6275993)
                                      John W. Moynihan (ARDC No. 6212061)
                                      Thomas M. Levinson (ARDC No. 6286713)
                                      REED SMITH LLP
                                      10 South Wacker Drive
                                      Chicago, IL 60606
                                      (312) 207-1000

# CERTIFICATE OF SERVICE

      I, Max A. Stein, hereby state that on October 31, 2011, I electronically filed the foregoing PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW with the Clerk of the Court using the ECF system, which will send notification to all parties.

    By:   */s/* Max A. Stein
Max A. Stein (ARDC No. 6275993)
REED SMITH LLP
10 South Wacker Drive
Chicago, Illinois 60606
(312) 207-1000

US_ACTIVE-107644436.3