## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PHOENIX BOND & INDEMNITY, CO., et al., )<br>)<br>Plaintiffs, )<br>)<br>)<br>v. )<br>)<br>JOHN BRIDGE, et al., )<br>)<br>Defendants. ) | No. 05 C 4095<br>(Consolidated for Pretrial Purposes<br>with No. 07 C 1367)<br><br>Judge Matthew F. Kennelly |

## MEMORANDUM OF LAW IN SUPPORT OF
## BG DEFENDANTS' RENEWED MOTION FOR JUDGMENT
## AS A MATTER OF LAW OR, ALTERNATIVELY, FOR NEW TRIAL*

\* The "BG Defendants" are defendants BG Investments, Inc. ("BG Investments"), Bonnie Gray ("Bonnie"), Atlantic Municipal Corporation ("Atlantic Municipal"), Midwest Real Estate Investment Company ("MREIC"); Bonnie Gray as executor of the Estate of David Gray and as Trustee of the David Gray Revocable Trust; and Midwest Real Estate Investment Company Employee Profit-Sharing Plan and Trust ("PS Plan").

Plaintiffs' Complaint also names as defendants Wheeler-Dealer Ltd. ("Wheeler-Dealer") and Timothy Gray ("Timothy" or "Tim") (collectively "Wheeler Defendants"), who are separately represented and as to whom a mistrial has been declared.

The BG Defendants and the Wheeler Defendants are sometimes referred to herein collectively as the "Gray Defendants".

## INTRODUCTION

The BG Defendants move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for a new trial under Federal Rule of Civil Procedure 59.

Plaintiffs failed to prove that the BG Defendants acted with the intent to defraud. The BG Defendants presented evidence that they reasonably interpreted the Cook County Treasurer's rules and regulations governing the annual tax sales and acted consistently with that interpretation. Plaintiffs never negated the reasonableness of this interpretation, nor did they present evidence negating the truth of either David Gray's or Tim Gray's attestations under their reasonable interpretation of the rules and regulations.

In addition, there is insufficient evidence to support the jury verdict for damages against the BG Defendants. Plaintiffs made a deliberate and strategic decision to lump together in a single damages calculation every defendant across multiple, unrelated "conspiracies." That model is legally impermissible because it seeks to hold the BG Defendants liable for the conduct of unrelated parties. Moreover, in selecting that model plaintiffs assumed an increased burden, and failed to meet that burden. Plaintiffs did not present any evidence of the alleged ineligibility of the Peters Group, nor did they present sufficient evidence on which the jury could conclude that various settling defendants in the present litigation were ineligible to bid.

We discuss these and other reasons for the relief we seek below.

## STANDARD OF REVIEW

A defendant is entitled to judgment as a matter of law if the plaintiff did not introduce enough evidence to support his claim. Massey v. Blue Cross-Blue Shield of Illinois, 226 F.3d 922, 924 (7th Cir. 2000). The question is whether the plaintiff presented the jury with a "legally sufficient amount of evidence from which it could reasonably derive its evidence." Id. A "mere scintilla" of evidence is not enough. Id.

The standard for granting a new trial is different. A new trial may be granted if the verdict is against the clear weight of the evidence or the court determines that the trial was unfair to the moving party. David v. Caterpillar, Inc., 324 F.3d 851, 863 (7th Cir. 2003) (citing Miksis v. Howard, 106 F.3d 754, 757 (7th Cir.1997)). A trial judge considering a Rule 59 motion has broad discretion to order a new trial. See, e.g., Fort Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373, 1377 (7th Cir. 1990).

## PLAINTIFFS FAILED TO PROVE THAT THE BG DEFENDANTS ACTED WITH THE INTENT TO DEFRAUD

This case ultimately boiled down to competing constructions of the Treasurer's rules and regulations relating to participation in the annual tax sales.

The BG Defendants have consistently asserted that the rules bar a registrant bidding at the tax sale from using multiple bidders for the purpose of increasing the registrant's likelihood of obtaining more liens (and that they did not violate those rules). The BG Defendants repeatedly asserted (and testified) that the phrase "one tax buying entity (principal)" in the SSB Rule meant "registrant" and that the rule was violated only if multiple registrants bid for the "purpose of increasing the principal's likelihood of obtaining a successful bid on a parcel."

Plaintiffs' position at trial, on the other hand, was that the rules and regulations must be read more broadly – as barring the simultaneous participation of entities related in the loosest, most generic sense of the term – and that the representations and warranties in the registration materials must be interpreted to seek out any information that might be perceived by some undefined third party as demonstrating generic relatedness. Plaintiffs argued at closing:

> *More importantly than what the words say* . . . is that the lengths to which the defendants took . . . to conceal the manner in which they used common funding common resources, common personnel, the extent to which they concealed all those things *tells you everything you need to know about what the rule prohibits* because, as if the language of the rule itself weren't clear enough, the lengths to which the defendants took to conceal their relatedness tells you that they knew

full well what the rule prohibited because they were in violation of it and they were taking steps to conceal that.[1] (Tr. 3515-16, emphasis added.)[2]

The [Treasurer's] rules and regulations were *trying to cover everything that even could conceivably run the risk of an appearance of impropriety.* (Tr. 3517, emphasis added.)

The BG Defendants maintain that their interpretation is the only reasonable reading of the rules and regulations and that, under their interpretation, the BG Defendants are entitled to judgment as a matter of law. But even if plaintiffs' far broader reading is also reasonable, the BG Defendants are still entitled to judgment as matter of law because plaintiffs failed to carry their burden of proving that the BG Defendants' interpretation was unreasonable.

Plaintiffs' RICO claims allege that the BG Defendants engaged in a pattern of racketeering activity that consisted of multiple acts of mail fraud. In order to prove that the BG

---

[1]    This argument is contrary to the evidence presented at trial against the "Gray Defendants" and exposes the prejudice to the BG Defendants of being tried alongside and grouped together with members of separate and unrelated "conspiracies." See, e.g., Closing Argument of Plaintiffs' Counsel (Tr. 3528-30) ("So the notion that Mr. Atlas and Mr. Gray and that SALTA and that Midwest Entities, Wheeler-Dealer, BG, that somehow they get a pass because this was all motivated by father concern, it's offensive.")

As to the "Gray Defendants," the record does not reflect efforts to conceal anything. Unlike the evidence of concealment presented against the "SALTA Defendants" and Mr. Atlas, which included lying about addresses and asserting the Fifth Amendment, the evidence was that tax-buying entities that registered to bid knew David Gray, knew that Tim Gray was David's Gray's son, and knew that Dan Elkin (a long-time employee of Midwest Real Estate Investment Company) was bidding for BG at the same time that Tim Gray was bidding for Wheeler-Dealer. See also Tim Gray's testimony that at a sale in 2001, someone complained to the Treasurer's office that because he was David Gray's son, he should not be bidding, that he was asked to produce some kind of documentation showing that he was independent, that his lawyer showed some documents to Martha Mills reflecting that Tim was the sole owner of Wheeler-Dealer and that within a few minutes, she advised him that he could return to the sale and bid. (Tr. 996-999.)

[2]    The BG Defendants have not attached as an Exhibit the transcript references cited in this Memorandum but are willing to make available to the Court, at its request, copies of the referenced transcript pages.

Defendants committed mail fraud, plaintiffs had the burden of proving that defendants "acted with the intent to defraud." (Jury Inst., Tr. 3500-01.)[3] As the jury was instructed:

> A person acts with the intent to defraud a person or entity if he acts with the intent to deceive or cheat that person or entity in order to bring about financial gain to himself or a financial loss to the person or entity. Good faith on the part of a defendant is inconsistent with intent to defraud. A defendant is not required to prove that it acted with good faith; rather, the plaintiffs must prove that the defendant acted with the intent to defraud. (Jury Inst., 3500-01.)

A person cannot act with the "intent to defraud if he relies on a good faith interpretation of a regulation. See U.S. ex rel. Oliver v. Parsons Co., 195 F.3d 457, 464 (9th Cir. 1999) (A party relying on a good faith interpretation of a regulation is not subject to liability under the False Claims Act because the good faith nature of his or her action "forecloses the possibility" that he acted knowingly.); U.S. ex rel. Schuhardt v. Washington University, 361 F. Supp. 2d 992, 1005 (E.D. Mo. 2003) (there is no evidence of fraud under the False Claims Act if a defendant's interpretation of applicable regulations is reasonable even though incorrect, analyzing allegations of fraud under the False Claims Act); United States v. Migliaccio, 34 F.3d 1517, 1525 (10th Cir. 1994) (applying false statement case law to a mail fraud prosecution).[4] Even a person who takes advantage of an ambiguous rule or regulation does not make a knowingly false statement. Hagood v. Sonoma Cnty. Water Agency, 81 F.3d 1465, 1478 (9th Cir. 1996).

