## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PHOENIX BOND & INDEMNITY, CO., et al.,    )
                                          )
                Plaintiffs,    )      No. 05 C 4095
                                          )      (Consolidated for Pretrial Purposes
                                          )      with No. 07 C 1367)
      v.                                  )
                                          )      Judge Matthew F. Kennelly
JOHN BRIDGE, et al.,                      )
                                          )
                Defendants.

## TRIAL TRANSCRIPT PAGES TO WHICH REFERENCE IS MADE IN BG DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR POST-TRIAL MOTION (DKT. 911)

Attached hereto for the Court's convenience are copies of trial transcript pages to which

reference is made in the BG Defendants' Post-Trial Motion filed on December 13, 2011 as Dkt.

911.

                         Respectfully submitted,
                         **BG DEFENDANTS**

                By:       /s/ Arthur W. Friedman
                         One of their Attorneys

Arthur W. Friedman
Gabriel B. Plotkin
Miller Shakman & Beem LLP
180 North LaSalle Street
Suite 3600
Chicago, IL 60601
Phone: 312/263-3700
Fax: 312-263-3270

Dated: December 30, 2011

1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   PHOENIX BOND & INDEMNITY            )
    COMPANY, et al.,                    )
5                                       )   Docket No. 05 C 4095
                        Plaintiffs,     )
6                                       )
             vs.                        )
7                                       )   Chicago, Illinois
    JOHN BRIDGE, et al.,                )   October 12, 2011
8                                       )   2:00 p.m.
                        Defendants.     )
9

10  BCS SERVICES, INC., et al.,         )
                                        )
11                      Plaintiffs,     )   Docket No. 07 C 1367
                                        )
12           vs.                        )
                                        )
13  HEARTWOOD 88, INC., et al.,         )   Chicago, Illinois
                                        )
14                      Defendants.     )

15                        VOLUME 2
                  TRANSCRIPT OF PROCEEDINGS
16  BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17

    APPEARANCES:
18

19  For the Plaintiff:    REED SMITH, LLP
                           BY:  MR. JOHN W. MOYNIHAN
20                              MR. JONATHAN S. QUINN
                                MR. MAX A. STEIN
21                              MR. THOMAS M. LEVINSON
                           10 South Wacker Drive, 40th Floor
22                         Chicago, Illinois  60606

23

24

25

```
 1    For the Defendant:        SIDLEY AUSTIN, LLP
                                     BY:  MR. WILLIAM F. CONLON
 2                                        MR. CHRISTOPHER K. MEYER
                                          MR. ROBERT N. HOCHMAN
 3                                   One South Dearborn Street
                                     Chicago, Illinois  60603
 4

 5                              MORGAN, LEWIS, BOCKIUS
                                     BY:  MR. THEODORE M. BECKER
 6                                        MR. RICHARD J. PEARL
                                     77 West Wacker Drive
 7                                   5th Floor
                                     Chicago, Illinois   60601
 8

 9                              NEAL, GERBER & EISENBERG
                                     BY:   MR. ATHANASIOS PAPADOPOULOS
10                                   MR. MICHAEL D. SHER
                                     Two North LaSalle Street
11                                   Suite 1700
                                     Chicago, Illinois   60602
12

13                                   MR. WILLIAM T. HUYCK
                                     122 South Michigan Avenue
14                                   Suite 1850
                                     Chicago, Illinois   60603
15

16                              MILLER, SHAKMAN & BEEM, LLP
                                     BY:  MR. ARTHUR W. FRIEDMAN
17                                        MR. GABE PLOTKIN
                                     180 North LaSalle Street
18                                   Suite 3600
                                     Chicago, Illinois   60601
19

20                              RUFF, WEIDENAAR & REIDY, LTD.
                                     BY:  MR. JAMES R. QUINN
21                                        MR. SCOTT NELSON
                                     222 North LaSalle Street
22                                   Suite 1525
                                     Chicago, Illinois   60601
23

24

25
```

1              GENSON & GILLESPIE
2                  BY:  MR. EDWARD M. GENSON
                 53 West Jackson Boulevard
3                   Suite 1420
                 Chicago, Illinois   60604

4

5              O'HALLORAN, KOSOFF, GEITNER, & COOK
                 BY:  MR. ELI ROSENBLUM
6                   Edens Corporate Center
                 4th Floor
7                   650 Dundee Road
                 Northbrook, Illinois   60662

8

9              STEARNS, WEAVER, MILLER, WEISSLER,
            ALHADEFF & SITTERSON
10                  BY:  MS. ANA BARNETT
                 150 West Flagler Street
11                  Miami, Florida   33130

12

13 Also Present:        MR. MARK MARTIN

14

15                  MR. ANDREW MARKS
                 MR. STANFORD MARKS
16                  MS. JOCELYN CONGUA-BLAIR-STOLLER

17

18

19

20

21

22

23

24      LAURA M. BRENNAN - Official Court Reporter
       219 South Dearborn Street - Room 2102
25           Chicago, Illinois   60604
            (312) 435-5785

1    in that form?

2    A.   What was called for was an attestation, a swearing, that

3    we were not -- Phoenix was not involved with any kind of

4    prior arrangement whatsoever with someone else at the tax

5    sale who would help Phoenix, would benefit Phoenix from

6    participation in the sale.

7    Q.   And, sir, were there also representations and warranties

8    included in the registration package?

9    A.   Yes.

10   Q.   And the first representation and warranty said what?

11   A.   Well, it says that -- we are talking about Phoenix

12   now -- that Phoenix has no capital, purchase money, or other

13   finances in common with any other bidding entity or person

14   registering to bid at the sale.

15   Q.   And was that true in the years 2002 to 2007?

16   A.   It was true in every year, before then and since.

17   Q.   And what about B?

18   A.   B states that there would be no common ownership

19   interest or common source of funds with any other bidding

20   entity.

21        That was true when we signed that initially,

22   whichever one we signed, and every one since.

23   Q.   And what about the next representation?  Was that true?

24   A.   It was true.  It provides that we would have no

25   agreements to purchase or sell any properties in connection

1  lien sales that you sued about, that Phoenix Bond sued about

2  between 2002 and 2007, was there any rule that prohibited the

3  post-sale assignment of liens?

4  A.  No, there was not.

5  Q.  So, if Phoenix Bond attended a sale and bought liens and

6  after the sale it decided it didn't want to keep the

7  certificates, Phoenix Bond, during 2002 to 2007, could have

8  sold those certificates to anybody, isn't that right?

9  A.  They could, yes.

10 Q.  And that sale would not have violated the single

11 simultaneous bidder rule, is that right?

12 A.  Yes.

13 Q.  Is there any rule or law that you know of prohibit --

14 against -- let me rephrase that.

15         Between 2002 and 2007, relating to the tax lien sales

16 at issue in this case, is there any rule that prohibits

17 providing bid books to prospective buyers?

18 A.  Not that I know of, no.

19 Q.  And between 2002 and 2007 at the tax lien sales at issue

20 in this case, was there any law, to the best of your

21 knowledge, against providing bid books to prospective buyers?

22 A.  No.

23 Q.  Was there any law against people charging prospective

24 buyers for bid books during the period of time 2002 to 2007?

25 A.  No.

1   A.   If I'm --

2   Q.   I need you to answer that question. I need you to answer

3   this question. I'll state it again.

4         Between 2002 and 2007, was there any rule that

5   prohibited people from charging prospective bidders for bid

6   books?

7   A.   Yes, there was.

8   Q.   What rule was that?

9   A.   The rule was that you couldn't provide them if you were

10   engaging in participation in the results and consequences of

11   delivery of that book, so that in effect, you had some

12   relationship to the development there, and you were doing the

13   same function for anyone else.

14   Q.   What about if you -- if you just charged for a bid book

15   and you didn't have all of those things you just said?

16   A.   There's no objection to that, I would think.

17   Q.   No rule against it?

18         Now, is there any rule that prohibited Phoenix Bond

19   as, a registrant for a Cook County tax sale, to give -- to

20   give somebody else a copy of its due diligence of all the

21   information that you acquired before the sale?

22   A.   Just giving that to someone?

23   Q.   Right.

24   A.   Not that I know of.

25   Q.   All right. Now, you testified before that you were a

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHOENIX BOND & INDEMNITY
COMPANY, et al.,                    )
                                    )
                                    )    Docket No. 05 C 4095
              Plaintiffs,           )
                                    )
     vs.                            )
                                    )    Chicago, Illinois
JOHN BRIDGE, et al.,                )    October 13, 2011
                                    )    9:45 a.m.
              Defendants.           )

BCS SERVICES, INC., et al.,         )
                                    )
              Plaintiffs,           )    Docket No. 07 C 1367
                                    )
     vs.                            )
                                    )
HEARTWOOD 88, INC., et al.,         )    Chicago, Illinois
                                    )
              Defendants.           )

VOLUME 3
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

APPEARANCES:

For the Plaintiff:     REED SMITH, LLP
                       BY:  MR. JOHN W. MOYNIHAN
                            MR. JONATHAN S. QUINN
                            MR. MAX A. STEIN
                            MR. THOMAS M. LEVINSON
                       10 South Wacker Drive, 40th Floor
                       Chicago, Illinois  60606

Stanford Marks - cross

1  such as yourself, true?

