**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PHOENIX BOND & INDEMNITY CO., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHN BRIDGE, et al., | ) | Case No. 05 C 4095 |
| | ) | |
| Defendants. | ) | Consolidated with |
| | ) | Case No. 07 C 1367 |
| | ) | |
| BCS SERVICES, INC., et al. | ) | Judge Matthew F. Kennelly |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HEARTWOOD 88, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**JOINT SUBMISSION REGARDING SETOFF AND ENTRY OF JUDGMENT**

Pursuant to the Court's Memorandum Opinion and Order of January 2, 2012 (Dkt. 921 (the "Opinion")), the parties, by and through their undersigned attorneys, hereby make this joint submission regarding setoff and entry of judgment. Other than for purposes of putting together and filing this joint submission, the parties did not share their respective submissions with the other side prior to this filing. Accordingly, the parties reserve the right to respond to any arguments presented in this joint submission.

**PLAINTIFFS' SUBMISSION
REGARDING SETOFF AND ENTRY OF JUDGMENT**

**A.     Allocation Of Settlements For Purposes Of Setoff.**

In Section 1 of the Opinion, the Court concluded that "it is equitable to give the Sass defendants a setoff for amounts paid to settle exposure for which they would have been jointly

liable – compensatory damages and attorney's fees," but not for "amounts paid to settle punitive damages exposure, for which each defendant would have been separately liable." (Dkt. 921 at 5.) The Court then noted that "[n]either plaintiffs nor the Sass defendants has offered a proposal for how the settlements should be allocated" given this conclusion and directed them to do so in this submission.[1]

In light of the absence of any principled basis upon which to allocate the settlement amounts, the only arguably-appropriate way to now allocate them is to mirror the mathematical proportion of the damages that the jury made in its verdict, a copy of which is attached as Exhibit I-A. The jury's verdict awarded Plaintiffs both compensatory damages and punitive damages, the latter of which the Court concluded is not subject to setoff. In so doing, the jury provided the *only* basis to calculate the percentage of the settlement payments that should be excluded from any setoff.

In its verdict against the Sass Defendants, the jury awarded Plaintiffs compensatory damages totaling $2,107,500 and punitive damages totaling $1,805,500, for a total damages award against the Sass Defendants of $3,913,000. Thus, under this analysis, 46.14% ($1,805,500/$3,913,000) of the jury's verdict is not subject to setoff pursuant to the holdings in the Court's Opinion. Given the conclusions reached in the Opinion and the Court's apparent decision to permit the Sass defendants *some* setoff, the Court should now adhere to the jury's

---

[1] The settlements themselves did not allocate or apportion – nor did they attempt to – the settlement amounts among and between compensatory damages, punitive damages, and attorneys' fees. In our December 13, 2011 submission (Dkt. 914), we presented all the reasons why making such a retrospective and entirely speculative apportionment would be incorrect and unfair. The Court's Opinion rejected our position, and so we are not repeating it here. We continue to believe, however, that it would be unfair and unjust to permit any setoff for the Sass Defendants for the reasons previously articulated.

reasoning and hold that 46% of the settlement amounts were paid to resolve any liability the settling parties might have had for punitive damages, and therefore not now subject to setoff.

The settlements from members of the Sabre Enterprise total $7,075,000. These are the only settlements that should be considered for purposes of a set off against the jury's verdict against the Sass Defendants since the other settlements relate to separate harms caused by separate enterprises. Additionally, these settlement amounts were paid to Plaintiffs collectively, and then split evenly between them, meaning whatever amount is determined to be appropriate for the setoff calculations should be apportioned evenly between the two Plaintiffs.

Applying the 46.14% to this total means that $3,264,480.58 of the total settlement amounts paid by the other members of the Sabre Enterprise should be considered as the amount paid for settlement of potential liability for punitive damages. Thus, under this analysis, $3,810,519.42 is the amount that should be setoff against the trebled damages, costs of suit, including attorneys' fees and expenses, and pre- and post-judgment interest that Plaintiffs otherwise would recover from the Sass Defendants.

