**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**


| | |
|---|---|
| **PHOENIX BOND & INDEMNITY CO., et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case Nos. 05 C 4095** |
| ) | **and      07 C 1367** |
| **JOHN BRIDGE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |


**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case asserted claims against a number of defendants under

the Racketeer Influenced and Corrupt Organizations Act (RICO) and Illinois law.  When

a Cook County property owner fails to pay property taxes on time, the past due tax

becomes a lien on the property in favor of the County.  The County sells the liens at

auction.  The bids are stated as a percentage penalty that the owner will have to pay to

the winning bidder to clear the lien.  If the owner does not pay, the lien holder can

obtain a "tax deed" and become the property's owner.

Competition typically drives the winning bid to a zero percent penalty, and

multiple bidders usually bid zero, more or less simultaneously.  This creates a problem

of allocation, which the Cook County Treasurer (who conducts the auction) resolves by

spreading wins around equitably.  This, in turn, creates an incentive for bidders to put

multiple agents in the auction or to create related bidders, so that they will have more

chances to be awarded liens. The County created a series of rules to prevent this and requires bidders to certify that they do not have certain types of relationships with other bidders. Plaintiffs claimed that the defendants, several groups of related bidders, submitted false certifications and thus had extra related bidders in the auction. As a result, plaintiffs claimed, the defendants acquired more liens, and the plaintiffs (and others who complied with the rules) acquired fewer.

Some of the defendants that the plaintiffs sued settled before trial. A jury returned a verdict in favor of the plaintiffs against most, though not all, of the defendants who went to trial. The jury also awarded compensatory damages, which were trebled under RICO, as well as punitive damages on the state-law claim. The Court later ruled that certain portions of the compensatory damage award were subject to setoff based on the settlements the plaintiffs had concluded with other previously-named defendants.

The defendants against whom the plaintiffs prevailed have moved for entry of judgment as a matter of law or alternatively for a new trial. There are two groups of these defendants, to which the Court will refer as the Sass defendants and the BG defendants, consistent with the shorthand references used at the trial and in earlier briefing.

For the reasons stated below, the Court denies the defendants' motions.

A.     **Motions for judgment as a matter of law**

A court may enter judgment as a matter of law in a party's favor only if "the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is [not] sufficient to support the verdict when viewed in the light most

favorable to the party against whom the motion is directed." *Clarett v. Roberts*, 657

F.3d 664, 674 (7th Cir. 2011). A jury's verdict may be overturned "only if no reasonable

juror could have found in the [prevailing party's] favor." *Id.* The Court "must construe

the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v.*

*Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011).

### 1. Deprivation of property

The predicate criminal acts underlying the plaintiffs' RICO claims against the

defendants were multiple acts of mail fraud in violation of 18 U.S.C. § 1341. Section

1341 proscribes the use of the mail in furtherance of a "scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises." 18 U.S.C. § 1341. The Supreme Court has interpreted

the statute as "limited in scope to the protection of property rights." *McNally v. United*

*States*, 483 U.S. 350, 360 (1987).

The Sass defendants, joined by the BG defendants, argue that plaintiffs failed to

prove violations of section 1341. Specifically, they contend that plaintiffs did not

establish that they were deprived of property as that term is understood under the

statute. Defendants rely to a significant extent on *Cleveland v. United States*, 531 U.S.

12 (2000). In that case, the defendant was prosecuted for making false statements to

Louisiana authorities to obtain a license to operate video poker machines. The

Supreme Court held that section 1341 "does not reach fraud in obtaining a state or

municipal license of the kind here involved, for such a license is not 'property' in the

government regulator's hands." *Id.* at 20. Addressing the contention that the state had

a right to decide who would get a license, the Court stated that this was not a property right, but an intangible right, specifically, the right to regulate. *Id.* at 23. The Court concluded its decision by stating that section 1341 "requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property' under § 1341." *Id.* at 26-27. Defendants argue that the tax liens that were the object of the fraud similarly were not "property in the hands of the victim." *See id.* at 15.

*Cleveland* holds that if B defrauds A into transferring something that is not property in A's hands but is property in B's hands, that does not violate section 1341. Here, however, the items transferred – the tax liens, which represented the right to collect past due property taxes – *were* property in the hands of A, namely the County. Thus *Cleveland* does not control this case. What *Cleveland* stands for, as the Seventh Circuit has stated, is that mail fraud "require[s] that the object of the fraud is money or property, rather than an intangible right." *United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2006). In this case, the object of the fraud was unquestionably property.

Defendants' real argument appears to be that because the property was never in plaintiffs' hands, there was no violation of section 1341. That, however, is not what *Cleveland* holds. More specifically, *Cleveland* does not speak to whether a violation of section 1341 occurs when B defrauds A into transferring property to B rather than C.

Defendants' argument conflates two distinct issues: the question of who is the (primary) mail fraud "victim" with the question of who can sue under the RICO statute. The RICO statute does not say that a victim (as criminal law would define that term) of

4

a pattern of mail fraud can sue.  Rather, the statute says that "[a]ny person injured in his business or property" by reason of a RICO violation may sue.  18 U.S.C. § 1964(c).  Defendants' argument appears to proceed on the assumption that the RICO plaintiff must be the person who, as a result, of the mail fraud, parted with property under false pretenses.  That is not so.  Indeed, this question was effectively settled in an earlier appeal in this case, in which the Seventh Circuit and Supreme Court made it clear that the RICO plaintiff need not have relied upon, or even have been the direct recipient of, the perpetrator's false statements.  *See Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932-22 (7th Cir. 2007), *aff'd*, 553 U.S. 639 (2008).