---

[3]     Where, as here, the basis for a civil claim under RICO is the criminal mail fraud statute, that statute must be narrowly construed to punish only "*deliberate* fraud." Emery v. American General Finance, Inc., 71 F.3d 1343, 1346 (7th Cir. 1995) (emphasis in original); see also, Northwest Tissue Center v. Shalala, 1 F.3d 522, 528-29 (7th Cir. 1993).

[4]     See also United States v. Isley, No 08-14534, 2010 WL 801736, at *8 n.22 (11th Cir. Mar. 10, 2010) (affirming a jury instruction that "a statement or claim is not knowingly or willfully false if it is the subject of a disputed legal question or if it represents a reasonable interpretation of applicable rules or regulations."); U.S. ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) ("[I]mprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA."); U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc., 613 F.3d 1186, 1190-91 (8th Cir. 2010); U.S. ex rel. Raynor v. Nat'l Rural Util. Co-op Fin. Corp., No. 8:08CV48, 2011 WL 976482, at *8 (D. Neb. Mar. 15, 2011).

In a mail fraud case, where defendant's assertion that he reasonably interpreted a regulation is inextricably intertwined with his intent and good faith, plaintiff "bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct." Migliaccio, 34 F.3d at 1525 (reversing mail fraud conviction because trial court failed to so instruct the jury); United States v. Parker, 364 F.3d 934, 945 (8th Cir. 2004) (citing United States v. Anderson, 879 F.2d 369, 376-77 (8th Cir. 1989) (government bears burden of negating literally truthful interpretations of statements in a fraud cause when statements are ambiguous and subject to reasonable interpretations); see also Jury Instruction (Tr. 3501) (plaintiff bears burden to prove intent to defraud). Moreover, defendants in a fraud prosecution are entitled "to have their intent assessed in the light of the interpretation of the underlying filing requirements that is most congenial to their case theory and yet also objectively reasonable." United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001) (vacating fraud conviction because trial court refused to instruct jury that defendants' asserted understanding of certain FDA filing requirements was "reasonable" and "the measure against which defendants' criminal culpability should be assessed.").

A.    The Testimony of the Grays.

The testimony of Tim Gray and David Gray shows that they reasonably interpreted the Treasurer's rules and regulations and believed that the statements they made in the Registration Applications were true.

Tim Gray testified that he did not believe Wheeler-Dealer violated the SSB Rule. He testified that he did not believe Wheeler-Dealer was a "Related Bidding Entity" unable to bid under the SSB Rule because he understood the term "Related Bidding Entity" to be limited to the definition expressly provided in the SSB Rule Acknowledgement Form, and Wheeler-Dealer did

not fit that definition vis-à-vis any other registrant. (Tr. 988-990). Wheeler-Dealer did not have a "shareholder, partner, principal, officer, general partner or other person or entity having an ownership interest in common with, or contractual relationship with" any other registrant at the tax sale. For this same reason, he did not believe he made a false statement with respect to any of the representations and warranties in the registration packets because he did not purchase liens with finances common to another bidding entity. (Tr. 988-990.)

David Gray similarly believed that it was not a violation of the SSB Rule for Wheeler-Dealer to bid simultaneously with either BG Investments or Atlantic Municipal because Wheeler-Dealer was on its own separate line of credit. David Gray testified that he believed it might have been a violation of the SSB Rule (or the representations and warranties in 2004-2007) for two entities on a joint line of credit - like BG Investments and Atlantic Municipal - to bid simultaneously. (Tr. 804-05.) But it is undisputed that (i) BG Investments and Atlantic Municipal never registered to bid or bid at the same sale during the years in question, and (ii) Wheeler-Dealer had its own line of credit.

These interpretations of the rules are eminently reasonable based on the language of the rule. Indeed, the plaintiffs themselves testified that they read the rules and regulations in a manner consistent with the interpretation presented by the BG Defendants and Tim Gray. Andrew Marks, an owner of Phoenix Bond and its principal bidder, admitted that it is his position that the SSB Rule prohibits multiple bidders participating in tax sales contemporaneously for the "same *registrant*." (Tr. 729-730, emphasis added).[5] Stanford Marks, also an owner of plaintiff Phoenix Bond, testified that when Phoenix submitted its registration materials to become a registrant at the tax sales, it attested that *"Phoenix [the registrant]* was not

---

[5]     Jocelyn Stoller, the president and owner of plaintiff BCS, testified that ". . . this whole lawsuit is about – to me it's very simple. You're supposed to have one – *each company* is to have *one bidder*." (Tr. 1238, emphasis added.)

involved with any kind of prior arrangement whatsoever *with someone else at the tax sale* who would help Phoenix, would benefit Phoenix from participation in the sale." (Tr. 431, emphasis added.)

Janet Meyers, plaintiff BCS Services' principal bidder, testified that based on her understanding of the SSB Rule, there is nothing wrong with "a *tax buyer* [who] *registers* for the sale in order to bid on liens *for its own benefit.*" ( Tr. 1174, emphasis added.) That is precisely what BG Investments did (in 2003-2005) and what Atlantic Municipal did (in 2006-2007). Each bid for its own benefit. Neither was a "shill" for Wheeler-Dealer, and Wheeler-Dealer was not a "shill" for either of them.

B.    Even if the language of the rules and regulations can be read more broadly,
      plaintiffs never negated the reasonableness of the Grays' interpretation.

Even if plaintiffs' broader interpretation of the Treasurer's rules and regulations is reasonable, plaintiffs never negated the reasonableness of either David Gray's or Tim Gray's interpretation. See Migliaccio, 34 F.3d at 1525; Parker, 364 F.3d at 945; Anderson, 879 F.2d at 376-77. Plaintiffs called Martha Mills, who told the jury that the SSB Rule was subject to different interpretations by different people and that applying the rule to various hypothetical fact patterns would be speculation because the SSB Rule had never been so applied (Tr. 2792-93). Ms. Mills further testified that the language of the Representations and Warranties is subject to different interpretations, that the phrase "*finances in common,*" the phrase used in subparagraph (A) of the Representations and Warranties, might mean many different things, and that it would be speculation for her to define the term. (Tr. 2783-84.) But plaintiffs never proved that the Grays' interpretation was not among the reasonable possible interpretations. Cf. Prigmore, 243 F.3d at 18 (in vacating conviction, observing that FDA experts who testified concerning the meaning of the regulations conceded reasonableness of defendants' interpretation).

Moreover, plaintiffs never negated the truth of either David Gray's or Tim Gray's attestations under their reasonable interpretation of the rules and regulations.

It was undisputed that Wheeler-Dealer did not have common ownership with either BG or Atlantic Municipal during the years in question, and plaintiffs presented no evidence to show that Tim Gray was a principal, partner or shareholder in BG Investments or Atlantic Municipal in those years. The evidence further established that during the years in question (and for years prior) Wheeler Dealer had its own audited financial statements and operated independently – it engaged in other investment opportunities, like estate sales, had its own employees, was paying a management fee to Midwest Real Estate Investment Company, and had its own line of credit from LaSalle Bank.

Plaintiffs' evidence at trial of the relatedness between entities within the "Gray Enterprise" amounted to little more than evidence that David Gray guaranteed the line of credit extended to Wheeler-Dealer by LaSalle Bank, which Wheeler-Dealer used to purchase liens at the tax sales from 2003 to 2007.[6] This evidence fails to support the conclusion that Wheeler-Dealer was a "Related Bidding Entity" vis-à-vis either BG Investments or Atlantic Municipal, or that BG Investments in 2003-2005 purchased liens with "finances in common" with another registrant (as reasonably understood by Tim Gray or David Gray) for the purpose of increasing BG Investments' chances of winning liens. (The analysis as to BG Investments in 2003-2005 also applies with respect to Atlantic Municipal in 2006-2007.)

In short, the Gray Defendants testified to acting upon a reasonable interpretation of the Treasurer's rules and regulations – one in which David Gray's guarantee of a line of credit to

---

[6] It is undisputed that David Gray's guaranty was never called upon, that money Atlantic Municipal had loaned to Wheeler-Dealer was never used in a tax sale, and that it was repaid well before Atlantic Municipal registered to bid and bid at the sale conducted in 2006. (Tr. 970, 3669-73, 985-86.)