2  A    Yes.

3  Q    He charged you a fee for that information, didn't he?

4  A    He did.

5  Q    He sold it to other tax buyers, didn't he?

6  A    Yes.

7  Q    They used it at the same sale that you used it at, true?

8  A    I believe so, yes.

9  Q    The fact that two bidders used that same information from

10 the same source certainly did not violate any of the

11 treasurer's rules.  Would you agree?

12 A    I would agree.

13 Q    And whether that information was purchased or just given

14 to the bidder doesn't affect the fact that it doesn't violate

15 the rule, true?

16 A    I would agree with that.

17 Q    You described lines of credit that Phoenix Bond had

18 arranged in advance of the sales with some of the large banks

19 here in Chicago, true?

20 A    Yes.

21 Q    MB Bank and what was the other?

22 A    US Bank.

23 Q    US Bank.

24       At the time that you registered for the sale, that

25 your company registered for the sale, you certified that you

1    were interested in buying, but that if you got one of them,

2    you might sit out the next eight or nine, is that true?

3    A.    That's true.

4    Q.    There were other times when you might have some kind of

5    interest in a property but not a compelling interest, and so

6    you might bid lackadaisically, I think is the word?  Is that

7    correct?

8    A.    That's correct.

9    Q.    And by lackadaisically, it may be that you didn't hurry

10   to get your hand up and you didn't shout out your percentage

11   because you weren't really that interested in the property;

12   it wasn't that important to you, correct?

13   A.    I think that's true.

14   Q.    Now, it's the position of Phoenix Bond that the Single

15   Simultaneous Bidder Rule prohibits multiple bidders from

16   participating in tax sales contemporaneously for the same

17   registrant, correct?

18   A.    I believe that's a portion of the rule you read, yeah.

19   Q.    Well, do you remember -- your deposition was taken I

20   know in three sessions.  The one I'm referring to is

21   September 16th of 2009 at page 628.

22          When I asked you the following question -- this is

23   the question:  Now, first I assume that it's your position --

24          MR. JONATHAN QUINN:  Objection, your Honor.  This

25   is not impeaching.

 1          THE COURT:  It doesn't need to be.  He's a

 2    representative of a party.

 3          Go ahead.

 4          MR. JONATHAN QUINN:  My mistake.  I'm sorry.

 5    BY THE WITNESS:

 6    A.   I'm sorry, what page did you say?

 7          THE COURT:  628.

 8          THE WITNESS:  I don't have a page 628.

 9          THE COURT:  He's just going to read it to you for

10    now.

11          Do you want him to have it or do you just want to

12    read it to him?

13          MR. FRIEDMAN:  If he wants it, I'm glad to provide

14    it to him.

15          THE COURT:  He must have a different volume.

16        (Document tendered.)

17          THE WITNESS:  Okay.

18    BY MR. FRIEDMAN:

19    Q.   The question I asked, beginning at line 12, is:  Now,

20    first I assume that it's your position that the rule enacted

21    in 2001 prohibits multiple bidders from participating in tax

22    sales contemporaneously with the same registrant?

23          And your answer was:  Yes.

24          Correct?

25    A.   Yes.

1               IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4  PHOENIX BOND & INDEMNITY
    COMPANY, et al.,
5                            Docket No. 05 C 4095
                 Plaintiffs,
6

7              vs.
                          Chicago, Illinois
    JOHN BRIDGE, et al.,           October 14, 2011
8                            9:00 a.m.
                 Defendants.
9

10  BCS SERVICES, INC., et al.,

11                Plaintiffs,   Docket No. 07 C 1367

12             vs.

13  HEARTWOOD 88, INC., et al.,    Chicago, Illinois

14                 Defendants.

15                     VOLUME 4
                 TRANSCRIPT OF PROCEEDINGS
16     BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17

18  APPEARANCES:

19  For the Plaintiff:    REED SMITH, LLP
                    BY:   MR. JOHN W. MOYNIHAN
20                        MR. JONATHAN S. QUINN
                        MR. MAX A. STEIN
21                        MR. THOMAS M. LEVINSON
                   10 South Wacker Drive, 40th Floor
22                   Chicago, Illinois  60606

23

24

25

David Gray - deposition

1   Q   I'm sorry.

2   A   Sorry.

3   Q   This is one of the questions I have been meaning to ask

4   you.

5          When BG had been buying taxes or bought taxes at the

6   2002, 3 and 4 sale -- or I should say strike that.

7          They bought taxes in calendar year 2002?

8   A   No, 3, 4 and 5.

9   Q   Sorry.  Bought taxes in calendar years 2003, 4 and 5?

10  A   Yes.

11  Q   Then Atlantic Municipal bought taxes in calendar years

12  2006, 7 and 8?

13  A   That's correct.

14  Q   Okay.  Why didn't BG buy taxes in 2006?

15  A   Because BG's belly was full.  It had purchased taxes in

16  the three years prior to that, and it was digesting.  By that

17  I mean perfecting title to and attempting to sell and dispose

18  of properties that it had acquired, and, therefore, it was

19  time to stop for the time being anyway.

20  Q   Okay.  And why didn't Atlantic Municipal conversely buy

21  taxes in the years that BG bought taxes?

22  A   Well, that probably would have violated the single

23  simultaneous bidder rule.

24  Q   How?

25  A   Actually I changed my mind.  I guess it probably wouldn't

1  have.  It probably wouldn't have.  So it simply was a matter

2  of policy decision on my part to continue with BG for those

3  three years and then Atlantic for the next three years.  They

4  were on the same line of credit.

5       So, no, no.  Go back to what I said in the first

6  place.  I think it would have violated the single simultaneous

7  bidder rule in that if not the rule, certainly the

8  representations and warranties which were in effect at the

9  time said that there wasn't any common finances and there

10 would have been common finances.  So I think it may have

11 violated the rule.

12      Whether it did or whether it didn't, it was a matter

13 of policy on my part that three years of BG purchases was

14 that -- was quite sufficient and time for somebody else to

15 buy.  It was just a part of my all-over plan, the company's

16 all-over plan, family's all-over plan, to put Atlantic in for

17 three years.

18 Q   Okay.  What do you mean by the family's overall plan?

19 A   Well, the family overall plan basically is, it started in

20 1990, just going back to what I had said before.

21 Q   Uh-huh.

22 A   I was about 57, and that's old, and I owned all the stock

23 of Midwest.  And when you get old and own all the stock in one

24 company, that's not good.

25      Therefore, for family purposes, for state tax

1  Q   Was 2001 the first time that you had become independent?

2  A   No.  I was always independent.  I think that it refers

3  possibly to the bank line being independent.  I always look at

4  myself as being independent.

5       I always made my own choices for my company and hired

6  my own employees, had my own health insurance plan, my own

7  401(k) plan, independent.

8       We're talking now, I think, about tax matters to

9  which I hire an accountant and pay him a fair sum of money to

10 prepare, but I'm not an accountant, and my background is not

11 in accounting.

12 Q   Now, at that time in 2001, you had your own line of credit

13 at LaSalle Bank for use in the tax sale, is that correct?

14 A   That's correct.

15 Q   All right.  And at any of the subsequent tax sales that

16 you were on, did you use any funds other than funds that you

17 had -- that Wheeler-Dealer had borrowed on this line of

18 credit?

19 A   To purchase at the tax sale?

20 Q   To purchase at the tax sale.

21 A   No, I did not.

22 Q   Now, I want to go back.  You were asked a lot of questions

23 about the procedures at the tax sale?

24 A   Yes.

25 Q   And let's start, first of all, with the presale

1   Q   And did --

2       Were the bidders for Wheeler-Dealer and Atlantic

3   visible on that video?

4   A   Yes, they were, both of them.

5   Q   They were both in the front rows?

6   A   That's correct.

7   Q   Were you the bidder?

8   A   No.  My employee, Lance Shields, was the bidder.

9   Q   So in watching that video, were you able to see whether or

10  not Wheeler-Dealer and Atlantic were bidding on the same bids?

11  A   I was able to make a count of that, yes.  I was able to

12  make that determination.

13  Q   You counted the times that they have been on the same

14  lien?

15  A   Yes.

16  Q   And the times they didn't?

17  A   That's right.  I went through each one.

18      There were 209 examples where either Wheeler-Dealer

19  or Atlantic Municipal placed a bid on one of the items.  And

20  of those 209, there were 58 times, 58 times, where we did not

21  bid on the same item.

22      And even though I said I'm not very good at math,

23  that is 28 percent difference, 72 percent the other way, where

24  we did not bid on the same item 28 percent of the time, or we

25  did bid on the same item 72 percent of the time, which

1   absolutely shows we did not bid on the same items.  That's a

2   very large portion.