The Court also directed the parties to address the potential logistical issues created by the fact that the setoff would be applied not just against the compensatory damages, but also against the award of attorneys' fees and expenses that will be made in the future. (Dkt. 921 at 6.) Under RICO, the jury's compensatory damages award is trebled. Thus, the jury's award of $2,107,500 in compensatory damages against the Sass Defendants is trebled to become $6,322,500. Because this amount exceeds the $3,810,519.42 setoff amount discussed above, the potential logistical issues are avoided. And when the Court resolves the issues related to Plaintiffs' recovery of the cost of suit, including attorneys' fees and expenses, provided for under § 1964(c) of the RICO

statute, the Court can simply enter a judgment for the amount of fees it determines Plaintiffs are entitled to recover.

### B.    Post-Judgment Interest and Entry Of A Final Judgment.

The Court's Opinion also requests that the parties address the propriety of the Court making a finding pursuant to Federal Rule of Civil Procedure 54(b) that would make the judgment entered against the Sass Defendants and the BG Defendants both enforceable and appealable and also when post-judgment interest can begin if the Court does not do so. Both of these issues are, however, now moot as Plaintiffs will be filing a motion to dismiss their claims against the Wheeler-Dealer Defendants. As a result, once the Court grants that request, there will be no remaining claims that would prevent the Court from entering a final judgment against the Sass Defendants and the BG Defendants.

To ensure that Plaintiffs are properly compensated, however, that final judgment should include prejudgment interest for the period of time between the jury's verdict and the entry of the judgment. Plaintiffs' damages evidence at trial included prejudgment interest for the period between the original damages calculations and the trial, calculated at the prime interest rate, 3.25%, and compounded monthly. (Trial Tr. at 2902-2903.) This calculation was included in the damages numbers presented to the jury by Plaintiffs and that formed the basis for the jury's damages award, especially since the defendants failed to present a damages model of their own. Accordingly, Plaintiffs are entitled to prejudgment interest from the date of the jury's verdict – November 7, 2011 – to the date on which the Court enters judgment.

Assuming the Court accepts the analysis set forth above, the judgment that would be entered would be calculated as follows:

| **Sass Defendants:** | **BCS Services** | **Phoenix Bond** |
|---|---|---|
| Compensatory Damages | $1,232,500.00 | $875,000.00 |
| Trebling | x3 | x3 |
| **Trebled Compensatory Damages** | **$3,697,500.00** | **$2,625,000.00** |
| | | |
| Plus Prejudgment Interest | +$20,969.51 | +$14,886.36 |
| Less Setoff | -$1,905,259.71 | -$1,905,259.71 |
| **Total Compensatory Damages** | **$1,813,208.80** | **$734,626.65** |
| | | |
| Punitive Damages | $1,048,000.00 | $757,500.00 |
| Plus Prejudgment Interest | $5,943.20 | $4,295.78 |
| **Total Punitive Damages** | **$1,053,943.20** | **$761,795.78** |
| **Total Sass Defendants Damages** | **$2,867,152.00** | **$1,496,422.43** |
| | | |
| **BG Defendants** | **BCS Services** | **Phoenix Bond** |
| Compensatory Damages | $363,000.00 | $304,625.00 |
| Trebling | x3 | x3 |
| **Trebled Compensatory Damages** | **$1,089,000.00** | **$913,875.00** |
| | | |
| Plus Prejudgment Interest | +$6,175.71 | +$5,182.58 |
| **Total Compensatory Damages** | **$1,095,175.71** | **$919,057.58** |
| | | |
| Punitive Damages | $291,000.00 | $351,300.00 |
| Plus Prejudgment Interest | +$1,650.26 | +$1,992.22 |
| **Total Punitive Damages** | **$292,650.26** | **$353,292.22** |
| **Total BG Defendants Damages** | **$1,387,825.97** | **$1,272,349.80** |

Finally, the Court requested that the parties address how detailed the judgment itself should be. (Dkt. 921 at 9-10.) Given the number of issues related to the entry of the judgment, Plaintiffs suggest that the judgment "show the work" done to reach the final amount. Therefore,

Plaintiffs suggest that the judgment would look something like the table above, showing the calculations that went into the judgment beginning with the jury's verdict, ending with the final amounts that the Sass and BG Defendants must now pay, and showing the calculations in between.