In sum, the object of the fraud in this case was property in the hands of the recipient of the fraudulent representations, as well as in the hands of the defendants when they received it, and it would have been property in the plaintiffs' hands absent the fraud.  To put it another way, the fraud at issue in this case concerned actual property, not merely an intangible right.

Defendants also argue that plaintiffs failed to prove that the County, as the owner of the property transferred due to the fraud, suffered a pecuniary injury, and that for this reason the mail fraud statute was not violated.  They base this argument on *United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992).  *Ashman* concerned futures trading on a commodity exchange that required purchases and sales of commodity futures contracts to be executed via "open outcry" – bid or offered audibly and openly to all others in a trading pit.  The evidence showed that the defendant traders had conducted some trades by prearrangement rather than open outcry.  This enabled certain defendants to obtain a guaranteed profit, which they shared with others who

5

assisted in arranging the trades.  The Seventh Circuit ruled that in the vast majority of instances, this denied the traders' customers the opportunity to get a better price and thus deprived them of property.  *Id.* at 477-78.  The court stated that "the deliberate deprivation of a clear financial opportunity violate[s] the mail fraud statute," and that "[i]t does not matter if the defendants' customers were not harmed financially because of the scheme."  *Id.* at 478.  "'It is not necessary that a plan actually result in a financial loss as long as it is aimed at the fraudulent deprivation fo some of the victim's money or property.'"  *Id.* (quoting *United States v. Cosentino*, 869 F.2d 301, 307 (7th Cir. 1989)).

In a number of situations, however, the evidence showed that traders' customers did not have an opportunity to get a better price.  This happened on so-called "limit days," in which the price was essentially fixed because of exchange rules that limited the amount that a commodity price could rise or fall on a given day.  On those days, only one price was being traded in the pit, and thus customers could not get a better price.  The court ruled that in these situations, the defendants did not deprive the customers of any money or property, but rather only the "intangible" right to obtain the single available price by open outcry rather than by prearrangement.  *Id.* at 479.  The government conceded that "no customer lost money" on those trades, arguing only that these trades deprived other traders of the ability to be on the other side of those trades and thus make money.  The court stated that this amounted to a contention that open outcry trading by itself constituted a property right protected under the mail fraud law, and it rejected the argument, stating that this was not a deprivation of money or property.  *Id.*  The Sass defendants argue that this case is similar because the evidence showed that in the vast majority of situations, only a single price was bid for the tax

6

liens being sold, meaning that the County was no worse off having sold to one bidder rather than to another.

The Court does not agree that *Ashman* controls this case. In *Ashman*, the mail fraud victim – the customer for whom the pit trader was trading – cared only about price. It did not matter to him who he sold his futures contract to or bought it from. In this case, however, the evidence showed that it mattered to the Treasurer whether it was selling to a bidder eligible to participate in the sale or not. In this regard, the case is more like *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006). *Leahy* involved the City of Chicago's award of certain contracts. A City ordinance required companies that wished to contract with the City to commit to spending particular percentages of the contract's value with subcontractors owned by members of racial or ethnic minority groups or by women. The defendants were charged with mail and wire fraud and with RICO violations because they made false representations regarding the ownership of certain purported minority-owned or women-owned enterprises. The defendants argued that there was no deprivation of money or property. They contended that the City had received exactly what it bargained for, at the same price it would have obtained had everything been on the up-and-up. Thus, the defendants argued, the City "only lost a regulatory interest in controlling exactly where its money went." *Id.* at 787. They analogized the case to *Cleveland*, saying that as in that case, the charges implicated only the government's regulatory interests.

The Seventh Circuit rejected this contention. It stated that the scheme had "precisely and directly targeted Chicago's coffers and its position as a contracting property." Unlike in *Cleveland*, in which the fraud was committed "against a

governmental body acting only as a regulator," the scheme in *Leahy* "was committed both against Chicago as a regulator and also against the city as property holder. The certifications were necessary steps, but they were not the object of the long-ranging fraud. That object was money, plain and simple, taken under false pretenses from the city . . . ." *Id.* at 788. The court distinguished the case from *Ashman* on the ground that even though, as in *Ashman*, the price for the contract may have been inflexible for several reasons, the City had lost the ability to obtain the services for which it had paid from a qualified contractor. *Id.*

The same is true here. The County unquestionably parted with property, and it did so under circumstances that deprived it of its ability to transfer that property as it wished, to someone it considered eligible to acquire the property. The defendants' fraud was aimed at obtaining property, and it was directed at the County as a property holder, not just as a regulator. Thus under *Leahy*, the mail fraud statute was appropriately applied.[1]

The preceding discussion was predicated on the proposition that the County was

---

[1] Imagine the following hypothetical. A person dies, and his will directs that his property is to be left to his long-lost nephew. A fraudster poses as the nephew and submits, by mail, a carefully forged birth certificate to prove it. The estate's executor is deceived and distributes the property to the fake nephew. The real nephew is left holding the bag. The estate is no worse off financially – it had planned to give away the property anyway – but it is clearly the victim of a fraud, because it transferred the property to someone other than the person to whom it wanted to transfer it. Unlike the customer in *Ashman*, who did not care who was on the other side of the transaction, the estate's executor wanted to transfer the property to a particular person. The same is true here; the County Treasurer wanted to transfer the County's property to eligible bidders, for the reasons described in the testimony at trial.

the mail fraud victim and that the plaintiffs were injured due to the RICO violation that was predicated on the defendants' pattern of mail fraud violations. Plaintiffs have also articulated an alternative theory for sustaining the RICO claim. The Court deals with this only briefly, because the preceding discussion is sufficient without more to require denial of defendants' motion for judgment.