Wheeler-Dealer did not prevent Wheeler-Dealer from bidding for its own liens at the same sale with either BG or Atlantic Municipal. Indeed, plaintiffs argued that the actual language used by the Treasurer was not too important, was subject to many different interpretations, and the jury should simply accept plaintiffs' preferred expansive and unbounded definition. Consequently, plaintiffs' evidence at trial was insufficient to support a finding that the BG Defendants *intended to defraud* anybody, and the BG Defendants are entitled to judgment as a matter of law or, alternatively, a new trial.

## ALTERNATIVELY, THE BG DEFENDANTS ARE ENTITLED TO A NEW TRIAL WITH PROPER INSTRUCTIONS ON INTENT TO DEFRAUD

Alternatively, the BG Defendants are entitled to a new trial because the Court refused the defendants' request to instruct the jury that "statements made when there is a good faith disagreement about the applicable governing law or when the law is unclear are not false." (Tr. 3428-29.) It is error to refuse to give a jury instruction if it results in a misleading impression of the law to the prejudice of the complaining party. Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc., 125 F.3d 468, 478 (7th Cir. 1997). Based on the case law set forth above, the proposed instruction is an accurate statement of the law that was not adequately covered by a simple good faith instruction. The failure to give the instruction misled the jury by permitting them to accept the plaintiffs' interpretation of the Treasurer's rules and regulations without considering the reasonableness of the BG Defendants' interpretation. Moreover, there was prejudice to the BG Defendants. There was little dispute at trial about the relationships among the Gray Defendants. The dispute centered instead on the very issue of intent – i.e., the reasonableness of the BG Defendants' interpretation of the rules – making the proposed instruction crucial to the jury's deliberations.

## THERE IS INSUFFICIENT EVIDENCE TO SUPPORT A DAMAGE AWARD AGAINST THE BG DEFENDANTS

In BCS Services, Inc. v. Heartwood 88, LLC, 637 F.3d 750, 760-61 (7th Cir. 2011), the Court of Appeals sanctioned the use of statistical theory to prove damages in this case. The opinion of the Court of Appeals, however, did not sanction the plaintiffs' use of any and all statistical models. Indeed, the opinion left open the possibility that the model could be flawed. Id. The specific model chosen by plaintiffs was, in fact, flawed. Plaintiffs' deliberate and strategic decision to lump together in a single damages calculation *(i.e.,* statistical theory) every defendant across multiple, unrelated "conspiracies" dooms their case against the BG Defendants.[7]

Under the plaintiffs' chosen theory of damages, each plaintiff was damaged in an amount equal to the number of liens that plaintiff claims it would have won at any given auction had only "eligible bidders" participated in the auction. The plaintiffs repeatedly described this number as their "fair share" of liens. (Tr. at 2887:19-22.) Each plaintiff's "fair share" was reflected in a single calculation (determined for each annual auction) called its "win percentage." (Tr. 2887:23 – 2888:11.) The win percentage represented the percentage of liens the plaintiff claims it would have won had none of the defendants (or the members of the Peters Group) participated in each tax sale. Id.

---

[7]    Other reasons why Mr. Shaffer's evidence is legally insufficient include: (a) his acceptance of spreadsheets prepared by plaintiffs' counsel in 2009 as an accurate statement of the liens on which plaintiffs intended to bid, without attempting to confirm whether those spreadsheets conformed to plaintiffs' bid books (other than to look at a few pages of one year's bid book), let alone whether those spreadsheets reflected actual bids (Tr. 2931-32); (b) using a "video bid adjustment" based on 2 hours of video in 2007 – out of a total of 648 hours of auction – without doing anything to determine whether those two hours were a representative sample (Tr. 2935); and (c) ignoring the uncontradicted testimony of Tim Gray that he reviewed the video and determined that there was a substantial percentage of time (28%) when Wheeler-Dealer's bidder was not bidding on the same liens as Atlantic Municipal's bidder. (Tr. 977-978.)

Plaintiffs consciously decided as a matter of trial strategy to structure their damages calculations this way because it resulted in higher damages. Plaintiffs have freely admitted that they could have calculated damages specific to each defendant or specific to each "enterprise." See Argument of Jonathan Quinn at Pre-Trial Hearing on October 5, 2011, at 39 (Mr. Shaffer is "absolutely" capable of making individualized calculations and "if your Honor rules that the defendants are entitled to ask him to do those calculations, he can do them.") An excerpt from the transcript of the October 5, 2011 Hearing is attached as Exhibit A. Doing so, however, would have resulted in a smaller share of redistributed liens. See Shaffer at 2956:3-10 (admitting that each plaintiff's win percentage goes down as more bidders are deemed eligible).[8]

By way of illustration, the testimony at trial was that the win percentage for plaintiff BCS in 2003 was *12.45%.* That number was calculated by dividing 566 (the number of liens BCS actually won) by 4,547 (the number of liens won by BCS and <u>all</u> other bidders characterized by plaintiffs as "eligible" bidders). Trial Testimony of Shaffer at 2888-2889. However, had plaintiffs set up a model that isolated the alleged wrongful conduct of the members of the so-called "Gray Enterprise," by calculating a win percentage based on the number of liens BCS would have won had only the Gray Defendants been deemed ineligible, that win percentage

---

[8]     Trial Testimony of Mr. Shaffer, 2956:3-10 (in response to questions from counsel for the Sass Defendants):

Q: If the Grays are eligible to bid, then [the Sass Defendants] pay less, right?

A: If they're deemed to be eligible, then the damages would go down, yes.

Q: Okay. And if the Grays are ineligible to bid, then my clients [Sass Defendants] will have to pay more under your analysis; isn't that right?

A: As compared to the Grays being deemed eligible, yes.

would have been *5.2%* (566 divided by 10,936).[9] See Demonstrative Used by Shaffer, a copy of which is attached as Exhibit B and discussed at Tr. 2887-2889.

Consequently, upon reallocation of the liens to BCS, under plaintiffs' theory the BG Defendants were asked to give up *12.45%* of their liens from the sale in 2003 instead of *5.2%* if plaintiffs had isolated the allegedly wrongful conduct of the "Gray Enterprise."

Plaintiffs' overreaching has consequences – consequences that doom its case against the BG Defendants.

> A.  Plaintiffs' damage theory is legally impermissible because it seeks
> to hold the BG Defendants liable for the conduct of unrelated parties.

The decision to lump together in a single damage calculation every defendant across every "enterprise" impermissibly assesses damages against the BG Defendants for the alleged wrongdoing of other wholly separate and unrelated defendants.

The law is clear that a defendant cannot be held liable for damages caused by the acts of wholly independent parties. See Restatement (Third) of Torts: Apportionment of Liability § 26, cmt. B (1999) ("[n]o party should be liable for harm it did not cause"); Hershey v. Pac. Inv. Mgmt. Co., 697 F. Supp. 2d 945, 955 (N.D. Ill. 2010) (in demonstrating that plaintiff "suffered a loss as a result of the defendant's alleged unlawful behavior," an "expert . . . must conduct some form of statistical analysis that isolates the defendant's conduct and apportions it to the overall loss."); see also Infusion Resources, Inc. v. Minimed, Inc., 351 F.3d 688, 695 (5th Cir. 2003) (a damages theory that fails to properly "disaggregate" damages, which requires an estimation of

---

[9]     The 10,936 figure is derived as follows (using the figures on Shaffer's Demonstrative, Exhibit B):

| | |
|---|---|
| 4,547 | Liens won by BCS and other "eligible bidders" |
| 3,731 | Liens won by the Sabre Defendants |
| 992 | Liens won by the Salta Defendants |
| 1,666 | Liens won by the Peters Group |
| 10,936 | |

damages that flow only from the alleged wrongful conduct, is seriously flawed and inadmissible). Yet that is precisely what plaintiffs did by lumping together in a single damages calculation every defendant across every enterprise.

It is undisputed that the Gray Defendants were wholly independent from and unrelated to the Sabre Group, the Salta Group, and the Peters Group (which included Interstate Funding and Central Buyms Group, Tr. 1976, as well as Diamond Guest and Union Tax). Nevertheless, as the above re-calculation of plaintiff BCS' 2003 win percentage shows, the plaintiffs' theory of damages effectively assesses additional damages against the Gray Defendants due to the alleged wrongful conduct of the Sabre Group, the Salta Group, and the Peters Group. Indeed, in 2003, as to plaintiff BCS, it more than doubles the BCS "win percentage."