3   Q   And was that true in the sales where you were the bidder

4   that you weren't bidding on exactly the same items as BG or

5   Atlantic?

6   A   Yes, absolutely.

7        But, in fact, our entire strategies for bidding were

8   different.

9   Q   Now, you've heard testimony and arguments of lawyers about

10  the business models of various companies that participated in

11  the tax sale?

12  A   Yes.

13  Q   What would you say the business model of Wheeler-Dealer

14  was?

15  A   Well, I think I kind of touched on it, but the reality was

16  we were trying to buy tax liens that had low dollar amounts so

17  I could get my inventory numbers higher.

18       Again, I wasn't interested in big items.  I wasn't

19  really interested in commercial or industrial, though I did

20  buy a few.  But for the most part I was -- at the beginning

21  especially, I bought a lot of vacant lots, hundreds and

22  hundreds of vacant lots on the West Side of Chicago, and a lot

23  them from 12 to 18 percent because everybody thought I was

24  nuts for bidding on them, but I bid on hundreds and hundreds

25  of them, and I was the only one bidding on them most of the

Timothy Gray - cross

1  Municipal?

2  A   That's correct.

3  Q   That was --

4  A   Yes, I owned zero percent of BG, so no common ownership

5  interest.  Common source of funds, I had my own line set up

6  with LaSalle Bank completely separate, hundred percent

7  separate.  So I feel like I'm good on B.

8  Q   And did you feel when you signed that that the fact that

9  you had borrowed some money from Atlantic --

10          Well, if BG was the other bidder, which would have

11  been the case in 2004, did you feel that having a loan from

12  Atlantic Municipal constituted a common source of funds for

13  BG?

14  A   No, of course not, absolutely not.

15  Q   And later when Atlantic Municipal was the bidder, did you

16  feel that the fact that you had loans from your dad or from

17  profit sharing plan meant that you had a common source of

18  funds?

19  A   No, absolutely not.  That's the nature of the loans.

20  Q   Now, you testified that in 2004 you sold your stock in

21  Atlantic, is that correct?

22  A   Yes.

23  Q   And that was prior to the year that -- it was two years

24  prior to the year that Atlantic first bid at this sale, is

25  that correct?

1   A    That's correct, Tom.  It was a little over two years, as I

2   remember.

3   Q    At the time they bid in 2006 and 2007, you had no

4   ownership interest in Atlantic?

5   A    Two years removed from that.

6   Q    Now, you were asked whether there had been -- and your dad

7   in his deposition was asked -- whether there was a stock

8   purchase agreement, is that correct?

9   A    Yes, that's right.

10  Q    And I believe you replied that there was a canceled stock

11  certificate, is that correct?

12  A    Yes.

13  Q    I want to show you what is part of Defendants'

14  Exhibit 165.  Is that the canceled certificate?

15  A    It is.

16  Q    Showing a sale of your shares?

17  A    It was canceled 7/1/04, and you can see the name Timothy

18  E. Gray is written, and that is the document, yes, sir.

19          THE COURT:  What was that number, Mr. Huyck?  I'm

20  sorry.

21          MR. HUYCK:  165, Defendants' 165.

22      (Brief interruption.)

23  BY MR. HUYCK:

24  Q    Now, you've testified, and your dad testified at his

25  deposition, that it was Mr. Palasz who decided the amount of

Timothy Gray - cross

1  oftentimes every month like clock work, so that I paid for my

2  portion of everything.  There was nothing handed to me here.

3  Q    There was another thing I wanted to ask you about, the

4  registration form, Plaintiffs' Exhibit 400.

5       You were also asked about this document, the

6  acknowledgment of single simultaneous bidder rule.

7  A    Yes, Tom.

8  Q    When you signed that form in 2004, did you think that

9  because of BG bidding at that sale that you and BG were in

10  violation of that rule?

11  A    No, absolutely not.

12  Q    What was your understanding of the rule?

13  A    My understanding of the rule is that if you had another

14  bidder bidding on your behalf in that room with the same money

15  that you are contributing to, your money, that would be a

16  violation of the rule.

17       So, therefore, I own a hundred percent of my company.

18  I have a hundred percent control in the line of credit which I

19  went out and got from the bank, and I'm using that.  No one

20  owns my company.  No one controls my finances.  I have my own

21  employees.  And there is absolutely no question that there was

22  anyone else bidding in that room for me.

23       And I would love to see a penny from anyone in that

24  room bidding for me.  There was no one.  It was just me or

25  Lance, which is my employee.

Timothy Gray - cross

1  Q   Now, there is a footnote on this form defining the term

2  "related bidding entity."

3  A   Yes.

4  Q   Do you see that?

5      (Brief interruption.)

6  BY MR. HUYCK:

7  Q   At any rate it says --

8          THE COURT:  I think he can see it, and I think the

9  jurors can all see it.  I don't think you have to worry about

10 it.

11 BY MR. HUYCK:

12 Q   A related bidding entity is an individual corporation and

13 so on.  It has a shareholder and partner and principal,

14 officer, general partner, or other person or entity having an

15 ownership interest in common with a contractual relationship

16 with any other registrant in the 2002 annual sale.

17         Did you feel that in any way you were a related

18 bidding entity to BG?

19 A   No, absolutely not.  This definition alone proves that I

20 had nothing to do with any other entity at that tax sale,

21 ever.

22         It spells it out.  I know I was not a shareholder in

23 any other company that was in there.  I was not a partner.  I

24 was not a principal.  I was not an officer or a general

25 partner.  And I had no ownership interest in common with BG or

Timothy Gray - cross

1  Atlantic or a contractual relationship with BG or Atlantic or

2  any other registrant at the 2002 annual sale.  I mean, that is

3  as clear and cut and dry as words on a paper can be.

4  Q   Now, I believe you mentioned, and your dad, of course,

5  also mentioned in his deposition, that he had been

6  participating in these tax sales for many years, is that

7  correct?

8  A   That is correct.

9  Q   And Dan Elkin, who was doing the bidding for him, also was

10  frequently at these sales, is that correct?

11  A   Yes, he was doing the bidding for BG or Atlantic and, yes.

12  Q   Now, were you aware of any attempt to hide the fact that

13  you were your dad's son?

14  A   No, absolutely not.  I did at least half to more than half

15  of the bidding.  I was in the room.

16  Q   And you got to know some of the other bidders that were

17  there in the room?

18  A   Yes, I got to know, you know, on a -- I wouldn't call it,

19  you know, a professional basis -- almost all the bidders in

20  the room.

21  Q   And they knew that you were David Gray's son?

22  A   Yes, that's right.

23  Q   And were you aware that people knew that Dan Elkin was an

24  employee of your dad?

25  A   I would certainly think so.  He had been working for my

1  Q   Well, there is one year she didn't actually welcome your

2  business, right?

3  A   No, that's not true.

4  Q   Was there a year after the implementation of the single

5  simultaneous bidder rule where you were ejected from the sale

6  for violating the single simultaneous bidder rule?

7  A   No.   That's not the way I would say it.

8  Q   That's not the way you would say it?

9  A   That's certainly not the way I would describe.

10  Q   Was there ever a period of time after the implementation

11  of the single simultaneous bidder rule where you were not

12  allowed to bid at the tax sale because the treasurer's office

13  believed you had violated the rule?

14  A   That is a question --

15  Q   It's a yes or no question.

16  A   Well, I can't answer it yes or no.

17  Q   Okay.  So your testimony here is that there was never a

18  time that you were prevented from bidding at one of the tax

19  sales for violating the single simultaneous bidder rule?

20  A   There is no question about it.   The treasurer never

21  thought I violated it.

22         There was a question as to the relatedness and my

23  being in the room.   It was not a violation.

24  Q   You were prevented from bidding because of the question as

25  to the relatedness, right, Mr. Gray?

Timothy Gray - redirect

1   A    That's not how I remember it, sir.

2   Q    That's not how you remember it?

3   A    Correct.

4   Q    But you were prevented from bidding for a period of time

5   at one of the sales, is that correct, Mr. Gray?

6   A    Sir, I believe --

7           MR. HUYCK:  Objection.

8           THE COURT:  Excuse me?

9           MR. HUYCK:  He keeps asking the same question.

10          THE COURT:  It's because it hasn't been answered

11  directly.  So the objection is overruled.

12          THE WITNESS:  It was during a lunch break.

13  BY MR. STEIN:

14  Q    Sir, it was a yes --

15          THE COURT:  Start the question over again.  The

16  answer is stricken.  It wasn't responsive.  Ask the question

17  again.

18  BY MR. STEIN:

19  Q    Was there ever a time that you were prevented from bidding

20  at a sale because of a question as to the relatedness?