### BG DEFENDANTS' STATEMENT ON A RULE 54(b) FINDING AND POST-JUDGMENT INTEREST

In response to the Court's Order of January 2, 2012, the BG Defendants drafted a position paper setting forth the reasons why they believe it would be improper to make a Rule 54(b) finding at this time and that in the absence of such a finding, interest does not accrue.[2]

On the morning of January 9, 2012, the undersigned sent an email to counsel for Plaintiffs, advising Plaintiffs that without prejudice to the BG Defendants' position and given the small amount of interest at issue, the BG Defendants would be willing to stipulate that interest on the amount of a judgment against the BG Defendants could begin to accrue as of January 12, 2012 if (i) the relief requested in the BG Defendants' Post-Trial Motions is not granted and a final judgment is entered against the BG Defendants following the retrial of the claim against the Wheeler Defendants, and (ii) plaintiffs would agree that a Rule 54 (b) finding was improper at this time. A copy of that email is attached hereto as the BG Defendants' Exhibit 1.

In response to that email, counsel for Plaintiffs sent an email just before Noon on January 9, stating that Plaintiffs are not seeking a Rule 54(b) finding and that they intend to dismiss the claims against the Wheeler Defendants and seek an immediate judgment. A copy of that email is attached hereto as Exhibit 3.

---

[2] The statement we had prepared is attached hereto as BG Defendants' Exhibit 2.

Under the circumstances, it would appear that once the Wheeler Defendants are dismissed and the Court is in a position to enter judgment against all non-dismissed parties, *i.e.,* against the BG Defendants and the Sass Defendants, the issue of a Rule 54(b) finding is moot.

**SUBMISSION BY THE SASS DEFENDANTS IN RESPONSE TO QUESTIONS POSED BY THE COURT'S MEMORANDUM OPINION AND ORDER OF JANUARY 2, 2012**

The Sass Defendants[3] submit the following responses to questions posed by the Court in its Memorandum Opinion and Order entered on January 2, 2012 (docket number 921) (hereafter, "Order"). The Sass Defendants first will discuss issues regarding punitive damages, setoff, and the proper calculation of damages subject to judgment. The Sass Defendants then will address briefly the Court's inquiries into the timing of the judgment that should be entered in this case.

**I.     PUNITIVE DAMAGES AND SETOFF ISSUES.**

**A.  The Settlement Payments Obtained By Plaintiffs Do Not Include Punitive Damages**

In its Order the Court correctly determined that the Sass Defendants should receive a setoff, such that amounts obtained in settlement by the plaintiffs from other members of the Sabre enterprise should be setoff against the damages awarded by the jury against the Sass Defendants. Order, page 5. The Court further concluded, however, that setoff should occur only as to compensatory damages and attorneys' fees, but not as to amounts that other settling members of the Sabre enterprise "paid to settle punitive damages exposure[.]" *Id.* The Order directs the parties to offer a proposal for how the settlement sums should be allocated.

As an initial matter, however, the Sass Defendants respectfully do not agree that the settlements reached with other Sabre enterprise parties included money that was paid to settle

---

[3] Defendants Sass Muni-IV, LLC; Sass Muni-V, LLC; MD Sass Investors Services, Inc.; MD Sass Tax Lien Management LLC; MD Sass Municipal Finance Partners-IV, LLC; MD Sass Municipal Finance Partners-V, LLC; Vinaya Jessani and Kirk Allison are referred to collectively herein as the "Sass Defendants" for convenience.

punitive damages exposure. This notion, that the settlements include a punitive damages component, first appeared when the parties filed their "Joint Status Report Regarding Entry Of Judgment" (docket number 914, filed 12/13/11). In that pleading the Sass Defendants renewed their earlier claims that setoff was required in this case. *Id.* at pages 8-11. Plaintiffs resisted application of setoff by asserting "that the settlements [with other Sabre enterprise members] were entered into by defendants facing not just the possibility of an award of compensatory damages, but also of *punitive damages* and attorneys' fees." *Id.* at page 5 (emphasis added).