Plaintiffs' alternative theory is that they, along with other eligible bidders at the tax lien sales, were directly victimized by the fraud. At oral argument, plaintiffs' counsel characterized what happened here as a theft of property to which plaintiffs were entitled. The evidence supported this characterization. If an ineligible bidder won a tax lien, he necessarily deprived an eligible bidder of that property. The eligible bidder unquestionably would have obtained the property but for the defendant's fraudulent scheme. To make the case simple, one might hypothesize an auction of a single lien at which there were only three bidders, one of which was eligible and the other two of which were each other's alter egos and thus ineligible. In this situation, if the two ineligible bidders had not deceived the County into allowing them to bid, the third would have gotten the lien. Plaintiffs argue that in this situation, the eligible bidder would have been the victim (or a victim) of mail fraud. The Court agrees. Nothing in *Cleveland* or the other cases defendants cite requires that to be a victim of mail fraud, a person has to already have the property in question. If it is a certainty that I would have obtained particular property except for the fraud, and you trick someone into transferring it to you rather than to me, then the mail fraud statute is violated, and I am the victim, or at least one of the victims.

The hypothetical scenario is far simpler than what actually occurred; in fact, there

were numerous bidders at the actual sale as well as numerous liens offered for sale. But the outcome is no different. If the defendants, as ineligible bidders, had not participated, an eligible bidder would have obtained the liens. Plaintiffs offered, via an expert witness, evidence that it was a virtual certainty that they would have obtained at least one more lien, and the jury was entitled to accept that evidence. (And plaintiffs then offered testimony, which the jury likewise was entitled to accept, that in fact it is likely that they would have obtained many more liens than that.) Plaintiffs unquestionably lost money from this, even if the County might not have. For this reason, even if the absence of a pecuniary loss to the County brings *Ashman* into play, the RICO verdict may nonetheless be sustained on the theory that the plaintiffs were mail fraud victims (or, more precisely, were among the mail fraud victims) and thus were entitled to sue.

### 2. Intent to defraud

The BG defendants, joined by the Sass defendants, argue that plaintiffs failed to prove that the defendants acted with the requisite intent to defraud. Defendants' contention is that they relied on a good faith interpretation of the Cook County Treasurer's rules and regulations governing the tax sale. To obtain judgment as a matter of law based on this argument, defendants must show that no reasonable jury could have found otherwise.

Defendants rely on their purported interpretation of the Treasurer's single simultaneous bidder rule. This focus is misplaced, because the evidence permitted the jury to find that defendants engaged in several other material false pretenses and misrepresentations (including concealing material information). The materials that

bidders were required to complete to participate in the tax sale required each bidder to make a sworn statement that it did not have finances in common or a common source of funding with any other bidder or an agreement to sell certificates that it won to another bidder. Plaintiffs offered evidence that the BG defendants had common funding sources with other bidders. They also offered evidence from which the jury reasonably could find that the Sass defendants had an agreement in advance to sell certificates that it won but could not redeem to an entity affiliated with John Bridge, one of the defendants who settled.

In addition, as plaintiffs contend, the evidence permitted the jury to find the defendants had violated the single simultaneous bidder rule. *See* Pls.' Resp. at 7-9. And contrary to defendants' contention, the interpretation of the rule about which certain defendants testified was not the only reasonable interpretation, nor was the jury required to treat defendants' claimed explanation and understanding as credible.

### 3. Participation in operation / management of RICO enterprise

The RICO statute provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ," and the RICO conspiracy statute makes it unlawful to conspire to violate this provision. 18 U.S.C. § 1962(c) & (d). The Supreme Court has ruled that

> [i]n order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (footnote omitted). The Court rejected, however, an interpretation that would require a RICO defendant to have "*significant control* over or within an enterprise." *Id.* at 179 n.4 (emphasis in original; internal quotation marks omitted). Rather, the Court held that the statute requires proof of participation in the operation or management of the enterprise. *Id.* at 179.

With regard to the Sass defendants, the enterprise involved John Bridge's establishment of a system for sharing information identifying liens on which participants should or should not bid, as well as what plaintiffs refer to as an "exit strategy" for selling liens that ended up going unredeemed. The Court agrees with plaintiffs that the evidence that the Sass defendants participated in the scheme's design by, among other things, negotiating a pre-sale agreement with Bridge and agreeing in advance to the exit strategy was sufficient to support a finding that they participated in the operation of the enterprise. The fact that Bridge may have used a similar agreement with other bidders, or that Bridge may have been the person who initiated the form of arrangement, does not alter the Court's conclusion. The evidence supported a finding that the Sass defendants made a conscious decision to adopt this particular arrangement as the structure for their dealings with Bridge and their participation in the tax sale. This was enough to permit a reasonable jury to find that they participated in the operation and the management of the enterprise.

### 4. Pattern of racketeering activity

The Sass defendants, joined by the BG defendants, argue that the evidence was insufficient to establish a "pattern" of racketeering activity. To establish a pattern of

racketeering activity, a plaintiff must establish at least two racketeering acts that "are related, and that . ... amount to or pose a threat of continued activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). This may be shown by proof of a series of related predicate acts extending over a substantial period of time. *Id.* at 242.

The question is not close. Taking the evidence in the light most favorable to plaintiffs, they unquestionably provided evidence sufficient to permit a reasonable jury to find that a RICO pattern existed. They offered evidence permitting the jury to find that the defendants committed thousands of acts of mail fraud over a period of several years. Defendants seem to think that the fact that they committed the same sort of criminal acts over and over again somehow insulates them from RICO liability. Not so. These were not multiple acts of mail fraud that caused a single injury; plaintiffs were injured separately each time they lost a lien due to the fraudulent scheme. Even if that were not enough, the fact that defendants' acts extended over a six year period was more than sufficient to permit the jury to find that plaintiffs met the requirements for a pattern of racketeering activity.