This Court accurately observed, when quashing subpoenas directed to some of the Peters Group, that plaintiffs' theory of damages "increases the amount of damages that the defendants end up having to pay" by grouping together all defendants. See Excerpt of Transcript from Hearing on October 11, 2011, a copy of which is attached hereto as Exhibit C, at 11. For the same reason, the Court should now conclude that plaintiffs' damage theory was and is legally impermissible, and that having elected to present damages in this way, plaintiffs failed to present admissible evidence sufficient to sustain the jury's verdict.

> B.   Plaintiffs assumed an increased burden in selecting
>      their damages model and failed to meet that burden.

Plaintiffs' decision to lump together in a single damage calculation every defendant across every "enterprise" also increased the plaintiffs' burden of proof at trial – an increased burden plaintiffs acknowledged, yet failed to meet. Thus, even if the Court determines that plaintiffs' damages theory is legally permissible, the BG Defendants are still entitled to judgment as a matter of law.

As plaintiffs repeatedly pointed out, the jury could not accept its theory of damages unless it accepted the underlying assumption that the Gray Defendants, the Sabre Group, the Salta Group, and the Peters Group were <u>all</u> ineligible to bid at all sales in all years. <u>See, e.g.</u>, Dkt. 784 at 3. For example, when the defendants moved to sever the trials of each alleged enterprise, plaintiffs argued against it, asserting that a jury would need to consider and determine that each alleged enterprise was ineligible in order to calculate the damages owed by any one defendant. Plaintiffs explained:

> Plaintiffs' damages calculation necessarily computes how many liens the eligible bidders . . . likely would have received had the ineligible bidders not participated. The calculations do this by removing ***all*** of the ineligible bidders from the calculations. *This means that any jury considering the damages caused by any of the enterprises' fraud must also consider evidence concerning the other enterprises' conduct to determine if they were eligible. . [or] ineligible bidders who should not have received liens.* For example, in determining damages caused by the Sabre Enterprise's RICO violations, the jury likely will need to hear evidence that the Salta Enterprise and Gray Enterprise each placed multiple bidders at the tax sales, rendering them ineligible and explaining the elimination of their successful bids for purposes of calculating Plaintiffs' damages. Dkt. 711 at 7, bold face emphasis in original, all other emphasis added.

<u>See also</u> Plaintiffs' Response to Motion in Limine, Dkt. 784 at 3 (". . . Plaintiffs' damages analysis assumes that all of the members of the Defendant enterprises were ineligible. Plaintiffs seek to present evidence showing the Peters were also ineligible . . . . [The Court in ruling on the <u>Daubert</u> motions] noted that assumptions [regarding the Peters Group] may or may not be accepted by the jury and could be the subject of attack generally . . . Plaintiffs will introduce evidence that would undercut any such attacks, and should be allowed to do so.")

The practical effect of adopting this theory was to increase the plaintiffs' burden at trial. Plaintiffs had to prove not just that the defendants on trial were ineligible to bid but also present evidence sufficient for the jury to find that it was reasonable for their expert, Scott Shaffer, to assume that every other defendant who had settled (including every member of the Peters Group)

was ineligible to bid as well. Otherwise, the opinions underlying Shaffer's theory would not be supported by the record. See, e.g., Elcock v. Kmart Corp., 233 F.3d 734, 754-757 (3d Cir. 2000) (reversing trial court's decision to admit into evidence an expert's economic loss model where it "relied on several empirical assumptions that were not supported by the record."); Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 7 (1st Cir. 1992) (excluding expert testimony at trial where there was insufficient foundation for the proffered opinions).

### 1. The plaintiffs did not present any evidence of the alleged ineligibility of the Peters Group.

Only one fact witness even mentioned the Peters Group, and that was John Bridge (one of the Sabre defendants). Yet his only testimony was that he had grouped together entities in the Peters Group in an email because they were owned "by members of the same family." (Tr. 1971) That does not support a finding of ineligibility, as plaintiffs' own witness confirmed.[10] Additionally, plaintiffs introduced the registration forms of the Peters Group without any testimony. (PX 619, 621, 623, 625, 627, 629.) While these documents show that registrants who were members of the Peters Group swore to abide by the SSB Rule, they say nothing about whether that statement (or any representation/warranty) was false or would have rendered the entities ineligible to bid. Finally, the fact that the Peters Group settled claims asserted against them in the state court, a fact elicited only from Mr. Shaffer, proves nothing as to their eligibility or ineligibility.

---

[10] Janet Meyers, BCS Services' long-time employee, testified that it is not a violation of any rule of which she is aware for a company owned by a parent (e.g., a father) and an independent company owned by an adult child of that parent (e.g., a daughter) to register to bid and bid at the same tax sale. (Tr. at 1214.)

2. *The plaintiffs did not present sufficient evidence on which the jury could conclude that various settling defendants in the present litigation were ineligible to bid.*

As an example, plaintiffs offered almost no evidence of alleged ineligibility of many of the Sabre Defendants who settled before trial. Summarizing what they believed to be their "evidence," plaintiffs stated the following:

(a) "CMS *provided bid books* to the many former defendant entities [listing, *inter alia*, Aztec Partners LLC, Chonus, Inc., Bamp LLC, Richarony LLC, BRB Investments, LLC and CCJ Investments LLC, Cronus Projects, LLC, Varan Realtors, DRN II, Inc., DRN 2, LLC, Mudcats Real Estate, LLC, G3 Holdings, LLC, Georgetown Investors, LLC, GJ Ventures, LLC, L.C.C. Ventures, LLC]." Dkt. 872, at 14-15, emphasis added. This proves nothing. As Stanford Marks admitted at trial, there was no law or rule that prohibited providing bid books to prospective tax buyers for a fee or without charge. (Tr. at 496, 498, 598.)

(b) "all of the CMS 'customers' . . . sold the liens acquired at the annual tax sales to Sabre or other Bridge-related entities within two years, and often did so either during or just after the sales at which they bought liens," from which Plaintiffs argue a jury could conclude that "[t]hese sales, and the timing of them, provide a more than sufficient basis for the jury to believe that they were done pursuant to pre-sale agreements" and that, in turn, "would provide a more than sufficient basis for the jury to conclude that it was reasonable for Mr. Shaffer to assume that these entities were all ineligible." (Dkt. 872 at 16.)

Plaintiffs' need to layer inference upon inference reveals the insufficiency of Plaintiffs' evidence. And closer examination of the trial exhibits to which plaintiffs refer reveals that they do not permit the inference that the sales "were done pursuant to pre-sale agreements." The trial exhibits on which plaintiffs now rely either do not show dates of the sales agreements (*e.g.*, PX 211) or show dates that are all *after* the end of the tax sales in question and sometimes by many

weeks (*e.g.*, PX 218; sales agreement dated 9/28/05; tax sale ended 7/27/05). It takes a leap of faith – not an inference – to conclude that sales agreements dated *after* a sale were in fact agreed to *before* the sale.

Plaintiffs' failure to provide evidence as to the alleged ineligibility of even a single bidder is fatal to their damages theory. Plaintiffs sought to increase the damages they could collect from each defendant by lumping them all together and instructing their damage expert to assume the ineligibility of every one of them. In so doing, they necessarily undertook the burden of presenting evidence to support this assumption. And having failed to present such evidence, the entire theory collapses. Plaintiffs' evidence was insufficient to support the opinions of Mr. Shaffer and consequently the jury cannot adopt his analysis and is left with no way to calculate damages against the BG Defendants short of pure speculation and conjecture.

*Wheeler-Dealer*

The plaintiffs' damages model also assumes that Wheeler-Dealer (along with BG Investments in 2003-2005, and Atlantic Municipal in 2006-2007, and all other defendants and the Peters Group) was ineligible to bid. That is, Mr. Shaffer did not perform any calculations as to what the damages against the BG Defendants would be if Wheeler-Dealer had been treated as an *eligible* bidder. The jury was unable to reach a verdict as to Wheeler-Dealer, so it cannot be said that the jury agreed with Mr. Shaffer's assumption that Wheeler-Dealer was ineligible. Consequently, the jury had no basis on which to calculate damages under Mr. Shaffer's analysis.

*Additional note with respect to the damage analysis.*

The record is undisputed that the representations and warranties were not part of the registration packet at the sale that was conducted in 2003, yet plaintiffs instructed Mr. Shaffer to assume that the BG Defendants and all other defendants were ineligible in 2003 as well as in the

subsequent years. To the extent that plaintiffs predicate their claims on alleged misstatements in the representations and warranties, the damage calculation is further undermined. [11]

## IN THE ALTERNATIVE TO RELIEF UNDER RULE 50(b) OR RULE 59, THE BG DEFENDANTS ARE ENTITLED TO A SETOFF.

Plaintiffs' decision to lump together in a single damage calculation every defendant across every enterprise transformed plaintiffs' injury into a single injury, such that all non-settling defendants (including the BG Defendants) are entitled to a reduction in damages in the amount equivalent to those paid by the settling defendants. (We request leave to submit the settlement agreements, which were produced on an attorneys' eyes only basis, under seal.)