21  A    Yes.

22          MR. STEIN:  Thank you.

23          THE COURT:  Mr. Huyck.

24                    RECROSS EXAMINATION

25  BY MR. HUYCK:

1    Q   Will you tell us then about that incident?

2    A   I would be happy to tell you, Tom.

3       Just before lunch on one of the days, there was a

4 complaint that what came in from another tax buyer -- I don't

5 know who it was -- but there was a complaint -- still to this

6 day I don't know who it was and do not care -- where they

7 complained that, as David Gray's son, or Timothy Gray, I was

8 in that room bidding and I should not have been in that room

9 bidding because there was another bidder.

10       It was right before lunch, as I remember it, and I

11 was asked then to produce some type of documentation showing

12 that, in fact, I was independent, if you will.

13       I had a third party attorney at the time, who then I

14 called. He came over with me, and we spoke personally to

15 Martha Mills, who was the tax sale supervisor at the time.

16 And he did most of the talking, as he was my attorney at the

17 time.

18       He showed some documents; namely, the documents that

19 proved that I own a hundred percent of Wheeler-Dealer. He

20 explained to her the situation, that we were not bidding on

21 each other's behalf, that I was doing my entire own thing. I

22 was young, building up my business.

23       She accepted that. She actually went away for a

24 period of maybe three minutes. She came back. She handed the

25 documents back to Mr. Brown. She said: I understand what

1 you're saying. You can go back into the room now and bid.

2       That was in, I think, 2001 for the 1999 taxes, if I

3 remember correctly. And since then, I have not had a single

4 problem with the treasurer's office. So from my point of

5 view, having a conversation with a third party attorney --

6       MR. STEIN: Your Honor, objection to the narrative

7 answer.

8       THE COURT: Sustained.

9 BY MR. HUYCK:

10 Q   What was the name of the attorney that went with you?

11 A   His name was Burt Brown.

12 Q   Now, the question that Mr. Stein asked you about, the

13 representations and warranties again, about the meaning of

14 that paragraph A in there, you're not a lawyer, are you,

15 Mr. Gray?

16 A   No, I'm not.

17 Q   And when you testified about what you meant about having

18 common finances, were you testifying about what your

19 understanding of the form was back then at the time you signed

20 the form?

21 A   Yes.

22 Q   And BG never loaned you any money to participate in this

23 sale?

24 A   Never.

25 Q   Did it ever loan you any money at all?

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
3

4    PHOENIX BOND & INDEMNITY
     COMPANY, et al.,
5                                     )  Docket No. 05 C 4095
                    Plaintiffs,       )
6                                     )
                vs.                   )
7                                     )  Chicago, Illinois
     JOHN BRIDGE, et al.,             )  October 17, 2011
8                                     )  9:50 a.m.
                    Defendants.       )
9

10   BCS SERVICES, INC., et al.,      )
11                  Plaintiffs,       )  Docket No. 07 C 1367
12              vs.                   )
13   HEARTWOOD 88, INC., et al.,      )  Chicago, Illinois
14                  Defendants.       )

15                         VOLUME 5
                 TRANSCRIPT OF PROCEEDINGS
16   BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17
     APPEARANCES:
18

19   For the Plaintiff:    REED SMITH, LLP
                           BY:  MR. JOHN W. MOYNIHAN
20                              MR. JONATHAN S. QUINN
                                MR. MAX A. STEIN
21                              MR. THOMAS M. LEVINSON
                           10 South Wacker Drive, 40th Floor
22                         Chicago, Illinois  60606

23

24

25

Meyers - cross

1    A    Yes.

2    Q    So the fact that it might sell one of those liens to

3    another tax buyer doesn't change that fact, does it?

4    A    That's correct.

5    Q    Under your understanding of the rule, if a tax buyer

6    registers for the sale in order to bid on liens for its own

7    benefit, there's nothing wrong with that, is there?

8    A    No.

9    Q    I'd like to show what has been marked as Defense

10   Exhibit 76.

11            Now, this first page is a letter dated August 22nd,

12   2005.  And it's a letter that the treasurer's office sent to

13   BCS on that date, isn't that correct?

14   A    Yes.

15   Q    Okay.  And this was a -- what the treasurer's office was

16   doing here was enclosing a survey that they were asking BCS to

17   fill out?

18   A    That's correct.

19   Q    The survey was asking them, for the tax buyer's impression

20   of how the sale was run that year, isn't that correct?

21   A    That's correct.

22   Q    This was sent out after the sale?

23   A    Yes.

24   Q    Basically saying, how did it go?

25   A    Right.

1  A   Yes.

2  Q   And in the area where you can write your own comments, you

3  said the liens between 60 and $90,000 Sass was getting 90

4  percent of those even when there were several bidders at zero

5  percent, correct?

6  A   Yes.

7  Q   You knew that before this lawsuit was filed that that was

8  how the auctioneers were awarding liens, didn't you?

9  A   Yes.

10     MR. PEARL:  I have nothing further, your Honor.

11     THE COURT:  Mr. Friedman.

12     MR. FRIEDMAN:  Good morning.  My name is Arthur

13  Friedman on behalf of some but not all of the Gray defendants.

14                     CROSS EXAMINATION

15  BY MR. FRIEDMAN:

16  Q   I just have a couple of questions, Miss Meyers.

17          If I have a daughter, and I do have a daughter, and

18  she has an independent company and I have an independent

19  company, she owns her company, I own my company, both of us

20  registered and bid at the sale, that's not a violation of the

21  rules as you understand it, correct?

22  A   Not that I'm aware of.

23     MR. FRIEDMAN:  Thank you.

24     THE COURT:  Anyone else on the defense side?

25     Redirect?

1  Q   Miss Stoller, I'm sorry to interrupt you.  You heard also

2  throughout this trial, you have heard defense counsel refer to

3  you as rich.  Have you been here for that?

4  A   Yes.

5  Q   And you've heard defense counsel say that you filed this

6  lawsuit because you wanted to get richer?

7  A   I heard them say that.

8  Q   How would you characterize your own financial well-being?

9  A   I am successful.  I have worked very hard for everything.

10  I'm totally self-made.  My staff worked hard.  We worked

11  sometimes 24/7.  Whatever I have it's because of what I

12  earned.

13  Q   And why did you file this lawsuit on behalf of BCS

14  Services?

15  A   I was angry that these people -- I'm a survivor, and this

16  whole lawsuit is about -- to me it's very simple.  You're

17  supposed to have one -- each company is to have one bidder.  I

18  only had one bidder.  Mr. Marks only had one bidder.  But

19  there were lots of other bidders in the room.  And as a result

20  of all those other bidders we were not getting our fair share

21  of the product.  And that's why I filed it.  I worked hard in

22  this business.

23  Q   Miss Stoller, tell us about your upbringing.

24  A   I'm a South Side girl.  My natural father died when I was

25  five.  My mother remarried.  I'm from Brighton Park, which is

1819

1
2
3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

4  PHOENIX BOND & INDEMNITY
5  COMPANY, et al.,

                              Docket No. 05 C 4095
6              Plaintiffs,

7         vs.
                              Chicago, Illinois
8  JOHN BRIDGE, et al.,       October 19, 2011
                              1:30 p.m.
9              Defendants.

10  BCS SERVICES, INC., et al.,

11              Plaintiffs,    Docket No. 07 C 1367

12         vs.

13  HEARTWOOD 88, INC., et al.,    Chicago, Illinois

14              Defendants.

15                  VOLUME 7
16         TRANSCRIPT OF PROCEEDINGS
   BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17
   APPEARANCES:
18

19  For the Plaintiff:    REED SMITH, LLP
                          BY:  MR. JOHN W. MOYNIHAN
20                             MR. JONATHAN S. QUINN
                               MR. MAX A. STEIN
21                             MR. THOMAS M. LEVINSON
                          10 South Wacker Drive, 40th Floor
22                        Chicago, Illinois  60606

23

24

25

1   Q    That's right.  CMS did not have any of its own personnel,
2   right?

3   A    That's correct.

4   Q    And CMS offered the same services that SI Management
5   offered?

6   A    Yes.

7   Q    What is the cluster of tax buying entities that's next?  I
8   don't know what color that is.

9        How would you describe that color?

10  A    Green.

11       THE COURT:  It's either yellow-green or green-yellow
12  or the color of your tie, whichever you prefer.

13       Those of us who had the Crayola 64 back in the day,
14  it's not clear whether that's yellow-green or green-yellow.

15       MR. JONATHAN QUINN:  I didn't know whether maybe it
16  was puce.

17       THE WITNESS:  That's green.  On here it's green.

18  BY MR. JONATHAN QUINN:

19  Q    I will go with green.

20       Who is listed in the green cluster?

21  A    Interstate and a company called Central.

22  Q    And those entities are grouped together because you
23  believe they were owned by two different members of the same
24  family, right?