The plaintiffs offered no support for this factual assertion in the Joint Status Report, and in fact there is no apparent reason to believe that the plaintiffs' assertion is true. That is, there is no reason to conclude that when the other Sabre enterprise members settled their cases, they paid settlement sums that included exposure for punitive damages. There are instead a number of reasons to conclude that the settlement payments made to plaintiffs did not include a punitive damages component.

First, the settling parties were not "facing" the prospect of punitive damages by virtue of the law suits they reference in their settlement agreements. The plaintiffs' first Complaint in this litigation was filed in 2005 (case number 05 C 0495) and they filed another action in 2007 (case number 07 C 1367). Over the course of years during which these consolidated actions were pending, the plaintiffs' various Complaints and amended Complaints *never* included a prayer for relief stating their intent to seek the imposition of punitive damages. When a party settles a claim at a time when the plaintiff's prayer for relief did not seek punitive damages, and where their settlement agreement is otherwise silent on the topic, courts will assume that the parties perceived a "lack of exposure to such [punitive] damages" and that their settlement was meant to

resolve only claims for compensatory damages. *Harriss v. Elliott,* 207 Ill. App. 3d 384, 389-90, 565 N.E. 2d 1041, 1045 (2d Dist. 1991).

Second, during discovery the plaintiffs studiously avoided any direct assertion that they were entitled to punitive damages. For example, in 2009 defendants posed an interrogatory to plaintiffs asking them to specify the "types of damages" they would seek at trial. Plaintiffs' response made no mention of punitive damages, but instead referred only to "expert analysis," a cryptic response which certainly did not suggest the existence of a claim for punitive damages. (*See* the Final Pre-Trial Order submitted to this Court by the parties, at Schedule E-1, pages 70-71) (Exhibit III-A). The plaintiffs' first overt effort to claim punitive damages in this matter occurred in August of 2010, after discovery closed, when they sent the defendants an e-mail announcing their intent to ask that Judge Holderman instruct the jury that it could consider the imposition of punitive damages. Shortly after plaintiffs first gave this indication that they viewed the case as involving punitive damages, Judge Holderman granted defendants' motion for summary judgment and the issue was not addressed again until during the trial conducted by this Court.

Third, although plaintiffs may respond that the two largest settlement agreements in question were executed after they suggested in an e-mail that punitive damages should lie, that fact only underscores that neither of their most recent settlement agreements contains any mention that punitive damages formed a part of the settlement payments. These are not isolated circumstances: the plaintiffs settled with over fifty (50) members of the Sabre enterprise by means of five (5) settlement agreements that offered absolutely no textual support for the notion that exposure to punitive damages was a consideration in the decision to settle.

The settlement agreements produced by plaintiffs[4] resolved claims with no fewer than fifty separate parties, both individuals and entities, who are alleged to have been members of the Sabre enterprise. Three parties, grouped together as the "Aztek Partners" group, executed one agreement in the amount of $125,000. (Ex. III-B[5]) This group settled with plaintiffs before plaintiffs notified the parties that they intended to seek punitive damages. Seventeen (17) parties, grouped together as the "Nash group," executed another agreement in the amount of $380,000. (Ex. III-C) That settlement also pre-dated the first assertion by plaintiffs of a right to punitive damages. Four parties, grouped together as the "Turer group," joined in an agreement for $120,000 (Ex. III-D) that also preceded the punitive damages claim.

The other two settlement agreements were executed after plaintiffs first made known their intent to seek punitive damages. Twenty-three (23) parties, grouped together in the "Sabre group," joined in a settlement document for the sum of $3,750,000. (Ex. III-E) Four (4) parties, grouped together as the "Heartwood 88 group," participated in a settlement document in the amount of $2,700,000 (Ex. III-F) that was reached during the trial of this case. All totaled, the aggregate amount of money paid to plaintiffs by the fifty-one Sabre enterprise parties, pursuant to the five settlement agreements listed herein, was **$7,075,000**.