### 5. RICO causation

The Sass defendants argue that "plaintiffs failed to show that they would have obtained any liens if they were subjected to the 'correct' selection process . . . . That failure in turn constitutes a failure to show that any damages were directly caused by the conduct alleged as a RICO violation . . . ." Sass Defs.' Mem. at 15. The Court disagrees. Plaintiffs' expert Thomas Dunn testified that it was a virtual certainty that absent the various defendants' conduct claimed to be improper, plaintiffs would have

obtained more liens.  Dunn may not have been able to show this was 100 percent certain, but the law does not require that; it requires proof only by a preponderance of the evidence.  Taking the evidence in the light most favorable to the plaintiffs, as the law requires, the jury was entitled to find that plaintiffs established exactly what defendants say they did not show.

**6.      Tortious interference claim**[2]

The Court rejects defendants' argument that the evidence did not support a finding that the Sass and BG defendants intentionally interfered with the plaintiffs' prospective contractual relationships.  Defendants argue that plaintiffs did not prove that defendants even knew plaintiffs existed or that they sought to harm plaintiffs.  *See* Sass Defs.' Mem. at 24.  They also argue that their conduct did not prevent plaintiffs from bidding.  The latter argument, of course, completely misses the point.  Because the norm at the auctions was for all bidders to bid an identical amount, simultaneously or virtually so, the Treasurer's personnel allocated wins as best they could, equitably. The conduct that plaintiffs alleged and that the evidence permitted the jury to find involved defendants having multiple related bidders at the auctions so that they could garner more liens than they otherwise would have.  The evidence permitted the jury to find that this prevented plaintiffs from obtaining as many liens as they otherwise would have obtained and that defendants knew their actions had this effect on other bidders.

---

[2] In addition to the arguments noted in this section, the BG defendants contend that the evidence demonstrated that they believed they were acting under a correct or reasonable interpretation of the Treasurer's rules, which undermines a finding of intent. The Court rejects this argument for the reasons that it rejected the parallel arguments addressed in the earlier "Intent to Defraud" section.

The fact that defendants may not have specifically targeted the plaintiffs is of no consequence.

In sum, the Court agrees with plaintiffs that there was a sufficient evidentiary basis supporting the jury's finding of liability. The defendants were obviously aware that given the finite number of liens available, any liens they won were lost by another bidder – as plaintiffs put it, this was a zero-sum game. The jury reasonably could find that by effectively putting extra ineligible bidders into the room, defendants knew they were causing harm to other bidders, including plaintiffs (who were longstanding participants in the tax sale), who otherwise would have won at least some of those liens.

This evidence was also sufficient to establish a basis for punitive damages. The jury was properly instructed that Illinois law permits a punitive damage award against a defendant that acts with utter indifference to or conscious disregard of a plaintiff's rights. *See Slovinski v. Elliot*, 237 Ill. 2d 51, 58, 927 N.E.2d 1221, 1225 (2010) (punitive damages available when "the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.") (internal quotation marks omitted). The jury was entitled to find that by scheming to lie and evade the Treasurer's rules, to enrich themselves and with knowledge that this was to the detriment of other bidders, defendants engaged in conduct sufficient to justify a punitive damage award.

**B.    Damages**

Defendants also launch attacks against the jury's award of compensatory

damages.  The Court dealt with certain of their arguments in decisions issued on

January 2, 2012 and January 24, 2012.  In particular, the Court concluded that the so-

called "one satisfaction" doctrine applied to the compensatory damage award.  Applying

this doctrine, the Court reduced the jury's compensatory damage award against the

Sass defendants but declined to reduce the award against the BG defendants.  The

Court also overruled defendants' argument that it should vacate the jury's award of

punitive damages on plaintiffs' state law claims.  In the present decision, the Court

deals with defendants' remaining contentions regarding damages.

The BG defendants, joined by the Sass defendants, argue that plaintiffs'

damages theory was "legally impermissible," *see* BG Defs.' Mem. at 13, and that even if

permissible, the evidence was insufficient for the plaintiffs to carry their burden of

proving compensatory damages.  *See id*. at 14.  For these reasons, the BG defendants

argue, defendants are "entitled to judgment as a matter of law."  *Id*.

The Court begins by noting that this is a somewhat odd argument, legally

speaking.  Typically a defendant challenging a compensatory damage award seeks a

new trial because the award was grossly excessive; was not rationally connected to the

evidence; or (in certain types of situations) was excessive when compared with awards

in similar cases.  *See, e.g., Deloughery v. City of Chicago*, 422 F.3d 611, 619 (7th Cir.

2005).  The BG defendants, however, do not seem to make these sorts of arguments.

Specifically, they do not contend that the jury made any errors along these lines.  Nor

do the BG defendants appear to say that Court, upon accepting one or more of their

arguments, should order a new trial.  Rather, they attack the theory of damages as

presented by plaintiffs' experts and as argued by plaintiffs' attorneys, and they seek not

a new trial, but judgment as a matter of law.

The latter request is particularly difficult to understand, from a legal standpoint. A court is permitted to enter judgment as a matter of law in a party's favor if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party." Fed. R. Civ. P. 50(a). In the present situation, this would in effect require a determination by the Court that even if defendants violated the RICO statute and state tort law, plaintiffs suffered no cognizable injury at all. Any such contention in this case would border on the frivolous.