For the reasons set forth above, the plaintiffs' theory of damages is legally impermissible and their evidence at trial was insufficient to support their calculations. However, even if the Court disagrees, plaintiffs' decision to lump together the wrongdoing of all defendants makes common the damages suffered by each plaintiff and entitles the BG Defendants to a setoff for all amounts recovered by plaintiffs in settlement with other bidders described by plaintiffs as "ineligible."

It is hornbook law that a plaintiff cannot recover twice for the same injury. "A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment." Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989) (quoting Restatement

---

[11]     In the BG Defendants' Rule 50 (a) Motion (Dkt. 861), we adopted certain other arguments made by the Wheeler Defendants in their Rule 50 (a) Motion (Dkt. 859). See, *e.g.,* Dkt. 861 at 1 (n.2) and at 7 (n.7). Because the Court has denied the Wheeler Defendants' Motion (Dkt. 900), we will not restate those arguments here. We include this footnote to avoid any inference that we have waived those arguments, or any other arguments stated in Dkt. 861, Dkt. 870, and Dkt. 895).

(Second) of Torts § 885(3) (1979)); see also Donovan v. Robbins, 752 F.2d 1170, 1178 (7th Cir. 1985) ("a plaintiff's total recovery, from all the tortfeasors together, is not allowed to exceed his total damages"). This is known as the "one satisfaction rule."

Under the one satisfaction rule, when a plaintiff receives a settlement from one defendant (even in a separate action) the "nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendants as long as both the settlement and judgment represent common damages." See Singer, 878 F.2d 596, 600 (2d Cir. 1989) (citing Hess Oil Virgin Islands Corp. v. UOP, Inc., 861 F.2d 1197, 1208 (10th Cir. 1988)). The inquiry is whether the plaintiff suffered a single or common injury. See also Howard v. General Cable Corp., 674 F.2d 351, 358 (5th Cir. 1982) (amounts recovered from a settling defendant should be applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided that both the settlement and the judgment represent common damages); U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1236 (10th Cir.1988) (amount plaintiff receives in settlement "is normally applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided both the settlement and the judgment represent common damages"); Gerber v. MTC Electronic Technologies Co., 329 F.3d 297, 303-304 (2d Cir. 2003) (setoff available for settlements "attributable to common damages").

A setoff is proper even in cases alleging violations of RICO and intentional tort cases. See Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1310 (7th Cir. 1987) (RICO claims); Zivitz v. Greenberg, 279 F.3d 536, 539 (7th Cir. 2002) (intentional tort – i.e. fraud); see also Singer, 878 F.2d at 600; Morley v. Cohen, 888 F.2d 1006, 1013 (4th Cir. 1989).

The use of a single win percentage makes the damages suffered by plaintiffs common to all defendants – both those who settled and those who did not. The damages are common in the first instance because, as plaintiffs repeatedly pointed out (and as set forth above), the jury could not accept its theory of damages unless it accepted the underlying assumption that all defendants – both those who settled and those who did not – were ineligible to bid.

More importantly, the damages were also common across defendants because the decision to calculate damages based upon a single win percentage that lumped together all defendants across all "conspiracies" increased the damages assessed against each defendant. As set forth above, under plaintiffs' damage theory, the BG Defendants were assessed damages on 12.45% of the liens it won in 2003 (instead of 5.2%) based on the conduct of all other defendants – including the defendants who settled. (And that is true of every other defendant sued by plaintiffs as well. They were assessed higher damages based on the conduct of the BG Defendants.) The damages assessed against the BG Defendants attributable to the inflated "win percentage" represent damages common to every other defendant considered ineligible under plaintiffs' damage theory, and the BG Defendants are entitled to a setoff for amounts paid in settlement by each such defendant.[12]

## PLAINTIFFS' EVIDENCE IS INSUFFICIENT
## TO SUPPORT ITS STATE LAW CLAIM

In order to prevail on their tortious interference claim, plaintiffs had to prove that the BG Defendants acted with the requisite intent. Illinois law requires proof that any interference with plaintiffs' business expectancy was "purposeful" or "intentional." <u>See</u> <u>Atanus v. American</u>

---

[12] Because the settlement agreements and the amounts of settlement were disclosed for "attorneys' eyes only" and are not currently part of the record, the calculation of any setoff amount will need to be addressed in a subsequent brief.

Airlines, Inc., 403 Ill. App. 3d. 549, 557 (1st Dist. 2010). Purposeful interference exists only if "the defendant acted with the aim of interfering with the plaintiff's expectancy." Id.

For many of the same reasons set forth at pages 3-10 above, there is no basis on which the jury could find that the BG Defendants acted purposefully or intentionally to interfere with plaintiffs' prospective business expectancy or aimed to interfere with plaintiffs' business expectations. Plaintiffs' evidence, at most, suggested that the BG Defendants acted under a reasonable but incorrect interpretation of the Treasurer's rules and believed they were complying when they were not. Such conduct is neither purposeful nor intentional.

## THERE IS NO BASIS FOR THE JURY'S AWARD
## OF PUNITIVE DAMAGES AGAINST THE BG DEFENDANTS

Punitive damages may be awarded "*only* if [the jury finds] that the defendant's conduct was *malicious or willful and wanton*. A defendant's conduct was *malicious* if it was accompanied by *ill will or spite or was done for the purpose of harming the plaintiff*." (Tr. 3505, emphasis added.) Punitive damages cannot stand where a plaintiff's evidence fails to prove any facts "that exceeded what was necessary to establish the tort itself." Cress v. Recreation Serv., Inc., 341 Ill. App. 3d 149, 182 (2d Dist. 2003). Assuming *arguendo* that plaintiffs presented evidence sufficient to establish the tort itself (which we deny for the reasons stated above), plaintiffs presented no evidence that the BG Defendants' conduct was malicious or willful or wanton, or that it was done for the purpose of harming the plaintiffs.

## TREBLING UNDER RICO
## AND PUNITIVE DAMAGES UNDER STATE LAW

For the reasons stated above, we believe there is no basis for a finding of liability under RICO or state law, and even if there were a basis for finding tortious interference, there is no basis for a punitive damages award. But even if there were a basis for treble damages under RICO and punitive damages under state law, plaintiffs are not entitled to both.

22

The Seventh Circuit has not squarely addressed whether a plaintiff may recover treble damages under RICO as well as punitive damages under a state tort claim based on the same course of conduct. See Dvore v. Casmay, 06-CV-3076, 2009 WL 211856, at *7 n.2 (N.D. Ill. Jan. 29, 2009) (identifying the question as difficult and one the Seventh Circuit has not yet decided). But Illinois law generally forbids cumulative damages multipliers and punitive damages for a single wrong, see Perez v. Z Frank Oldsmobile, Inc., 223 F.3d 617, 621 (7th Cir. 2000) (citing Harris v. Manor Healthcare Corp., 111 Ill. 2d 350, 366 (1986); Verdonck v. Scopes, 226 Ill. App. 3d 484, 491 (2d Dist. 1992)), and the rationale of Perez supports the conclusion that such awards are duplicative and a plaintiff may not recover both.[13]

Perez addressed whether a plaintiff could receive punitive damages under a common law fraud claim and also treble damages under either federal or state odometer tampering statutes. The Court concluded first that the federal statute did not permit a plaintiff to stack punitive damages on top of trebled damages, stating "no case of which we are aware holds that, when Congress specifies a damages multiplier, the jury may select a different and higher multiplier by awarding punitive damages under federal law." Id. at 621-22. The Court then concluded that the state odometer statute operated in the same way. Id. at 623. Finally, the Court predicted that Illinois would not permit a plaintiff to recover under both the state odometer statute and a state common law fraud claim if the fraud involved the same misrepresentations. Id. at 624. The Court explained: "Treble damages are a form of punitive damages" and the "legislative decision

---

[13]     The Court of Appeals for the Ninth Circuit, in an opinion decided before Perez and not cited by Perez, has held that "a plaintiff may receive both treble damages under RICO and state law punitive damages for the same course of conduct." See Neibel v. Trans World Assur. Co., 108 F.3d 1123, 1130-31 (9th Cir. 1997). Other courts have disagreed. See, e.g., Ross v. Jackie Fine Arts, Inc., C/A 2:85-2425-1, 1991 WL 213815, at *8 (D.S.C. Sept. 4, 1991) ("actual and punitive damages awarded under the state-law causes of action for fraud and civil conspiracy cannot be stacked with the RICO damages and are therefore mutually exclusive") (citing Morley v. Cohen, 888 F.2d 1006, 1012-13 (4th Cir. 1989)). But see Fujisawa Pharmaceutical Co. v. Kapoor, No. 92 C 5508, 1999 WL 543166, *18 n.15 (N.D. Ill. July 21, 1999) (decided before Perez and citing Neibel with approval but without discussion).

to have a multiplier of three is not honored when a court permits a jury to select a different punitive multiplier." Id.