25  A    Yes.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PHOENIX BOND & INDEMNITY
COMPANY, et al.,                  )
                                  )
                                  )   Docket No. 05 C 4095
                Plaintiffs,       )
                                  )
        vs.                       )
                                  )   Chicago, Illinois
JOHN BRIDGE, et al.,              )   October 26, 2011
                                  )   9:00 a.m.
                Defendants.       )

BCS SERVICES, INC., et al.,       )
                                  )
                Plaintiffs,       )   Docket No. 07 C 1367
                                  )
        vs.                       )
                                  )
HEARTWOOD 88, INC., et al.,       )   Chicago, Illinois
                                  )
                Defendants.       )

VOLUME 11
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

APPEARANCES:

For the Plaintiff:     REED SMITH, LLP
                       BY:   MR. JOHN W. MOYNIHAN
                             MR. JONATHAN S. QUINN
                             MR. MAX A. STEIN
                             MR. THOMAS M. LEVINSON
                       10 South Wacker Drive, 40th Floor
                       Chicago, Illinois  60606

1  A   Yes, I see.

2  Q   Okay. It says "it," referring to a bidding entity

3  registering to be permitted to participate, "it has no

4  capital, purchase money, or other finances in common with any

5  other bidding entity or person registering to bid."

6       And would it be fair to say that you really don't

7  have any idea what that means, the phrase "finances in

8  common," what that means specifically?

9  A   I know in general what it means.

10  Q   Well --

11  A   What I meant to say in terms of not understanding high

12  finance is that there are probably six million schemes for

13  doing these kinds of things that would be difficult to

14  uncover. We did the best we could with this kind of a thing.

15  And, again, this is not the sale I was at, but I assume we had

16  something similar.

17  Q   When you say it's not the sale you were at, this was the

18  sale that took place in 2004. Now, maybe you weren't

19  physically present at the sale, but --

20  A   Okay. But this was the sale in 2004.

21  Q   Yes.

22  A   Okay.

23  Q   Okay. But just the phrase "finances in common," you don't

24  know exactly what that means I guess is the point.

25  A   I could -- I could sit here and come up with 7500

Mills - redirect

1    explanations for what that might mean, but it would be

2    speculation.  And we know what we were trying to get at.  If

3    somebody came back and said yes, we have this, we have this,

4    we have this, we would have looked at it.

5    Q   Okay.

6    A   But nobody ever came back and said any of these things

7    were true.

8              MR. FRIEDMAN:  Thank you.

9              THE COURT:  Who's next?  Nobody else on the defense

10   side?

11             Redirect?

12             MR. JONATHAN QUINN:  Yes, I do, your Honor.

13                       REDIRECT EXAMINATION

14   BY MR. JONATHAN QUINN:

15   Q   Ms. Mills, Mr. Pearl was asking you some questions about

16   whether a tax buyer at the annual tax sale would be guaranteed

17   to receive liens.  Do you recall those questions?

18   A   Yes.

19   Q   And you testified that of course there was no such

20   guarantee, right?

21   A   Yes.

22   Q   But in the instance of liens that were -- that were sold

23   at zero percent --

24             Let me step back.

25             Would you agree with me that in the years you were at

1    THE COURT:  Mr. Huyck, anything else?

2    MR. HUYCK:  Nothing.

3    THE COURT:  Mr. Friedman.

4                    RECROSS EXAMINATION

5    BY MR. FRIEDMAN:

6    Q   Getting back to some of the questions I was asking before,

7    I think we -- you've indicated that no one ever brought to

8    your attention, as far as you recall, you never got --

9         First of all, no one was ever disqualified, to your

10   knowledge, from participating in the sale?

11   A   Under that rule, no.

12   Q   Under that rule, right.

13        And would you agree with me that the language of the

14   rule is subject to different interpretations by different

15   people?  Would that be fair?

16   A   That would be fair, but nobody ever said they did any of

17   those things, so nobody ever had a chance to look.  That's the

18   problem.

19   Q   So that if in any hypothetical situation something might

20   have been deemed a concern to somebody, we don't know whether

21   that concern would have gone any further because it never

22   happened, correct?

23   A   That's correct.

24   Q   I'm assuming that if two tax buyers, two registered tax

25   buying entities both went to the LaSalle Bank and got separate

Mills - recross

1  lines of credit, then that -- that certainly wouldn't be a

2  violation of the rule as far as you understand?

3  A    Two totally separate people who went to the same bank for

4  their own lines of credit, that's no problem, as far as I can

5  see.

6  Q    In a situation in which --

7       Well, let me do it this way:  Assume for a moment

8  that two registered tax buyers both registered at the sale and

9  each bid and each retained its own liens, in other words, each

10 was bidding on its own behalf, wasn't bidding on behalf of

11 anybody else, it was bidding on its own behalf, and one didn't

12 assign the liens to another.  That wouldn't strike you as a

13 violation of the rule, would it?

14 A    I can't speculate, and I'm not going to speculate.

15 Q    And, again, information that you would have received, if

16 you had received any --

17      And apparently you did receive some complaints?

18 A    We got complaints, but they were never backed up with any

19 information that was usable.

20 Q    Whatever complaints you had you shared with the state's

21 attorney?

22 A    We did.

23 Q    And the state's attorney never advised you that there was

24 something that could be acted upon?

25 A    The state's attorney always told us there was not

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3

4   PHOENIX BOND & INDEMNITY
    COMPANY, et al.,                     )
5                                        )   Docket No. 05 C 4095
                    Plaintiffs,          )
6                                        )
                                         )
7       vs.                              )
                                         )   Chicago, Illinois
    JOHN BRIDGE, et al.,                 )   October 26, 2011
8                                        )   1:40 p.m.
                    Defendants.          )
9

10  BCS SERVICES, INC., et al.,          )
                                         )
11                  Plaintiffs,          )   Docket No. 07 C 1367
                                         )
12      vs.                              )
                                         )
13  HEARTWOOD 88, INC., et al.,          )   Chicago, Illinois
                                         )
14                  Defendants.          )

15                          VOLUME 11
                  TRANSCRIPT OF PROCEEDINGS
16      BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17  APPEARANCES:

18

19  For the Plaintiff:        REED SMITH, LLP
                              BY:   MR. JOHN W. MOYNIHAN
20                                  MR. JONATHAN S. QUINN
                                    MR. MAX A. STEIN
21                                  MR. THOMAS M. LEVINSON
                              10 South Wacker Drive, 40th Floor
22                            Chicago, Illinois  60606

23

24

25

1  Q.   And did you do the same calculation for the other

2  defendant groups, the Gray and the Salta enterprises as well?

3  A.   I did.

4  Q.   And is that what's depicted on the slide in front of

5  you?

6  A.   Yes.  And what this slide depicts are the total -- the

7  summary of the liens that were subject to reallocation to BCS

8  and Phoenix Bond from each of the three defendant

9  enterprises.

10       And what I want to point out for the jury is,

11  remember that Sabre started out with 25,000 liens; Grays with

12  9300 liens; and Salta with 7,000 liens.  That was the

13  starting point.

14       And then I whittled it down to these numbers here.

15  And these numbers are the liens subject to reallocation.

16  That doesn't mean that I reallocated all these liens.

17  Q.   And what was the next step in determining the number of

18  liens to be reallocated to the plaintiffs?

19  A.   It was really to determine what I am calling the

20  plaintiffs' fair share of those liens.  In other words, they

21  can't get all of them.  That wouldn't be right.  But they got

22  a portion of them based on my computation.

23  Q.   And how did you calculate the number of liens to be

24  reallocated to the plaintiffs?

25  A.   I calculated what was called the win percentage for each

1    year.  And I took that win percentage and I multiplied it by

2    the liens that were subject to reallocation for each year.

3    Q.    And what do you mean by "bid win percentage"?

4    A.    The bid win percentage is the percentage of liens that,

5    in this case, that BCS won that they intended to bid on, that

6    were on the bid sheets, which is why I said before that with

7    the video bid adjustment, if the liens that were on the bid

8    sheets were to go down -- take the 3981, if that goes down

9    because the video bid percentage goes up, then the bid win

10   percentage goes up, the way I am calculating it.  And you

11   will see it in a second.

12   Q.    So let's walk through one year as an example.

13          How did you calculate the calculation for the 2003

14   tax sale year?

15   A.    Well, when I got done with the adjustments for the video

16   bid adjustment and for the matching to the bid lists, this is

17   what I was left with.  I was left with the liens won by all

18   eligible bidders.  And this carves out the defendants'

19   portion of the pie.  That's not in these calculations yet

20   because what I am trying to do, I am trying to calculate, of

21   the defendants' portion of the pie, how much of that pie

22   should BCS get?

23          So I excluded them in this part of the calculation.

24          So I said, all right, BCS won 566.  All other

25   eligible bidders won 3,981.  Therefore, the liens won by all

1   eligible bidders is 4,547.

2          I then took the 566, divided it by the 4,547, and

3   said the bid win percentage for that year is 12.45 percent.

4          So what that is saying is that for every hundred

5   liens that BCS bid on, they would win approximately 12 of

6   them, 12 and a half of them.