Not one of these five settlement agreements includes the word "punitive" or the phrase "punitive damages." None of these five agreements makes any textual reference to the notion

---

[4] To assist this Court's evaluation, and in keeping with the Court's comments about the need to explore these otherwise-confidential matters (Order, page 9), the settlement agreements discussed herein are attached as Exhibits B through F of this Submission by the Sass Defendants.

[5] The Sass Defendants' submission includes references to the settlement agreements entered into between Plaintiffs and other members of the Sabre Enterprise that have previously been designated as attorneys-eyes-only documents. Accordingly, they are being submitted separately, as part of a motion by the Sass Defendants requesting that the Court allow them to be filed under seal.

that the sums being paid under the agreement were intended to resolve claims that included punitive damages. To the contrary, two of the five agreements state that settlement sums being paid to plaintiffs "represent[] some or all of *actual damages* alleged to have been incurred" by plaintiffs according to the Complaint filed in this law suit (quoting agreements reached with the Nash and Turer groups, emphasis added). This text effectively rebuts the notion that these settlements were thought to include a punitive damages component; *cf., Certain Underwriters at Lloyd's London v. Oryx Energy Co.,* 203 F. 3d 898, 900-901 (5th Cir. 2000) (a settlement agreement paying "on account of personal injuries or sickness" does not encompass punitive damages). These two settlements, totaling $500,000, should be setoff in their entirety against the jury's award of compensatory damages from the Sass Defendants.

A third agreement, involving the Aztek group, likewise should be devoted entirely to setoff against the jury's compensatory damages verdict against Sass. That agreement makes no textual effort to identify or apportion punitive damages and it was reached at a time when no claim for punitive damages had been raised by plaintiffs in their various Complaints or in their other filings with the courts. Courts asked to construe settlement agreements look to the nature of the allegations actually written against the settling party, and "the fact that plaintiff never sought punitive damages from [the settling party] confirms [its] lack of exposure to such damages." *Harriss v. Elliott,supra,* 207 Ill. App. 3d at 390.

The remaining two agreements, for the Sabre and Heartwood groups, make no textual effort to distinguish or apportion the nature of any damages, and plaintiffs should not be allowed to ask this Court to speculate that either agreement was meant to include punitive damages. Plaintiffs participated in the drafting of those settlement agreements and if plaintiffs and those parties intended that the settlement payments would include sums tied to punitive damages, they

had every opportunity to say as much in the settlement agreements themselves. Plaintiffs were "fully aware of the nature of the settlement they reached" but included no language in their agreements suggesting that the settlement involved punitive damages, so it would be pure "speculation" to now assume that such damages formed part of those settlement sums. *Gavoni v. Dobbs Houses, Inc.,* 1997 WL 639052 at *2 (No. 95 C 1749, N.D. Ill.) (Hart, J., Oct. 3, 1997); *see also RSR Corp. v. Int'l Insurance Co.,* 612 F. 3d 851, 861-62 (5th Cir. 2010) (when settlement agreements do not allocate compensatory and punitive damages, nonsettling parties have "almost no ability to prove which part of the settlement amount represented actual damages. Nonsettling parties should not be penalized for events over which they have no control" and "settling parties [should not be permitted] to abrogate the one-satisfaction rule[.]") quoting *Mobil Oil Corp. v. Ellender,* 968 S.W. 2d 917, 926 (Tex. 1998).

There are other reasons to question whether the settling members of the Sabre or Heartwood group intended to pay punitive damages when resolving their disputes. For example, many of the people and entities named in those two settlement agreements were liable only on theories of vicarious liability, but "[v]icarious liability presents a diminished basis for an award of punitive damages." *Harriss v. Elliott, supra,* 207 Ill. App. 3d at 363. This further demonstrates why it is not appropriate for this Court to assume that the settling parties paid money to resolve punitive damages claims.