It is also somewhat incongruous for defendants to challenge plaintiffs' damages *theory* in this context. The Court is reviewing not particular arguments made by plaintiffs' counsel, but the award the jury made. And if defendants are contending that plaintiffs' damages expert Scott Shaffer should not have been permitted to testify, they should be seeking a new trial on that basis, not entry of judgment as a matter of law. The purportedly erroneous admission of evidence offered by a particular party is not a basis for a court to enter judgment in the opposing party's favor.

Thus if one takes defendants' argument at face value, it fails. There is no basis for entry of judgment as a matter of law in defendants' favor on the ground that plaintiffs pursued a flawed theory of damages.

The Court will, however, treat defendants' argument as a contention that the compensatory damage award was unsupported by the evidence, thus warranting a new trial. The Court will begin with an overview of the law regarding compensatory damages and then will summarize the theory that Shaffer and plaintiffs' counsel advanced.

17

A plaintiff has the burden of proving damages to a reasonable degree of certainty. *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 658 (7th Cir. 2004). But as the Seventh Circuit stated in an earlier appeal in this case, when it comes to damages, "the plaintiff has a more relaxed burden of proof than on the issue of causation." *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011). When a defendant's wrong makes it difficult for the plaintiff to prove damages, all reasonable doubts about the amount of damages are resolved in the plaintiff's favor. *Id.; see Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-66 (1946). "Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *Id.*

As the Court has indicated, plaintiffs' expert Shaffer sought to estimate losses resulting from the defendants' wrongful conduct. In denying a pretrial motion to bar Shaffer from testifying, the Court described his testimony as follows:

> Shaffer is a certified public accountant who has worked as an auditor and forensic accountant. Plaintiffs retained him to testify regarding the amount of additional money they would have made if the defendants had been ineligible to participate in the Cook County annual tax sales held in the years 2002 through 2007. Shaffer attempted to ascertain the number of additional tax liens plaintiffs would have been awarded had the defendants not participated in the auctions and then attempted to place a value on those liens.
>
> Shaffer's methodology was as follows. He identified the liens awarded to persons or entities other than the defendants; compared this to the number of those liens on which he determined or assumed plaintiffs had bid; and derived a percentage – the "win percentage" – of the non-defendant-awarded liens that plaintiffs had been awarded. Shaffer then identified the liens awarded to the defendants; made a determination or assumption regarding which of those plaintiffs had bid on; and applied the "win percentage" to determine how many more liens plaintiffs would have been awarded had defendants been eliminated from the bidding

process.  Shaffer next examined how defendants' lien portfolios had
performed, using data from defendants.  He computed overall figures
regarding cash flows, calculated an average, and applied this to the
incremental number of liens he believed plaintiffs would have been
awarded to determine lost income.  Finally, he reduced this by the costs
plaintiffs would have incurred to purchase the additional liens.

Order of Sept. 14, 2011 (dkt. no. 773) at 1.

Defendants take issue with the fact that Shaffer's analysis, and plaintiffs'

arguments to the jury, assumed that none of the defendants and others claimed by

plaintiffs to have violated the Treasurer's bidding requirements and prohibitions were

eligible to bid.  In attempting to estimate the number and value of the additional liens

plaintiffs would have acquired absent the fraud, Shaffer put back into the hopper, so to

speak, all of the liens that were awarded to any of the defendants or to others claimed

to have been ineligible.  The BG defendants argue that this held them responsible for

the alleged misconduct of others.

Plaintiffs attempted to prove their damages by building from a scenario in which

the law had not been broken and only eligible bidders had participated in the annual tax

lien sales.  The BG defendants contend that because plaintiffs contended there were

several groups of allegedly ineligible bidders that were unrelated to each other, backing

*all* of the allegedly ineligible bidders out of the sale before hypothetically redistributing

the liens the ineligible bidders had won in effect held the BG defendants responsible for

the misconduct of other unrelated bidders.  The Court does not see it that way, as it has

previously explained in earlier oral rulings, all of which the Court adopts and reaffirms

here.  In any event, the law did not compel plaintiffs to prove or estimate their damages

based on a theory that the damages attributable to a defendant were to be calculated

19

based on the assumption that only the ineligible bidders associated with that particular defendant had not participated. Among other things, that sort of scenario would have resulted in a reconstructed sale in which other bidders whom plaintiffs contended were ineligible would have been "awarded" some of the liens that had been acquired by the particular defendant and its associates. Plaintiffs were not required to follow that course.

Plaintiffs' theory of compensatory damages may not have been perfect, nor was it the only possible way to determine compensatory damages. But it met the standard established by the Seventh Circuit. The rigging of the tax lien sale made it well-nigh impossible to determine the exact amount of harm to the plaintiffs. It was left to plaintiffs to attempt to reconstruct and estimate what would have happened if defendants' wrongful conduct had not occurred. Shaffer's estimations provided a reasonable approximation of the actual harm that plaintiffs suffered due to defendants' violations of the RICO statute and state law.

In any event, defendants' argument seems to assume that the jury adopted, lock, stock, and barrel, the theory of damages advanced by Shaffer and by plaintiffs' counsel. That does not appear to be an entirely accurate assumption. The jury did not adopt Shaffer's or plaintiff's counsel's proposed compensatory damages figures for any defendant that it found liable. Rather, it set lower awards for each defendant than plaintiffs had proposed. This is one more reason why an attack on plaintiffs' or Shaffer's theory does not carry the day.

There is no basis to believe that the jury awarded compensatory damages against any defendant due to the wrongful conduct of another defendant or a party not

20

named as a defendant.  The jury was given the following instruction regarding damages, none of which was objected to:

> The plaintiff must prove its damages by a preponderance of the evidence. Your award must be based on evidence and not speculation or guesswork.  On the other hand, the law does not require a plaintiff to prove the amount of its damages with mathematical precision, but only with as much definiteness and certainty as circumstances permit.