This principle applies equally to state law claims brought in conjunction with RICO claims. Here, plaintiffs' state law claim for intentional interference with prospective business advantage alleges the exact same course of conduct as their RICO claims. The "unjustifiable interference" underlying the claim, like the predicate acts in their RICO claims, was the failure to comply with the Cook County Treasurer's rules and regulations governing the annual tax sale. (Jury Instr., Tr. 3502-03). Permitting the plaintiffs to recover both trebled damages as well as punitive damages is to sidestep the decision of Congress and permit a different punitive multiplier.

### ADOPTION OF ARGUMENTS
### IN THE SASS DEFENDANTS' POST-TRIAL MOTION

The BG Defendants hereby adopt the arguments advanced in Sections I, III and V (except as to "hub and spoke" instruction that does not relate to the BG Defendants) of the Sass Defendants' Memorandum in Support of their Post-Trial Motion to be filed today.

### CONCLUSION

The theory of damages the plaintiffs presented to the jury was fundamentally unfair. It was unfair in design because it increased the number of liens plaintiffs sought from the BG Defendants based upon the alleged ineligibility (i.e. wrongful conduct) of completely unrelated parties. And it was unfair in its execution because plaintiffs were permitted to increase the number of liens sought from the BG Defendants based on the conduct of completely unrelated parties without undertaking the burden of proving that these completely unrelated parties were, in fact, ineligible (i.e. committed wrongful conduct). The jury's verdict, based upon this impermissible theory of damages and the paucity of evidence to support it, is unjust.

24

Similarly, it is unjust for the BG Defendants to be subject to treble damages and attorneys' fees under RICO for acting consistently with a reasonable interpretation of the Treasurer's rules and regulations. Plaintiffs were required to prove the BG Defendants acted with an intent to defraud, and that means, in the context of this case, negating the BG Defendants' reasonable interpretation of the rules. Plaintiffs utterly failed to do so – arguing to the jury instead that the language of the rules was unimportant and plaintiffs' alternative interpretation was the right one.

For these, and the other reasons set forth above, the BG Defendants request judgment in their favor as a matter of law or, in the alternative, a new trial.

Dated:  December 13, 2011

Respectfully submitted,

**BG DEFENDANTS,**

By:     /s/ Arthur W. Friedman
                    One of their Attorneys

Arthur W. Friedman
Gabriel B. Plotkin
Miller Shakman & Beem LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Phone:  312/263-3700
Fax:  312-263-3270

# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4   PHOENIX BOND & INDEMNITY          )
    COMPANY, et al.,                  )
5                                     )   Docket No. 05 C 4095
                    Plaintiffs,       )
6                                     )
               vs.                    )
7                                     )   Chicago, Illinois
    JOHN BRIDGE, et al.,              )   October 5, 2011
8                                     )   2:00 p.m.
                    Defendants.       )
9

10  BCS SERVICES, INC., et al.,       )
                                      )
11                  Plaintiffs,       )   Docket No. 07 C 1367
                                      )
12             vs.                    )
                                      )
13  HEARTWOOD 88, INC., et al.,       )   Chicago, Illinois
                                      )
14                  Defendants.       )
```

```
15              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE MATTHEW F. KENNELLY
16

17  APPEARANCES:

18

19  For the Plaintiff:    REED SMITH, LLP
                          BY:  MR. JOHN W. MOYNIHAN
20                             MR. JONATHAN S. QUINN
                               MR. LOWELL E. SACHNOFF
21                             MR. MAX A. STEIN
                               MR. THOMAS M. LEVINSON
22                          10 South Wacker Drive, 40th Floor
                            Chicago, Illinois  60606

23

24

25
```

```
1    For the Defendant:    SIDLEY AUSTIN, LLP
                             BY:  MR. WILLIAM F. CONLON
2                                 MR. CHRISTOPHER K. MEYER
                                  MR. ROBERT N. HOCHMAN
3                           One South Dearborn Street
                             Chicago, Illinois  60603
4

5                           MORGAN, LEWIS, BOCKIUS
                             BY:  MR. THEODORE M. BECKER
6                                 MR. RICHARD J. PEARL
                             77 West Wacker Drive
7                            5th Floor
                             Chicago, Illinois  60601
8

9                           NEAL, GERBER & EISENBERG
                             BY:  MR. ATHANASIOS PAPADOPOULOS
10                           MR. MICHAEL D. SHER
                             Two North LaSalle Street
11                           Suite 1700
                             Chicago, Illinois  60602
12

13                           MR. WILLIAM T. HUYCK
                             122 South Michigan Avenue
14                           Suite 1850
                             Chicago, Illinois  60603
15

16                          MILLER, SHAKMAN & BEEM, LLP
                             BY:  MR. ARTHUR W. FRIEDMAN
17                                MR. GABE PLOTKIN
                             180 North LaSalle Street
18                           Suite 3600
                             Chicago, Illinois  60601
19

20                          RUFF, WEIDENAAR & REIDY, LTD.
                             BY:  MR. JAMES R. QUINN
21                                MR. SCOTT NELSON
                             222 North LaSalle Street
22                           Suite 1525
                             Chicago, Illinois  60601
23