7   Q.  And is Phoenix Bond included in the 3,981 you have here?

8   A.  Yes.

9   Q.  Now, you have Peters listed here as well, right?

10  A.  Yes.

11  Q.  Why?

12  A.  Well, because they are deemed to be ineligible.  That's

13  not to mean that I took the liens that Peters won and awarded

14  any to the plaintiffs.  I didn't do that.  I just said they

15  are not eligible.

16         As you can see, if you take the Sabre calculation,

17  multiply that by 12.45 percent -- if you could, step back a

18  second -- you can see the liens that were to be reallocated,

19  464 from Sabre to BCS; from Grays to BCS is 161; from Salta

20  to BCS is 123.

21         Peters -- none of Peters' liens were reallocated to

22  the plaintiffs.

23

24

25

Shaffer - cross

1  prepared that?

2  A   No.

3  Q   So you don't know who prepared that?

4       MR. JONATHAN QUINN:  Your Honor, we covered --

5  objection.  Repetitive.

6       THE COURT:  Sustained.  Rule 403.  You've covered

7  this point adequately.

8  BY MR. PEARL:

9  Q   Did you verify any of the information that you were sent?

10 A   No.  But as I testified to earlier, how I got comfort

11 around it.

12 Q   Mr. Shaffer, did you verify any of the information you

13 were sent on those Excel spreadsheets?

14 A   No.

15 Q   And the bid lists that were used to create those and then

16 the one bid list that was recreated because they didn't have

17 it, you never looked at those, did you?

18 A   When you say "those," what part are we talking about?

19 Q   The bid lists, the bid lists.  You never looked at --

20 A   The Excel sheets that I received?

21 Q   No, Mr. Shaffer.  The bid lists that went into preparing

22 the spreadsheets?

23 A   Okay.  I'm sorry.  Because I'm calling them bid books, but

24 okay.

25 Q   Sure.  The bid books.  You never looked at the bid books,

Shaffer - cross

1    did you?

2    A    I saw an excerpt of one.

3    Q    You didn't look at the bid books --

4         An excerpt of one?

5    A    I saw an excerpt of a couple of pages from one, yeah.

6    Q    A couple of pages.  Okay.  So you didn't look at those

7    hundreds or thousands of pages of bid lists to compare them to

8    the spreadsheet to make sure the spreadsheet was accurate?

9    A    Absolutely not.

10         MR. JONATHAN QUINN:  Objection, 403.

11         THE COURT:  To that particular question I'm

12    overruling the objection, but --

13    BY THE WITNESS:

14    A    No, I did not.

15    BY MR. PEARL:

16    Q    Now, the original bid sheets, bid lists, bid sheets, the

17    original bid sheets from which those Excel spreadsheets were

18    prepared.

19    A    I'm with you.

20    Q    Okay.  Those themselves were not accurate with respect to

21    the liens the plaintiffs actually bid zero percent on; isn't

22    that right?

23    A    In what way?

24    Q    Well, those bid sheets only showed what they intended to

25    bid on; isn't that true?

Shaffer - cross

1   A   That's correct.

2   Q   And about 120 hours in 2003?

3   A   Correct.

4   Q   120 hours in '04, 90 hours in '05, 108 hours in '06, 90

5   hours in 2007 that weren't shown on the video?

6   A   I'm assuming your hours are right, yes.

7   Q   648 hours of auction that were not shown on any videotape,

8   correct?

9   A   Correct.

10  Q   And the video is the only actual evidence, perhaps, of the

11  actual bids the plaintiffs placed zero percent, 1 percent, any

12  percentage; isn't that right?

13  A   I'm only aware of that video, yes.

14  Q   Somebody watched the video and tried to determine how many

15  liens the plaintiffs actually bid on; isn't that right?

16  A   Yes.

17  Q   Who did that?

18  A   Initially it was someone at Reed Smith, and then I had

19  another person do it at my office.

20  Q   Somebody at Reed Smith, one of the attorneys over there?

21  A   I don't know if it was an attorney or a paralegal.  It's a

22  young lady that I met.

23  Q   Do you remember her name?

24  A   No.

25  Q   Now, someone in your office watched -- someone in your

Shaffer - cross

1    Q    Okay?

2    A    And then I did my computations based on that.

3    Q    And if the Grays are eligible to bid, then my clients pay

4    less, right?

5    A    If they're deemed to be eligible, then the damages would

6    go down, yes.

7    Q    Okay.  And if the Grays are ineligible to bid, then my

8    clients will have to pay more under your analysis; isn't that

9    right?

10   A    As compared to the Grays being deemed eligible, yes.

11   Q    That's correct, right.

12        I'd like to --

13        You started working on this case in August of 2008;

14   isn't that true?

15   A    I think I was first contacted back in August of 2008, yes.

16   Q    And you said that some of the people you worked with were

17   Mark Pearson?

18   A    Yes.

19   Q    Uma?

20   A    Uma D.

21   Q    And if you can't pronounce it, I guarantee I can't

22   pronounce it.

23        And was there -- and two others that I can't

24   remember.  Nicole maybe?

25   A    Nicole is at FTI.  Amy Lerek.  There was a Scott Petrie

3381

1
IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

2

3

4   PHOENIX BOND & INDEMNITY              )
    COMPANY, et al.,                      )
5                                         )   Docket No. 05 C 4095
                        Plaintiffs,       )
6                                         )
           vs.                            )
7                                         )   Chicago, Illinois
    JOHN BRIDGE, et al.,                  )   November 3, 2011
8                                         )   9:35 a.m.
                        Defendants.       )
9

10  BCS SERVICES, INC., et al.,           )
                                          )
11                      Plaintiffs,       )   Docket No. 07 C 1367
                                          )
12         vs.                            )
                                          )
13  HEARTWOOD 88, INC., et al.,           )   Chicago, Illinois
                                          )
14                      Defendants.       )

15                       VOLUME 14
                 TRANSCRIPT OF PROCEEDINGS
16      BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17
    APPEARANCES:
18

19  For the Plaintiff:      REED SMITH, LLP
                            BY:  MR. JOHN W. MOYNIHAN
20                               MR. JONATHAN S. QUINN
                                 MR. MAX A. STEIN
21                               MR. THOMAS M. LEVINSON
                            10 South Wacker Drive, 40th Floor
22                          Chicago, Illinois  60606

23

24

25

1 of the mail or a private or commercial interstate carrier.

2 And I will now define some of the terms used in this

3 instruction.

4 A scheme to defraud is a plan or course of action

5 formed with the intent to deceive or cheat a person or entity

6 and to obtain money or property from a person or entity by

7 using one or more material false pretenses, representations or

8 promises.

9 A false or fraudulent pretense, representation or

10 promise is material if it has a natural tendency to influence

11 or is capable of influencing the decision of the person or

12 entity to which it was addressed. A material false or

13 fraudulent pretense, representation or promise may be

14 accomplished by concealing material information.

15 A person acts knowingly if he realizes what he is

16 doing and is aware of the nature of his conduct and does not

17 act through ignorance, mistake or accident. In deciding

18 whether a defendant acted knowingly, you may consider all of

19 the evidence, including what the defendant did or said.

20 Knowledge of a fact may exist if a person believes

21 there is a high probability that the fact exists and takes

22 deliberate actions to avoid learning the fact. A person acts

23 with the intent to defraud a person or entity if he acts with

24 the intent to deceive or cheat that person or entity in order

25 to bring about a financial gain to himself or a financial loss

1  to the person or entity.

2      Good faith on the part of a defendant is inconsistent
3  with intent to defraud. A defendant is not required to prove
4  that it acted with good faith; rather, the plaintiffs must
5  prove that the defendant acted with the intent to defraud.

6      To use or cause the use of the mail or a private or
7  interstate carrier, a defendant need not actually intend that
8  the use take place and need not have used the mail or private
9  interstate carrier himself or itself.

10      The plaintiffs must prove, however, that the
11  defendant knew the use would occur or that the defendant knew
12  the use would occur in the ordinary course of business or that
13  the defendant knew facts from which the use reasonably could
14  have been foreseen.

15      The use of the mail or private interstate carrier
16  must assist in carrying out the scheme to defraud or part of
17  the scheme to defraud, but the item that was sent need not be
18  fraudulent. It can be an innocent or routine mailing or one
19  that was sent for a legitimate business purpose.

20      Each use of the mail or a private or interstate
21  carrier in furtherance of a scheme to defraud constitutes a
22  separate act of mail fraud.

23      Plaintiffs' third claim is that the defendants
24  interfered with the plaintiffs' prospective business
25  advantage. To succeed on this claim against the particular

1  defendant you're considering, the plaintiff you're considering
2  must prove each of the following things by a preponderance of
3  the evidence:

4       Number 1.  The plaintiff had a reasonable expectation
5  of entering into one or more valid business relationships with
6  the Cook County treasurer's office by obtaining additional
7  liens at the annual tax sale.

8       Number 2.  The defendant was aware of the plaintiffs'
9  expectation.

10      Number 3.  The defendant intentionally and
11 unjustifiably interfered with the plaintiffs' expectation,
12 preventing it from ripening into a valid business
13 relationship.