The Sass defendants therefore dispute the proposition that the settlement payments made to plaintiffs by other members of the Sabre enterprise included payments intended to avoid exposure to punitive damages. Instead, the settlement sums gained by plaintiffs from these settlement agreements should be offset in their entirety against the compensatory damages

awards issued against the Sass Defendants and the attorneys' fees awards as determined by this Court.

## B. A Formula for Offset.

These arguments notwithstanding, and without waiving any argument set forth above, in compliance with this Court's directives the Sass Defendants submit what they believe is a "reasoned justification" (Order, page 5) for the correct formula that the Court should apply if it offsets the jury's damages awards on the theory that some portion of the Sabre settlement sums were paid and received as punitive damages.

The Sass Defendants submit that this process necessarily requires the Court to engage in assumption and surmise, particularly at this stage when attorneys' fees have not been resolved. In particular, the Sass Defendants believe that this Court will have to evaluate what the settling parties, plaintiffs and defendants, would have been thinking when they decided to settle. As explained above, the Sass Defendants believe that only the two largest of the five settlements properly are subject to adjustment, those two settlements involving a total of $6,450,000. The Sass Defendants believe that, when deciding what portion of that sum should be "backed out" to account for punitive damages, it is reasonable to begin by evaluating what the plaintiffs at the time reasonably could have believed was the correct measure of compensatory damages, as found in the findings of their damages expert, Mr. Shaeffer. Further, the anticipated amount of compensatory damages also offers insight into what plaintiffs' counsel reasonably would have anticipated to gain in attorneys' fees.

Mr. Shaeffer, plaintiffs' damages expert, concluded that the conduct of the Sabre enterprise caused damages to the Phoenix Bond plaintiff in the amount of $1,818,000 (Transcript of proceedings at 2905). He further testified that BCS suffered damages in the amount of

$2,200,000 (*id.* at 2904). This leads to a combined total of $4,018,000 in predicted damages. Trebling that amount of predicted compensatory damages yields a total of $12,054,000.

Attorneys' fees in RICO cases are considered part of the damages assessed in the case (Order, page 4) and the settlement agreements plainly contemplate that the money paid in settlement would include attorneys' fees (*See, e.g.,* Exhibit III-E at page 2, including "costs" and "compensation" among the obligations resolved through settlement). The Sass Defendants know that plaintiffs' counsel entered into contingent fee arrangements with their clients but are not aware of the specific terms of those arrangements. The Sass Defendants will assume, however, that counsel worked for a 33% contingency share in the damages.[6] Applying that percentage to the predicted treble damages award of $12,054,000 produces attorneys' fees of $3,977,820. Those two amounts, predicted compensatory (trebled) damages plus contingent attorneys' fees, equal $16,031,820.

The Sass Defendants turn next to the question of punitive damages. Although at trial the plaintiffs asked to instruct the jury on punitive damages, the defendants jointly objected to that request and resisted the idea that such damages were warranted under Illinois law. Under the circumstances, it is unlikely that the settling defendants considered that they faced a substantial risk of punitive damages.[7] It is even more unlikely that the settling defendants thought that punitive damages could or would be imposed on them in addition to treble damages on the RICO

---

[6] Of course, nothing in this Submission should be construed as a waiver of any objection or argument by the Sass Defendants about the propriety of the attorneys' fees sought by plaintiffs' counsel in this case. The Sass Defendants preserve their arguments and challenges to the fee award proposed by plaintiffs' counsel.

[7] Further, the Sass Defendants respectfully note that nothing in this Submission is intended to waive their claim that punitive damages may not be assessed in a case where RICO treble damages are based on the same course of conduct giving rise to a tort claim that led to imposition of punitive damages.

claim. As previously noted, therefore, it is particularly speculative to assume that the Sabre and Heartwood groups settled with punitive damages in mind. The Sass Defendants nevertheless accept that this Court seeks a formula that accounts for the presence of punitive damages in those settlements. They submit that, in the absence of allocations in the settlement agreements themselves, the most principled means to account for punitive damages in those agreements is to incorporate the finding actually made by the jury against the Sass Defendants. The jury awarded the plaintiffs punitive damages against the Sass Defendants in an aggregate amount of $1,805,500.