Tr. 3504.   The jury was also told that in seeking damages, a plaintiff was required to prove that a defendant's conduct was a proximate cause of the plaintiff's damages.  *Id.* In addition, the Court instructed the jury that it was required to give separate consideration to each plaintiff, each claim by each plaintiff, and each defendant.  Tr. 3493.  This instruction applied to the jury's consideration of damages just as it applied to its consideration of liability.  The jury was thus properly instructed to consider each defendant separately, and there is no reason to believe that the jury failed to do so.

The BG defendants also argue that even if plaintiffs' theory of damages was legally valid, plaintiffs failed to prove that all of the other bidders that Shaffer excluded in his model were actually ineligible.  The Court notes, again, that this would not be a basis to grant judgment as a matter of law for defendants even were their argument correct.  That aside, the BG defendants' contentions are unavailing.  The Court agrees with plaintiffs that there was sufficient evidence, including exhibits, to support a reasonable jury determination that the Peters group entities, Wheeler-Dealer, and various defendants who settled were ineligible to bid.  *See* Pls.' Resp. at 17-23.  With regard to Wheeler-Dealer, the BG defendants assume from Wheeler-Dealer's no-liability finding that the jury did not believe that entity was ineligible to bid.  This is an unwarranted assumption.  The jury could have found in Wheeler-Dealer's favor despite

21

believing it was ineligible by, for example, concluding that plaintiffs have failed to show the intent required to prove a RICO violation or tortious interference.  In any event, as the Court has noted, the jury did not adopt plaintiffs' or Shaffer's proposed compensatory damage figures for any defendant but instead made lower awards.  One can reasonably infer from this that the jury, which did an extraordinarily careful job, accounted for any failure of proof of ineligibility as to particular bidders.

**C.      Motion for new trial**

The defendants contend that the jury instructions were, in various respects, incorrect or erroneously failed to include language offered by defendant.  A court considering a challenge to jury instructions reviews the instructions as a whole to determine if they adequately informed the jury of the applicable law.  This requires a two-step process.  The first question is whether the instructions, taken as a whole, misstated or failed to fully state the law.  If so, the second question is whether the instructions confused or misled the jury, thereby causing prejudice.  *See, e.g., Aldridge v. Forest River, Inc.*, 635 F.3d 870, 876 (7th Cir. 2011); *Van Bumble v. Wal-Mart Stores, Inc.*, 407 F.3d 823, 825-26 (7th Cir. 2005).

**1.      Mail fraud property issue**

The Sass defendants challenge the Court's failure to give the following instruction that they requested regarding mail fraud:

> To prove mail fraud, Plaintiffs must show that there has been a deprivation of property.  You cannot find that mail fraud occurred if there has been only a deprivation of intangible rights to a fair opportunity to obtain money or property.  In addition, mail fraud requires proof of a scheme that causes the deprivation of property in the victim's hands.  A plan to increase market share or deprive competitors of a fair opportunity,

22

by itself, is insufficient.

Sass Defs.' Mem. at 16.

First, the instruction was incorrect in part.  As the Court has explained, though the mail fraud statute requires a scheme to defraud a person of money or property, this was not a suit directly under the mail fraud statute.  Rather, it was a suit under RICO, which permits a person injured by a pattern of racketeering activity to sue, even if that person was not the direct mail fraud victim, i.e. the recipient of the alleged misrepresentations.  Thus the proposed instruction's statement that "mail fraud requires proof of a scheme that causes the deprivation of property in the victim's hands" was misleading and erroneous.

In addition, the omission of this proposed instruction was harmless, because plaintiffs' claims did not concern intangible rights.  The tax liens indisputably *were* property.  In addition, even if plaintiffs' claims had been, as defendants contend, merely about being deprived a fair opportunity to bid, the instructions that the Court gave made it clear that a scheme to defraud had to involve money or property, not simply an intangible right.  The Court instructed the jury that "[a] scheme to defraud is a plan or course of action formed with the intent to deceive or cheat a person or entity *and to obtain money or property from a person or entity* by using one or more material false pretenses, representations or promises."  Tr. 3500 (emphasis added).  As the Court stated in rejecting defendants' proposed instruction as unnecessary:

> I think the instruction is clear enough as it is, and I don't think [defendants'
> proposed instruction] is needed.  I think that when the instruction defines
> scheme to defraud as a scheme that requires, given the change that we
> made, the intent to obtain money or property, I think it makes it clear
> enough that this is not about an opportunity to bid.  I can't imagine any

23

juror understanding money or property just being defined as an opportunity to bid. So I don't think [defendants' proposed instruction] is necessary.

Tr. 3460-61. The Court continues to believe this ruling was correct and thus reaffirms it.

## 2. RICO enterprise

The instructions for the RICO claim required plaintiffs to prove as to each defendant that, among other things, "[t]he defendant knowingly conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity." Tr. 3494. The instructions for the RICO conspiracy claim required plaintiffs to prove that "[t]he defendant you are considering knowingly conspired with one or more other persons or entities to conduct or participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity." Tr. 3495. The instructions also stated that "[a] person or entity conducts or participates in the conduct of an enterprise if the person or entity uses its position in or association with the enterprise to perform acts that are involved, directly or indirectly, in the operation or management of the enterprise, or by causing another to do so." Tr. 3497.

The Sass defendants argue that these instructions should have included the following language: "Liability depends on showing that the defendants conducted or participated in the conduct of the enterprise's affairs, not just their own affairs." Sass Defs.' Mem. at 18. This added language was not necessary. The instructions already expressly required plaintiffs to show that the defendants participated in the conduct of the enterprise or, with regard to the conspiracy claim, conspired to do so. It was not necessary to say this twice.