24

25
```

1    GENSON & GILLESPIE
         BY:   MR. EDWARD M. GENSON
2        53 West Jackson Boulevard
         Suite 1420
3        Chicago, Illinois   60604

4

5    O'HALLORAN, KOSOFF, GEITNER, & COOK
         BY:   MR. ELI ROSENBLUM
     Edens Corporate Center
6    4th Floor
     650 Dundee Road
7    Northbrook, Illinois   60662

8

9    STEARNS, WEAVER, MILLER, WEISSLER,
     ALHADEFF & SITTERSON
         BY:   MR. EUGENE E. STEARNS
10           MS. ALISON MILLER

11

12

13

14

15

16

17

18

19

20

21

22

23
     LAURA M. BRENNAN - Official Court Reporter
24       219 South Dearborn Street - Room 2102
             Chicago, Illinois   60604
25               (312) 427-4393

1    (The following proceedings were had in open court:)

2         THE CLERK:  05 C 4095, Phoenix Bond v. Bridge.

3         THE COURT:  All right.  So the way I would like to do

4    this is I would like to have one attorney for each party put

5    the names of all the attorneys for that party on the record.

6    And then the protocol is going to be, really for the court

7    reporter's benefit more than mine, that when you talk, you've

8    got to say at the beginning who you are because there's a lot

9    of people here.

10        So starting on this side of the room.  Hang on a

11   second.  Let me just get this door.

12       (Brief interruption.)

13       THE COURT:  Go ahead.

14       MR. PEARL:  Your Honor, I'm just having a little

15   trouble hearing.

16       THE COURT:  Well, you're just going to have to listen

17   better.  We have a very expensive sound system that was

18   recently put in that you all paid for, and I won't give you

19   the full word, but when you say that "it," the next word would

20   start with an "s," and it's five letters long.  That's all I'm

21   going to say.

22       I've got two microphones up here other, and I have

23   people standing 15 feet from me saying they can't hear me.  So

24   you're just going to have to do the best you can.

25       Go ahead, Mr. Quinn.

1  anyone else, the liens obtained by them.

2  When he took those liens, and he then went to step
3  two, reallocating them among eligible bidders, he had a
4  choice. He could either consider the Peters group with whom
5  we had settled and with whom we had provided evidence to him
6  that he had a reasonable basis upon which to consider them not
7  eligible. He considered them ineligible, but that was his
8  only choice.

9  Given the methodology that he used, he had two
10  choices. I could consider them eligible and, therefore, would
11  be eligible to be -- to have reallocated to them some of the
12  defendants' liens, or ineligible, in which case they do not.
13  But he can't -- in his method couldn't ignore them. He
14  couldn't pretend they didn't exist. Those were his two
15  choices.

16  We contend that there was a more than reasonable
17  basis on which he could consider them to be ineligible. And
18  going to their motion number two, we seek to present at the
19  trial the evidence on which he relied which we contend formed
20  that reasonable basis.

21  What the defendants want to have us -- the defendants
22  want us to be prevented from having Shaffer testify about what
23  he did, and they want to prevent us from putting on the
24  evidence to --

25  THE COURT: Basically the way I understand at least

1    part of the defendants' argument is what they want you to do,

2    or what they think is the appropriate way of doing it, is,

3    okay, let's say there's three groups of bidders, all of whom

4    the plaintiffs contend were acting inappropriately.  What they

5    want to do is say, okay, as to group one, the theory should be

6    what happens if group one is out of the picture, nobody else.

7    And that's group one's damage.

8         Going to group two.  What happens if group two is out

9    of the picture but groups one and three are still in, what's

10   the damages on group two, and so on.  That's the way I

11   understand their argument.

12        What's the flaw in that.

13        MR. JONATHAN QUINN:  The flaw in that is that, as

14   your Honor recognized, I believe, in the severance motions,

15   there are an infinite number of permutations of that.  As

16   Mr. Shaffer --

17        THE COURT:  Well, maybe not infinite, but there's a

18   bunch.

19        MR. JONATHAN QUINN:  There's a large number.

20        And is Mr. Shaffer capable of computing those?

21   Absolutely.  If your Honor rules that the defendants are

22   entitled to ask him to do those calculations, he can do them.

23        Our response to their motion in limine was, in

24   essence, to say to your Honor, if your Honor is going to

25   permit them to ask him whether he can do them, and your Honor

1   allows him to do them, then he can do them, and in that sense
2   they will be calculations and computations that have not been
3   previously disclosed.

4          By the way, they have not been previously disclosed
5   to us either. He's never done them. We have never asked him
6   to do them. But the point is this is a different damages
7   theory, one that the defendants could have gotten an expert to
8   do themselves and one that they can cross-examine Mr. Shaffer
9   about.

10         But simply because there are alternate ways of doing
11  damages doesn't entitle them to, on the one hand, demand that
12  he not do them from this point forward and also preclude him
13  from testifying about those that he did.

14         THE COURT: Okay. So let me flip ahead to your
15  motion number whatever it is, 5.

16         MR. JONATHAN QUINN: Yes.

17         THE COURT: So if I take everything that you just
18  said, why shouldn't they be able to argue that, hey, ladies
19  and gentlemen, this theory is just messed up because they're
20  asking us to pay for what these people did, and they haven't
21  proved that we should have to pay? Why shouldn't I let them
22  make that argument?

23         MR. JONATHAN QUINN: Because it's not true.

24         THE COURT: That's what juries decide, though. I
25  don't do that.

# EXHIBIT B

# Calculating Number of Liens to be Reallocated to the Plaintiffs for 2003

| | Liens Won by Eligible Bidders |
|---|---|
| BCS | 566 |
| Other | 3,981 |
| | 4,547 |

BCS Eligible Bid Win Percentage

$566 \div 4,547 = 12.45\%$

| | Liens Subject to Reallocation | BCS Eligible Bid Win Percentage | | Liens to be Reallocated |
|---|---|---|---|---|
| Sabre | 3,731 | $\times$ 12.45% | = | 464 |
| Grays | 1,294 | $\times$ 12.45% | = | 161 |
| Salta | 992 | $\times$ 12.45% | = | 123 |
| Peters | 1,666 | | | |

# EXHIBIT C

1     IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   PHOENIX BOND & INDEMNITY              )
    COMPANY, et al.,                      )
5                                         )   Docket No. 05 C 4095
                         Plaintiffs,      )
6                                         )
              vs.                         )
7                                         )   Chicago, Illinois
    JOHN BRIDGE, et al.,                  )   October 11, 2011
8                                         )   9:45 a.m.
                         Defendants.      )
9

10  BCS SERVICES, INC., et al.,           )
                                          )
11                       Plaintiffs,      )   Docket No. 07 C 1367
                                          )
12            vs.                         )
                                          )
13  HEARTWOOD 88, INC., et al.,           )   Chicago, Illinois
                                          )
14                       Defendants.      )

15                       VOLUME 1
               TRANSCRIPT OF PROCEEDINGS
16  BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17

18  APPEARANCES:

19  For the Plaintiff:    REED SMITH, LLP
                          BY:  MR. JOHN W. MOYNIHAN
20                             MR. JONATHAN S. QUINN
                               MR. MAX A. STEIN
21                             MR. THOMAS M. LEVINSON
                          10 South Wacker Drive, 40th Floor
22                        Chicago, Illinois  60606

23

24

25

1    (The following proceedings were had in open court:)

2         THE CLERK:  05 C 4095, Phoenix Bond v. Bridge.

3         THE COURT:  Okay.  All I need up here right now are

4    the people who are going to talk about the two motions that I

5    sent you the orders on last night that got teed up for this

6    morning.

7         Okay.  So the people at the podium, give your names.

8         MR. JONATHAN QUINN:  For plaintiffs --

9         THE COURT:  And watch out for that little microphone

10   there because every time you hit it, there's going to be noise

11   going all over the place.

12        MR. JONATHAN QUINN:  For plaintiffs Jonathan Quinn

13   and Max Stein.

14        MR. HOCHMAN:  Rob Hochman for Heartwood and Bank

15   Atlantic.

16        MR. MARTIN:  Good morning, your Honor; Mark Martin

17   for the intervenors Jay Lapat and Howard Berland.

18        THE COURT:  Okay.  So what I need to hear from the

19   plaintiffs is basically a response.  I need further argument

20   on the contention that if these nonparties' invocation of the

21   Fifth Amendment comes in, that's, A, improper or, B, unfair to

22   the people who are defendants in the case, the people and the

23   entities who are defendants in the case, against whom it's

24   going to be used.

25        MR. STEIN:  I'm sorry, your Honor.  You want the

1  plaintiffs --

2         THE COURT:  Because you didn't convince me with your

3  written response, so I need you to flesh it out.

4         Basically the deal is you want to put in -- you want

5  to have two nonparties get up in front of the jury and claim

6  the privilege on the question of whether they were sending

7  extra people into these -- into these auctions, right, and the

8  argument that's been made by -- it's Mr. --

9         I thought it was Mr. Becker and Mr. Pearl.  I could

10  be wrong about that.  You're with them.

11         MR. HOCHMAN:  It was everyone actually.

12         THE COURT:  Yes.

13         -- by the people who filed the motions, that that's a

14  nonparty who isn't affiliated with a party taking the Fifth

15  Amendment, it's not fair and it's not appropriate to put that

16  in against us.

17         What is wrong with that argument?

18         MR. STEIN:  The problem with that argument, your

19  Honor, is that the defendants have created a situation that

20  brought us to this day.  They are arguing that we want to put

21  this evidence in to support the determination in the damages

22  analysis that the Peters were ineligible bidders.  We need to

23  do that because the Peters were -- the Peters group were

24  bidders at the auctions, but in the damages analysis, no liens

25  were allocated to them.

1    The defendants want to attack that determination

2  saying it's wrong.

3    THE COURT:  Right.

4    MR. STEIN:  We, therefore, need to present evidence

5  to the jury that shows that that determination is right.

6    THE COURT:  Right.

7    MR. STEIN:  Therefore, we subpoenaed these witnesses.

8    At the time we subpoenaed them, we did not know what

9  their testimony -- that they would be invoking the Fifth

10  Amendment.  We subpoenaed Mr. Berland because he is named on

11  all four of the registrations that were filed for these -- for