14      Number 4.  The defendants' conduct caused injury to
15 the plaintiff.

16      And I will define certain of these terms in the next
17 instruction.

18      First, "intentional interference."  A person or
19 entity intentionally interferes with an expectation of a
20 business relationship if he or it knows that interference with
21 the relationship is substantially certain to occur as a result
22 of his or its conduct even if that is not his primary purpose
23 or desire.

24      Secondly, interference is unjustifiable, as that term
25 is used in this case, if the defendant did not comply with the

1  Cook County treasurer's rules and regulations governing the
2  annual tax sale, despite representing that it would do so.

3       If you find in favor of one or both plaintiffs and
4  against one or more defendants on one or more of the
5  plaintiffs' claims, then you will be required to determine
6  what amount of damages, if any, to award to the particular
7  plaintiff on the particular claim against the particular
8  defendant.  If you find in favor of all the defendants on all
9  of the plaintiffs' claims, then you will not consider the
10  question of damages.

11       The plaintiffs are seeking compensatory damages on
12  claims 1, 2 and 3 and punitive damages on claim 3.  This
13  instruction concerns compensatory damages.  If you find in
14  favor of a plaintiff and against one or more defendants on any
15  one of the plaintiffs' claims, then you must determine the
16  amount of money that will fairly compensate the plaintiff for
17  any injury that you find it sustained as a direct result of
18  the wrongful conduct of the enterprise for claims 1 and 2 or
19  of the defendant for claim 3.  This is called compensatory
20  damages.

21       The plaintiff must prove its damages by a
22  preponderance of the evidence.  Your award must be based on
23  evidence and not speculation or guesswork.  On the other hand,
24  the law does not require a plaintiff to prove the amount of
25  its damages with mathematical precision, but only with as much

1  assess punitive damages in favor of the plaintiff and against
2  any defendants that you have found liable.  The purpose of
3  punitive damages are to punish a party for its wrongful
4  conduct and to serve as an example or warning to that party
5  and others not to engage in similar conduct in the future.

6      The plaintiff must prove by a preponderance of the
7  evidence that punitive damages should be assessed against the
8  particular defendant you are considering.

9      You may assess punitive damages against a defendant
10  only if you find that the defendant's conduct was malicious or
11  willful and wanton.  A defendant's conduct was malicious if it
12  was accompanied by ill will or spite or was done for the
13  purpose of harming the plaintiff.  A defendant's conduct was
14  willful and wanton if it showed an utter disre -- excuse me --
15  if it showed an utter indifference to or conscious disregard
16  for the plaintiffs' rights.

17      If you find that punitive damages are appropriate,
18  then you must use sound reason in setting the amount of those
19  damages.  Punitive damages, if any, should be in an amount
20  sufficient to fulfill the purposes that I have described to
21  you but should not reflect bias, prejudice or sympathy toward
22  any party.  In determining the amount of any punitive damages,
23  you should consider the following factors:

24      The reprehensibility of the defendant's conduct, the
25  impact of the defendant's conduct on the plaintiff, the

1  bidding entity rule, but at least in this year's materials,
2  the text of the rule itself was contained in the registration
3  requirements.  So this is the rule.  And then there's a form
4  that asks you to acknowledge under oath, under penalty of
5  perjury, that you are in compliance with the rule.

6          And that acknowledgment form does, in fact, restate
7  the rule.  And, in fact, as you will see in a moment, it also
8  contains a definition of relatedness that is not contained
9  here.  So, again, it is somewhat confusing to see exactly
10  where all the rules are, but we submit to you that's beside
11  the point.

12          If you look at -- if you look at all of it together,
13  you look at the text of the regulations, you look at the
14  acknowledgement form, you look at the representations and
15  warranties, in sum total, it's crystal clear what it is that
16  is being prohibited.

17          And, more importantly -- we'll get to this in a
18  moment.  More importantly than what the words say, and as you
19  have seen from the evidence, what the evidence suggests, what
20  the evidence compels, is that the lengths to which the
21  defendants took to conceal their relatedness, the lengths to
22  which the defendants took to conceal the manner in which they
23  used common funding, common resources, common personnel, the
24  extent to which they concealed all those things tells you
25  everything you need to know about what the rule prohibits

1  because, as if the language of the rule itself weren't clear

2  enough, the lengths to which the defendants took to conceal

3  their relatedness tells you that they knew full well what the

4  rule prohibited because they were in violation of it and they

5  were taking steps to conceal that.

6      So in number 3 of the regulations, it says that each

7  tax buyer desiring to participate must sign an agreement to

8  abide by the single simultaneous related bidding entity rule

9  to make certain disclosures.

10     Now, this section has been read, and various parties

11 have underlined certain sections, various parties have

12 underlined other sections. Undoubtedly you will see defense

13 counsel put different sections of it up with different

14 sections underlined. I want to focus on a couple of words

15 here that have been overlooked but that I submit to you are

16 critically important.

17     No tax buyer may have its, his, her, their actual or

18 apparent, actual or apparent, and then it goes on, agents,

19 employees, related entities.

20     The key here is that the rules and regulations of the

21 treasurer's office didn't simply prohibit actual relatedness.

22 They prohibited anything that would make that relatedness even

23 apparent. The point is that even the perception of

24 impropriety was in and of itself a violation. And you will

25 recall that in the registration materials -- and you can look

1  at them yourselves -- the registration materials have in them
2  sections which allow a prospective tax buyer to explain, to
3  explain, circumstances under which perhaps it would be
4  apparent that there was relatedness.

5      So, for example, if someone believed they were in
6  compliance but understood that perhaps someone else may
7  perceive that they were in violation, there was an opportunity
8  to explain in the registration materials the circumstances
9  under which there was apparent relatedness and submit that to
10  the treasurer's office for their consideration.  You will
11  remember that not a single defendant put anything in that
12  space in the registration materials, none.  Their position was
13  on the face of things, they were neither actual or apparent
14  agents, employees or related entities.  That is critical.

15      And Ms. Mills testified that what the rules and
16  regulations were attempting to do was to encompass anything
17  that even touched upon bidders participating in the same
18  source of funding, same resources, same personnel.  They were
19  trying to cover everything that even could conceivably run the
20  risk of an appearance of impropriety.  So actual or apparent
21  is very critical there.

22      Then it goes on in an obvious attempt to be as
23  overinclusive as possible.  Directly or indirectly register
24  under multiple registrations.  And here again, another
25  important phrase that has been overlooked:  For the intended

1  alone worthy of no respect. The fact of the matter is I'm a
2  father and the son of a father, and the desire of a father to
3  provide for his family is an instinctual and largely natural
4  instinct. It's an admirable one and one that we should
5  applaud. However, there's a right way of doing things and
6  there's a wrong way of doing things. And in the name of -- in
7  the name of a parental desire to provide for family, as you
8  yourselves know, people embark on numerous ill-conceived, mis-
9  conceived and unlawful pursuits. And the most stark example
10 we have in this case, the most stark example that the evidence
11 has presented us, happens to be in the people, in the persons,
12 of Stanford and Andrew Marks.

13          Here you have the audacious Marshall Atlas and David
14 Gray telling you that the reason they established multiple
15 bidders was because they wanted to provide for their families.
16 Take a step back. You were told by numerous people in their
17 opening statements that you should use your common sense. You
18 were implored to use your common sense. You should use your
19 common sense. I completely agree with that.

20          Why in the world would it be necessary for a father,
21 in order to provide for his family, to set up another company
22 in his own offices to compete against him for liens in the
23 annual sales but for wanting to have another bidder in the
24 room?

25          Stanford Marks doesn't want to provide for his

3529

1   family?  Stanford Marks is not interested in his son Andrew's

2   well-being?  When Andrew Marks wanted to join his father in

3   the tax buying business, he joined his father in the tax

4   buying business.  He joined him at Phoenix Bond.  His

5   father -- and Stanford and Andrew now work together in Phoenix

6   Bond.  Stanford Marks didn't set up another company.  He

7   didn't set up a dummy corporation with his wife and his other

8   family members, the shareholders.

9          You will remember that Stanford Marks even testified

10  that in the early part of this decade, when faced with their

11  competitors who they were concerned did have multiple bidders,

12  he and Andrew looked and they thought to themselves:  Are we

13  missing something?  Is there something that we could be doing

14  in order to get more bidders in the room?  But they looked at

15  the rules.  It was crystal clear they couldn't have done that.

16  For Stanford Marks to set up a corporation using some lawyer's

17  Hebrew name and put Andrew Marks as the vice-president and put

18  his wife as the president, it would run afoul of every rule

19  the treasurer's office had.

20

21

22

23

24

25

1    So the notion that Mr. Atlas and Mr. Gray and that

2  SALTA and that Midwest entities, Wheeler-Dealer, BG, that

3  somehow they get a pass because this was all motivated by

4  fatherly concern, it's offensive. It's offensive.