Thus, the compensatory damages that plaintiffs may have optimistically predicted were $12,054,000. The attorneys' fees that plaintiffs' counsel would realize from that sum, if they adopted the most liberal contingent fee arrangement (33%), was $3,977,820. The punitive damages awarded against the Sass Defendants were for an aggregate total of $1,805,500 and it is not plausible to think that any settling party expected the jury to award a higher amount of punitive damages against any settling group of Sabre enterprise parties. All these figures, for damages, fees and punitive awards, combine for a total of $17,837,320. That sum, the Sass Defendants assert, is the most plausible measure available at this time and on these facts to calculate the proportion of total settlement monies paid that should be deemed as "punitive damages" money.

Of that total amount, the punitive damages ($1,805,500) constitute just slightly over 10% of the total award. Accordingly, under these circumstances the Sass Defendants submit that the settlement agreements entered by the Sabre group and the Heartwood group each should be reduced by 10% to reflect that portion of those settlement sums that are deemed by the Court to reflect payment of settlements intended to provide punitive damages. The Sass Defendants

therefore will set forth the calculation of setoff that should result from application of this formula.

Plaintiff Phoenix Bond was awarded compensatory damages in the amount of $875,000. RICO requires that these be trebled to $2,625,000. Plaintiff BCS was awarded compensatory damages in the amount of $1,232,500, which are trebled to $3,697,500. Total compensatory damages awarded by the jury against the Sass Defendants therefore amount to **$6,322,500**. The jury also imposed punitive damages on the Sass Defendants in an aggregate amount of $1,805,500. $757,500 (or 42%) of those punitive damages were assessed in favor of Phoenix Bond; $1,048,000 (or 58%) were assessed as to BCS. Attorneys' fees are yet to be determined.

The settlement agreements involving the Aztek and Nash group expressly limit the payments made to "actual" damages, and the settlement agreement with the Turer group pre-date the plaintiffs' first assertion of a claim to punitive damages. As such, settlement sums paid under those three agreements should be fully setoff against the compensatory awards made against the Sass Defendants. Those three settlements together produced to plaintiffs $625,000 in settlement sums.

The settlement sums paid by the Sabre and Heartwood groups each should be reduced by 10% to account for the purported payment of punitive damages, based on the formula described herein. This reduces the setoff available from the Sabre settlement agreement to $3,375,000 (a settlement of $3,750,000 less 10%, or $375,000 = $3,375.000). The setoff available from the Heartwood 88 settlement agreement becomes $2,430,000 (a settlement of $2,700,000 less 10%, or $270,000 = $2,430,000). As such, the aggregate amount of non-punitive settlement sums realized from the five separate groups making up the Sabre enterprise is **$6,430,000**. This formula also demonstrates that the plaintiffs already have received at least $107,500 more in

settlement awards than the amount of trebled compensatory damages that the jury's verdicts call upon the Sass Defendants to pay.

Incorporating all these data, and with application of the Sass Defendants' proposed formula, the current calculation of damages to be assessed against the Sass Defendants would be:

|  | **Phoenix Bond** | **BCS** |
|---|---|---|
| **Compensatory Damages** | **$0 (offset)** | **$0 (offset)** |
| **Punitive Damages** | **$757,500 (verdict)** | **$1,048,000 (verdict)** |
| **Attorneys' Fees and Costs** | **In an amount to be determined by the Court, said amount being subject to a credit for $107,500 to be shared by plaintiffs Phoenix Bond (42%, or $45,150) and BCS (58%, or $62,350).** | |

### B.    ENTRY OF JUDGMENT AND POST-JUDGMENT INTEREST

Just before the noon hour on the day when this joint filing is due for submission to the Court, plaintiffs announced via e-mail that they intend to dismiss their Complaint against the Wheeler Dealer and Gray defendants and seek the entry of a final judgment by this Court. As such, it appears that many of the questions posed in other portions of this Court's January 2, 2012 Order are moot, at least insofar as they raised questions under Rule 54(b), F. R. Civ. P. It appears that no Rule 54(b) finding will be sought and there are no questions pending about whether or when post-judgment accrues in the absence of a final judgment.