24

The Sass defendants offer a second challenge to the enterprise-related instructions. The instructions for each of the RICO claims defined an "enterprise" as follows: "An enterprise is a group of people or entities associated together for a common purpose of engaging in a course of legal or illegal conduct. You should consider whether the group has an ongoing organization or structure, either formal or informal, and whether its members functioned as a continuing unit." Tr. 3496.

The Sass defendants argue that this was insufficient and that the instruction also should have included language to the effect that an enterprise must be "more than just a name for alleged fraudulent acts or for an agreement to commit such acts." Sass Defs.' Mem. at 18. The Court notes that this language is not included in the Circuit's current pattern RICO instructions for criminal cases or the proposed new pattern instructions. That aside, the added language was unnecessary, and defendants were not prejudiced by its omission. The instruction advised the jury what plaintiffs had to prove to establish their claim. Having done that, there was no need to provide a list of what sorts of proof would be *in*sufficient. In any event, the language of the instruction expressly required more than just proof of illegal conduct; it said, among other things, that plaintiffs had to prove there was a group associated together *in order to* engage in illegal conduct. And the direction to the jury to consider whether there was a structure and whether the alleged enterprise's members functioned as a continuing unit accurately described how a plaintiff goes about proving that there is an enterprise as distinguished from a series of criminal acts. *See, e.g., Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377 (7th Cir. 2010); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009). Thus the instructions covered the very point the Sass defendants sought to

incorporate.

### 3.    RICO pattern

The Supreme Court has interpreted RICO's pattern requirement as requiring a plaintiff to show that the racketeering predicate acts are related and "amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239.  The Court's instructions regarding the RICO claim told the jury that a "pattern of racketeering activity," as used in this case, "consists of two or more violations of the federal mail fraud law that are related to each other and that are either ongoing over a substantial period or are part of the regular way of conducting one's business." Tr. 3497.[3]  The instruction sufficiently described the "continuity" requirement.  *See, e.g., Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1049 (7th Cir. 1998); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022-23 (7th Cir. 1992).

At the conference on instructions, the Court asked defense counsel what they thought was missing from the pattern definition that the Court proposed to give to the jury.  The Sass defendants' counsel replied, "I think what is missing is the threat of continued criminal activity."  Tr. 3404.  The language the Sass defendants proposed in this regard is not contained in the Circuit's pattern criminal instructions for RICO cases (the only pattern RICO instructions that exist in the Circuit), and it was unnecessary under the circumstances.  The instruction that the Court gave adequately covered the point.

_____

[3] The instruction went on to state that "[a]cts are considered to be related to each other if they have similar purposes, results, participants, or victims, or are committed in a similar way."  Tr. 3497.  Defendants do not challenge this aspect of the instruction.

In any event, defendants were not prejudiced by the absence of this language. The evidence reflected that the defendants had engaged in the conduct plaintiffs challenged repeatedly and regularly over a period of several years. The conduct unquestionably met the continuity requirement, and there is no basis to believe that a jury instructed as the Sass defendants propose would have found otherwise. Any claimed incompleteness in the instruction was harmless.

### 4. Conspiracy (hub & spokes)

Defendants challenge the Court's decision not to give a so-called "hub and spokes" instruction regarding conspiracy. Prior to the jury instruction conference and closing arguments, the Court circulated a draft set of instructions. Both sides filed written objections to those instructions. Defendants sought inclusion of the following instruction:

> Proof of one or more conspiracies is not proof of the overall "enterprises" alleged by the Plaintiffs. You must determine whether each of these enterprises existed, and whether each defendant alleged to be part of an enterprise was associated with that enterprise.
>
> Even if you find that one or more defendants conspired to commit an act of federal mail fraud, you must also find that for each alleged enterprise, a group of persons acted together for a common purpose or course of conduct. If you do not find a common purpose or course of conduct, you must find in favor of the defendant or defendants alleged to be part of that enterprise.
>
> If, however, you find that the Plaintiffs have proved by a preponderance of the evidence that one or more of the enterprises did exist, then you may consider which of the defendants were associated with each enterprise. However, proof of an enterprise and association with an enterprise do not themselves establish whether any defendant conducted or participated in the conduct of an enterprise.

See Defs.' Consol. Objs. to Court's Proposed Instructions, Ex. C (proposed instruction

27A).  The Court declined to give the instruction.  *See* Tr. 3415-16.[4]

The Court adopts the comments it made in ruling on defendants' objections to the Court's decision not to give this instruction.  *See* Tr. 3415-16.  Each of the salient points made in the proposed instruction was covered by the existing instructions or was otherwise unnecessary.

-        The advice that proof of a conspiracy did not constitute proof of a RICO enterprise was unnecessary because the instructions did not suggest otherwise and adequately laid these out as separate elements.

-        The statement that the jury had to find that an enterprise existed and that a particular defendant was a part of it was clearly and concisely covered by the existing instructions.