12  the bidders -- for the building entities related to the Peters

13  group.

14    THE COURT:  What were the years that those

15  registrations were filed?

16    MR. STEIN:  The tax sales that occurred in calendar

17  years 2003 and 2004.

18    THE COURT:  Okay, keep going.

19    MR. STEIN:  Mr. Lapat is the owner of one of those

20  entities, and it's our expectation that he would be testifying

21  at trial that he has no idea what that entity did or all

22  that -- and all that he did was sign the documents, as he was

23  instructed to do by his grandfather.

24    All of this will show that they were ineligible

25  bidders, and, therefore, it was appropriate for Mr. Shaffer

1    MR. STEIN:  He relied on the fact of a settlement.

2    THE COURT:  On the fact of a settlement to conclude

3  that they weren't eligible.

4    MR. STEIN:  Yes, your Honor.

5    THE COURT:  Okay.

6    MR. STEIN:  And the defendants now want to attack

7  that.  So we simply want to present the evidence that shows

8  that they were indeed ineligible bidders.

9    THE COURT:  See, that doesn't really respond to the

10  contention -- the contention that's made here is that what

11  you're effectively doing is using a third -- a nonparty's

12  invocation of the privilege against self-incrimination against

13  a party without having some relationship between the two.

14    I mean, you're not -- you don't contend that the

15  Peters people were acting in concert with any of the

16  defendants, do you?

17    MR. STEIN:  No, we don't, your Honor.

18    THE COURT:  Okay.

19    MR. STEIN:  And if I may correct myself, the expert

20  did not just rely on the terms -- on the fact of the

21  settlement.

22    THE COURT:  I should certainly hope not.

23    MR. STEIN:  He also was informed about the underlying

24  facts alleged against the Peters and made the determination

25  based on that.  I apologize.

1    THE COURT:  Okay.  So I don't think you've really

2  responded to the contention here that what you're effectively

3  doing is using a nonparty's invocation of the privilege

4  against self-incrimination against a party.

5    I mean, it's basically the predicate for your damage

6  analysis -- I mean, I'm going to sort of grossly oversimplify

7  this, okay.

8    You want to figure -- your guy wants to come in and

9  testify, this is what would have happened if all of the people

10  who were ineligible, at least the ones we know about, were cut

11  out.  So all of the bids they won would have been back on the

12  table and we would have gotten a percentage share of them, and

13  this is our percentage share, and then you figure out what

14  would have happened to those liens on average and so on, okay.

15  And so there's several groups of people that you're saying are

16  ineligible, one of them being these Peters people.

17    And so the ineligibility of the Peters people is

18  being -- is a basis on which you're asking to increase the

19  amount of damages that each of the defendants had.

20    Mr. Quinn, if you're not going to be arguing, don't

21  give me the body language.  It's just distracting to have

22  somebody sitting there shaking heads and nodding heads and

23  whatnot, okay.

24    That's the problem, because if the Peters people were

25  not considered to be ineligible, then their liens that they

1  wouldn't be going back on the table, and your people wouldn't

2  be getting them, so that's a lower amount of damages.

3        MR. STEIN:  Yes, your Honor.

4        THE COURT:  Am I missing something?

5        MR. STEIN:  Yes, you are, your Honor.

6        THE COURT:  What am I missing?

7        MR. STEIN:  We're not putting any liens that were won

8  by the Peters back on the table.  The damage analysis does not

9  do that.

10        THE COURT:  Why do you need the Peters in there then?

11        MR. STEIN:  Can I explain the damages analysis

12  briefly?

13        THE COURT:  Yes.

14        MR. STEIN:  It's two steps.

15        The first step is for each of the three defendant

16  enterprises, how many liens did they win.

17        THE COURT:  Did they win.

18        MR. STEIN:  And how much in profits did they earn

19  from them.

20        THE COURT:  Okay.

21        MR. STEIN:  That's step one, and that results in

22  three different buckets.

23        THE COURT:  Baskets, whatever, yes.

24        MR. STEIN:  Step two is, okay, now they were

25  ineligible and all of the other ineligible bidders are

1  excluded from the sale. We take each bucket and we allocate
2  it amongst the eligible bidders because --

3         THE COURT: This is the point at which you take the
4  Peters people out.

5         MR. STEIN: Correct.

6         THE COURT: I stand corrected, but it's the same
7  problem because if the Peters people --

8         So, in other words, if you are now reallocating the
9  three baskets that the three defendants got, and let's say the
10 only people out there are you guys and the Peters people,
11 okay, so if it's you guys and the Peters people, you would say
12 maybe 50/50. If it's just you guys, you would say a hundred.

13        So that increases the amount of damages that the
14 defendants end up having to pay because there's more liens
15 that you are getting under the analysis than you would be
16 getting if you didn't have -- if you weren't thinking about
17 the Peters people at all.

18        MR. STEIN: That's correct, your Honor, although the
19 numbers are very different than that.

20        THE COURT: I understand.

21        MR. STEIN: But that's right, and that's why we have
22 to present the evidence.

23        THE COURT: I'm not disputing that you really want to
24 do this, okay.

25        So what I'm --

1    The point I'm trying to make is the invocation of the
2  Fifth Amendment by the Peters people is being used in a way
3  that serves to increase the amount of damages that these
4  defendants in the case are having to pay. So why isn't that a
5  prohibited imputation of the Fifth Amendment to somebody else?

6    MR. STEIN: Because we're not asking for any adverse
7  inferences as to what the Peters --

8    THE COURT: Well, I mean, it's a matter of semantics.
9  You are asking for an adverse inference. You're asking for
10  the inference that --

11    You're asking for the inference that the Peters group
12  would not have been eligible, and that is an inference that is
13  adverse to these defendants.

14    MR. STEIN: But, your Honor, that's an inference that
15  occurs whether they're invoking the Fifth Amendment or
16  testifying substantively.

17    THE COURT: But if they're testifying, they get to
18  get cross-examined. That's the difference. That's a big
19  difference.

20    MR. STEIN: But, your Honor, the basis of the
21  defendants' motion is simply because they're invoking the
22  Fifth Amendment. The Fifth Amendment -- their invocation of
23  the Fifth Amendment does not change the relevance of the
24  testimony.

25    If it's relevant when they testify substantively,

1  then it's also relevant to show that the Peters were

2  ineligible when they invoked the Fifth Amendment because it's

3  only being used for that limited purpose of showing that the

4  Peters were ineligible.  The relevance of the testimony does

5  not change as a result of the invocation of the Fifth

6  Amendment.

7  THE COURT:  So what's the instruction I give to the

8  jury about how they are or aren't to consider this if I let

9  these people do what you want me to let them do?

10  MR. STEIN:  Your Honor --

11  THE COURT:  What do I tell the jury?

12  MR. STEIN:  I would suggest, respectfully, that your

13  Honor can instruct the jury that there are any number of

14  reasons why people invoke the Fifth Amendment.  This is being

15  used only for a limited purpose and that the jury should not

16  draw any inferences based on the Peters invocation of the

17  Fifth Amendment as to any of the defendants.  It's that

18  simple.

19  THE COURT:  But the inference that you're asking me

20  to draw from the Peters -- that you're asking the jury to draw

21  from the Peters invocation of the Fifth Amendment is that they

22  would have been ineligible to bid.

23  MR. STEIN:  We're asking the jury to determine that

24  the Peters were ineligible to bid.  The evidence we will

25  present to support that --

1      THE COURT:  Is there something other than their

2   invocation of the Fifth Amendment that you have to support

3   that?

4      MR. STEIN:  We have the registrations that show that

5   they were -- that multiple entities were registered in the

6   same sales and that -- and so we would present that as well.

7      THE COURT:  Okay.  I mean, I don't see why you

8   couldn't present that.  That's a document that's filed with

9   some public agency, right?

10      MR. STEIN:  Yes, your Honor.

11      THE COURT:  Are there business records of other

12   entities or something like that?

13      MR. STEIN:  Well --

14      THE COURT:  The difficulty is that when somebody gets

15   up and says, I'm not going to testify, you get an evidentiary

16   inference out of that, or at least you get an instruction to

17   the jury that they can draw an evidentiary inference from

18   that, and the other side doesn't get to cross-examine it at

19   all.

20      It's the equivalent of the person getting up on the

21   stand and saying, yes, I did it, and then walking out of the

22   room before the other people have a chance to question him.

23      MR. STEIN:  To be clear, your Honor, we're not asking

24   your Honor to instruct the jury about that inference.  All

25   we're asking --

1        THE COURT: Well, they're going to have to be told

2    something because otherwise they're just going to be wildly

3    speculating as to what it means.

4        MR. STEIN: Exactly, and to the contrary, not only

5    are we not asking for an inference that the jury should infer

6    anything against the defendants, we're suggesting that your

7    Honor can instruct the jury specifically that they're not to

8    do that.

9        This is, again, a problem of the defendants making.

10   We have --

11        THE COURT: Honestly, it's not. I mean, they're one

12   piece of it because they're disputing something that you

13   argue, but that doesn't mean it's a problem of their making.

14   I mean, there is no rule of law or anything that you can rely

15   on that says that the other side has to agree with everything

16   you're saying. It's a litigation that's been going on for

17   five and a half years. The assumption is they're going to

18   dispute everything you're saying. That's why we have trials.

19   So it's not a problem of their making. Seriously, it's just

20   not.

21        If it's a problem with your guy's damage analysis,

22   then it's a problem with the way in which you guys chose to do

23   the damage analysis.

24        MR. STEIN: Respectfully, your Honor, it's not that.

25   It is, they say --

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on December 13, 2011, he served copies of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF BG DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR NEW TRIAL** on the parties of record pursuant to ECF as to Filing Users.

_____/s/ Arthur W. Friedman_____
Arthur W. Friedman