5    The defendants are assuming that you can't use your

6  common sense in judging whether that's an argument that makes

7  sense to you. Why in the world is it necessary to set up

8  another company to do that? It's nonsensical. There's only

9  one reason to set up another company. And that's to violate

10  the rules of the Cook County treasurer's office in order to

11  get multiple bidders.

12    And, remember, these really were competitors. If you

13  owned a tailor shop, you wanted to bring your family into the

14  tailoring business, you're going to open a tailor shop across

15  the street for your son? Of course not. It's absurd. Why

16  would you start your family off as a competitor? The answer

17  is that given the way the tax sales worked, given the way the

18  Cook County annual tax sale worked, by setting up another

19  company with your children bidding against you perhaps, you

20  would get slightly fewer liens because it was a zero sum game.

21  Any lien that was obtained by someone else you couldn't

22  obtain. So maybe you'd get slightly more. But the

23  calculation, a calculation that came true, was that the total

24  number of liens obtained by both entities would be greater

25  than the number of liens obtained by the single entity the

3622

1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
3

4   PHOENIX BOND & INDEMNITY          )
    COMPANY, et al.,                  )
5                                     )    Docket No. 05 C 4095
                    Plaintiffs,       )
6                                     )
                                      )
7            vs.                      )    Chicago, Illinois
                                      )    November 4, 2011
8   JOHN BRIDGE, et al.,              )    9:15 a.m.
                                      )
9                   Defendants.       )

10  BCS SERVICES, INC., et al.,       )
                                      )
11                  Plaintiffs,       )    Docket No. 07 C 1367
                                      )
12           vs.                      )
                                      )
13  HEARTWOOD 88, INC., et al.,       )    Chicago, Illinois
                                      )
14                  Defendants.       )

15                     VOLUME 15
                 TRANSCRIPT OF PROCEEDINGS
16    BEFORE THE HONORABLE MATTHEW F. KENNELLY AND A JURY

17
    APPEARANCES:
18

19  For the Plaintiff:     REED SMITH, LLP
                      BY:  MR. JOHN W. MOYNIHAN
20                         MR. JONATHAN S. QUINN
                           MR. MAX A. STEIN
21                         MR. THOMAS M. LEVINSON
                           10 South Wacker Drive, 40th Floor
22                         Chicago, Illinois  60606

23

24

25

1   part of the packages in the subsequent years. The
2   representations and warranties section does not change the
3   definition of the single simultaneous bidder rule or the
4   definition of related bidding entities.

5       The representations and warranties provisions were or
6   at least may have been added in 2004 because of a desire to
7   get more information about possible connections between the
8   registrants for purposes of enforcing the rule but not
9   changing the rule. Any inference that plaintiffs might wish
10  to draw from the fact that the Gray defendant registrants
11  signed the representations and warranties section without
12  noting that David Gray, Sr. had made a guarantee simply does
13  not amount to evidence that any of the Gray defendants
14  violated the rule or would have been an eligible bid.

15      As you know, a guarantee is simply a promise that
16  says if the entity who was borrowing the money doesn't pay,
17  then I will pay. There is no evidence whatsoever, nor could
18  any evidence have been presented, that Wheeler-Dealer didn't
19  pay for all of the money that it borrowed to participate in
20  all of these sales pursuant to its line of credit.

21      Once again, the alleged scheme to defraud in this
22  case is the placing of multiple bidders in the tax auction in
23  order to obtain additional liens for a common principle, not
24  merely a possible misstatement on a form. And as far as I'm
25  concerned, and I will get to this in a moment, there was no

1    misstatement made in any of these applications.

2          First of all, there are only two of the

3    representations and warranties that could even conceivably be

4    relevant here.  One of them is the representation that the

5    registrant, the party registering, does not have finances in

6    common, close quote.

7          And the second one is that the registrant does not

8    have a, quote, common source of funds, close quote.

9          I submit to you that the fact that David Gray, Sr.

10   guaranteed Wheeler-Dealer's line of credit, agreed to pay if

11   Wheeler-Dealer didn't, does not qualify as finances in common,

12   common source of funds.  In fact, Martha Mills said that she

13   doesn't even really know exactly what those terms mean.  The

14   finances used by Wheeler-Dealer came from LaSalle Bank.  They

15   didn't come from David Gray, and as I said a moment ago, no

16   evidence that the bank ever called upon Mr. Gray to pay any

17   indebtedness.

18         And I heard Mr. Quinn say a couple of times

19   yesterday -- he used the phrase "crystal clear" in describing

20   the rules and regulations, the representations and warranties.

21   I also heard him say that -- I think this is in quotes.

22         In all candor, he said, the requirements of the

23   registration packets are confusing as to what is meant by the

24   single simultaneous bidder rule.

25         Most importantly here, failing to interpret the

1  representation about no finances in common, no common source
2  of funds, as plaintiffs now attempt to do, certainly is no
3  evidence of a scheme to defraud. If Martha Mills wasn't sure
4  what those words mean, it seems hard to believe that there
5  could be any kind of intent to defraud, a scheme to defraud,
6  when those representations were given.

7          Similarly, the plaintiffs talk about the loan from
8  Atlantic Municipal to Wheeler-Dealer. There was a loan.
9  We'll talk about that in a minute. But it is not evidence
10 that -- it is not evidence of anything that would support a
11 finding of a violation of the rule, let alone mail fraud. As
12 I said before, each registered bidder bid on its own behalf.
13 The loan that was that --

14         There was a loan that had nothing to do with the tax
15 sale, incidentally, but there was a loan that Atlantic made to
16 Wheeler-Dealer. That loan was paid off in 2005. Atlantic
17 Municipal did not bid until 2006. Tim Gray had no interest in
18 Atlantic Municipal at the time that Atlantic Municipal was
19 bidding. This is part, again, of what I view as an approach
20 that kind of tries to throw whatever plaintiffs can throw up
21 against a wall including misleading statements and
22 implications in slides and argument.

23         So let me ask Gabe to put on the screen -- yes, here
24 it is.

25         This is a slide that the plaintiffs put up in their

1 closing argument. Okay, let's take a look at it here.

2 Well, what does it say about Atlantic Municipal

3 corporation? It says that Atlantic Municipal Corporation was

4 bidding at the 2005 to 2007 sales. That is false. It's

5 undisputed that they did not bid in 2005. They bid in 2006

6 and 2007. That's a misrepresentation. This representation is

7 misleading. I'm not certain of the right adjectives, but

8 let's go to another one.

9 How do they describe Atlantic Municipal? Well, they

10 say that the owners -- they imply that the owners are David,

11 Jr., David Gray, Jr., Rickie Gray, Tim and Lori Gray. Now,

12 they put a little footnote there, a little asterisk, and they

13 say, well, Tim Gray was an owner before 2004. That's true.

14 There is no reason for them to put Tim in that portion of the

15 slide, period. He sold his shares in Atlantic Municipal. The

16 documents are in the record in 2004. There is no question

17 about that.

18 So when we got to -- so that in 2006 and 2007, the

19 only years in which Atlantic Municipal bid, Tim Gray had no

20 interest in it. There were no loans outstanding because

21 that's -- there were no loans outstanding anymore between

22 them.

23 Let's get to another misleading aspect of this

24 presentation. Atlantic Municipal, they say, and there is this

25 dollar sign with a red arrow, implying somehow that moneys are

1   going from Atlantic Municipal to Wheeler-Dealer. Well, as I
2   said a moment ago, the loans that were made by Atlantic to
3   Wheeler-Dealer had been paid off before Atlantic Municipal
4   bid.  But the plaintiffs I think want to try to suggest every
5   way -- and these really are not -- with all due respect,
6   they're not honest presentations of the facts.

7       And, finally, I guess I should have mentioned again,
8   here again they try to tie David Gray, saying that he
9   guaranteed a line of credit. He did guarantee the line of
10  credit.  He wasn't called upon to pay it.  He didn't provide
11  any financing that was used in the sale.

12      Okay, let me show you one other slide, if I may,
13  Gabe.  Okay, this is another one that the plaintiffs showed
14  you.  This is a portion of the combined financial statements
15  and supplemental information for what is called here Midwest
16  entities.  And this is -- this is June 30th of 2000 and 1999,
17  the two years -- it goes through June.  Of course, that is
18  three years before the first sale that is in issue in this
19  case.  And what that document says is that at that point
20  Wheeler-Dealer was considered to be part of what the
21  accountant described as the Midwest entities.

22      There is no entity known as Midwest entities.  It
23  doesn't exist.  It is a term used by the accountant to
24  describe entities that for bank financing purposes were being
25  put together.  At that point, in June 30th, 2000, yes,

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on December 30, 2011, he served copies of the foregoing **TRIAL TRANSCRIPT PAGES TO WHICH REFERENCE IS MADE IN BG DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR POST-TRIAL MOTION (DKT. 911)** on the parties of record pursuant to ECF as to Filing Users.

/s/ Arthur W. Friedman
Arthur W. Friedman