The Sass Defendants recognize that this Court will soon want to enter a final judgment in this case, although issues raised in defendants' post-trial motions and plaintiffs' attorneys' fee petitions await resolution. In this regard, however, the Sass Defendants do not consider that there is a need to hurry through the process of entering a judgment, and in particular they do not believe that any unfairness or prejudice affects the plaintiffs if a final judgment does not issue forthwith. In particular, it is apparent that even before the jury returned its verdicts in this case,

plaintiffs had gained more in settlement agreements with settling Sabre enterprise parties than the amount of compensatory damages perceived by the jury after trial. Moreover, plaintiffs are not entitled to accrue post-judgment interest on an award of attorneys' fees until such time as the amount of those fees is determined with specificity. *Fleming v. County of Kane,* 898 F. 2d 553, 565 (7th Cir. 1990). The passage of time will not work a financial hardship on plaintiffs.

The Sass Defendants recognize that if this Court calculates set-off based on the premise that settlements included payment for punitive damages, those calculations will involve various assumptions. The Sass Defendants therefore propose that this Court inform the parties whether it accepts the methodology proposed herein or whether it adopts a different formula. When the Court-approved formula is known to the parties, they can propose the text of a final judgment for this Court's consideration, showing with precision where setoffs are reduced on the basis that doing so reflects payments by settling parties for punitive damages exposure. This process also can incorporate the Court's determination of a proper award of attorneys' fees so that the final judgment entered by the Court indeed is its final word on these topics.

Dated: January 9, 2012

<table>
<tr>
<td>

*Plaintiffs BCS Services, Inc. and Phoenix Bond & Indemnity Co.*


By: ___/s/Max A. Stein_____
      One of their Attorneys

Lowell E. Sachnoff (ARDC No. 2438062)
Jonathan S. Quinn (ARDC No. 6200495)
John W. Moynihan (ARDC No. 6212061)
Max A. Stein (ARDC No. 6275993)
Thomas M. Levinson (ARDC No. 6286713)
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

</td>
<td>

*Defendants Sass Muni–IV, LLC; Sass Muni–V, LLC; MD Sass Investors Services, Inc.; MD Sass Tax Lien Management, LLC; MD Sass Municipal Finance Partners-IV, LLC; MD Sass Municipal Finance Partners-V, LLC; Vinaya Jessani and Kirk Allison*

By: ___/s/Theodore M. Becker_____
      One of their attorneys

Theodore M. Becker
Richard J. Pearl
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, Illinois 60601
(312) 324-1000

</td>
</tr>
</table>

Mark L. Rotert
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle St., Suite 2800
Chicago, IL  60603
Phone:  312/338-0214

*Defendants B G Investments, Inc.; Bonnie J. Gray;
Atlantic Municipal Corporation; Midwest Real
Estate Investment Company; Midwest Real Estate
Investment Company Employee Profit Sharing
Plan & Trust and David Gray*

By:＿＿＿/s/Arthur W. Friedman＿＿＿＿＿＿＿＿＿＿
＿＿＿＿＿One of their attorneys

Arthur W. Friedman
Edward W. Feldman
Stuart M. Widman
MILLER SHAKMAN & BEEM LLP
180 North LaSalle Street, Suite 3600
Chicago, Illinois  60601
(312) 263-3700

## <u>CERTIFICATE OF SERVICE</u>

I, Max A. Stein, hereby state that on January 9, 2012, I electronically filed the foregoing JOINT SUBMISSION REGARDING SETOFF AND ENTRY OF JUDGMENT with the Clerk of the Court using the ECF system, which will send notification to all parties.

By: _/s/ Max A. Stein_____
Max A. Stein (ARDC No. 6275993)
REED SMITH LLP
10 South Wacker Drive
Chicago, Illinois 60606
(312) 207-1000

US_ACTIVE-108240796.1