-        The statement that the jury had to find not only that a defendant

_____

[4]  Defendants had earlier proposed a different so-called "hub and spokes" instruction, specifically, their proposed instruction 27.  The instruction was extraordinarily complicated and confusing, as well as argumentative.  The Court did not give proposed instruction 27 for these reasons and because the salient points that it addressed were adequately covered by the conspiracy and other instructions already being given.  Defendants do not appear to pursue in their post-trial motions the failure to give proposed instruction 27.  Rather, they focus on the failure to give proposed instruction 27A.  *See* Sass Defs.' Mem. in Support of Renewed Mot. for Judgt. (etc.) at 21 (citing their filed objections, which focused on instruction 27A); Sass Defs.' Reply at 10 (discussing docket entry 878, exhibit C (which is instruction 27A), and calling this "the Sass Defendants' proposed 'hub and spokes' jury instruction").  Defendants' failure to specifically press instruction 27 (as distinguished from 27A) at the on-the-record instruction conference or in their post-trial filings constitutes forfeiture of the non-giving of instruction 27 as a basis for a new trial.  *See* Fed. R. Civ. P. 51(c)(1) (party objecting to an instruction must "state[ ] distinctly the matter objected to and the grounds for the objection.").  But even if the point is not forfeited, it lacks merit for the reasons discussed.

participated in a conspiracy but that, for each enterprise, a group acted together for a common purpose, was also covered by the existing instructions.

-       The statement that the absence of proof of a common purpose or course of conduct required a finding in defendant's favor was likewise covered by the existing instructions.

-       The statement that the jury had to find not only that an enterprise existed but that a defendant was associated with it was laid out clearly in the existing instructions.

-       Finally, the statement that proof of an enterprise and association with it did not establish a defendant's conduct or participation in the conduct of an enterprise was also set forth clearly in the existing instructions, which clearly described these as separate elements.

In sum, the instructions that the Court gave adequately advised the jury regarding the law's requirements on the points concerning conspiracy and RICO enterprises addressed by defendants' proposed instruction. The instructions were sufficient, and defendants have shown no prejudice.

**5.       Knowledge**

The Court gave what the Sass defendants characterize as an "ostrich" instruction, and those defendants contend this was erroneous. Specifically, the instructions defined knowledge, a requirement of the RICO predicate acts of mail fraud, as follows:

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether a defendant acted knowingly, you may

consider all of the evidence, including what the defendant did or said. Knowledge of a fact may exist if a person believes there is a high probability that the fact exists and takes deliberate actions to avoid learning the fact.

Tr. 3500. The Sass defendants object to the deliberate-avoidance language in the instruction, suggesting it did not apply to them and that it undercut their defense.

The Court disagrees. First, the instruction was appropriate given the testimony of certain defendants / defendant representatives (Bonnie Gray, Lori Levinson, and Arlene Atlas) that they were unaware of what they were signing when they executed certain significant documents. The Sass defendants do not contend that the deliberate-avoidance instruction was inappropriately given as to other defendants. Assuming the instruction was warranted only as to Gray, Levinson, and Atlas, there is no basis to believe the jury somehow inappropriate misapplied it to find liability for the Sass defendants based on negligence. Courts presume that juries sort through evidence capably and follow instructions to consider each defendant separately. *See, e.g., United States v. Morales*, 655 F.3d 608, 627 (7th Cir. 2011). The Court's instructions clearly and unambiguously directed the jury to consider each defendant and each claim separately. *See* Tr. 3493. The jury's verdict demonstrates that it did just that; it found liability as to some defendants but not others. In any event, the instruction clearly did not permit the jury to base any defendant's liability on a finding of negligence. The deliberate-avoidance definition was derived from a recent Supreme Court decision, in which the Court reaffirmed that deliberate avoidance of knowledge, as defined in the instruction at issue, amounts to actual knowledge under the law. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070-71 (2011).

**6.      Intent to defraud**

The Court gave the jury accurate instructions regarding the requirement, for mail fraud, to prove intent to defraud.  Specifically, the Court instructed the jury that plaintiffs were required to prove that defendants "had the intent to deceive or cheat."  Tr. 3499-3500.  The Court also instructed the jury that "[g]ood faith on the part of a defendant is inconsistent with intent to defraud.  A defendant is not required to prove that it acted with good faith; rather, the plaintiffs must prove that the defendant acted with the intent to defraud."  Tr. 3501.

Defendants wanted the Court to go still further and to give an instruction that "statements made when there is a good faith disagreement about the applicable governing law or when the law is unclear are not false."  The Court rejected the instruction on the ground that it was unduly argumentative, because the instruction essentially focused on a single topic and told the jury what to find based on its determination of what the evidence on that topic showed.  The Court did not err in disapproving the instruction.  "Rather than describing each possible inference of the evidence, the judge may and usually should leave the subject of the interpretation of the evidence to the argument of counsel."  *Hasham v. Calif. State Bd. of Equalization*, 200 F.3d 1035, 1051 (7th Cir. 2000).  The Court in no way precluded defendants from arguing the inference on which they sought an instruction.

In any event, the additional instruction defendants sought was unnecessary in light of the instructions advising the jury that they had to find that plaintiffs had proven both knowing conduct and intent to defraud, not to mention the instruction that good faith was inconsistent with intent to defraud.  *See, e.g., United States v. Prude*, 489

F.3d 873, 882 (7th Cir. 2007); *United States v. Given*, 164 F.3d 389, 394-95 (7th Cir. 1999) (overruling an argument that a specific good faith instruction was necessary when the jury adequately was apprised of the requirement of intent using the Seventh Circuit's pattern instructions); *United States v. Koster*, 163 F.3d 1008, 1012 (7th Cir. 1998) ("[T]he jury could not have found that [the defendant] knowingly committed mail fraud and/or knowingly made false statements . . . and yet simultaneously have found that [he] acted in good faith. . . . Accordingly, [his] theory of defense was already part of the . . . charge.").

## Conclusion

In addition to the points discussed in detail in this decision, the Court has considered all of the other points raised by defendants – some only in footnotes – and has determined them to be without merit. For the reasons stated above, the Court denies defendants' motions for judgment as a matter of law and for a new trial. The Sass defendants' motion to stay was previously ruled upon and is therefore terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 5, 2012