In the

# United States Court of Appeals
## For the Seventh Circuit

CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

_____

Nos. 12-3235, -3241, -3281, -3292, 13-1052, -1055–56, -1060, -1433, -1435, 1449–50

BCS SERVICES, INC., and PHOENIX BOND & INDEMNITY CO.,

*Plaintiffs-Appellees*,

*v.*

BG INVESTMENTS, INC., *et al.*,

*Defendants-Appellants*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 05 C 4095, 07 C 1367 — **Matthew F. Kennelly**, *Judge*.

_____

SUBMITTED JUNE 28, 2013 — DECIDED AUGUST 23, 2013

_____

Before BAUER, POSNER, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. These consolidated appeals are sequels to our decision in *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), which reversed judgments dismissing two suits which for simplicity we treated and will continue to treat as one. The plaintiffs, BCS Services, Inc.

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 2 of 13 PageID #:21354
Case: 12-3235    Document: 00712087038    Filed: 10/04/2013    Pages: 13

2                                                      Nos. 12-3235, *et al.*

and Phoenix Bond & Indemnity Co., seek damages for mail fraud under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, and for interference with a prospective business advantage under Illinois tort law. The ground of dismissal that we rejected when last the case was before us was that the plaintiffs could not prove that the defendants' alleged wrongdoing, even if it was proved, was a "proximate cause" of their alleged losses. 637 F.3d at 756.

When an owner of property in Cook County, Illinois, fails to pay his property tax on time, the amount of tax past due becomes a lien on the property. The County sells its tax liens at auctions. The bids at the auctions are stated as percentages of the taxes past due. The percentage that a bidder bids, multiplied by the amount of past-due taxes (plus any interest due on them), is the "penalty" that the bidder demands from the owner to clear the lien. The winning bidder is the bidder who bids (that is, is willing to accept) the lowest penalty—often zero percent of the tax due, meaning that the bidder is offering to pay the County the entire past-due taxes and receive in exchange the lien.

The taxpayer has two to three years in which to erase the lien by paying the winner of the auction (and hence new owner of the lien) the past-due taxes that the winner had paid the County, plus the penalty (if any). If the taxpayer fails to redeem by paying what he owes, the purchaser of the lien can obtain a tax deed to the property and thus become the property's owner. In deciding which tax liens being auctioned to bid for and how much to bid (whether a zero percent penalty, or a 5 percent penalty, or any other percent), the would-be tax lienor is looking for properties whose owners are unlikely to redeem them by paying the past-due

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 3 of 13 PageID #:21355
Case: 12-3235     Document: 00712087038     Filed: 10/04/2013     Pages: 13

Nos. 12-3235, *et al.*                                                        3

taxes during the redemption period *and* which are worth more than the past-due taxes on them.

The auctions are conducted in rapid-fire fashion in a room in which the bidders bid by raising a card with their bidder ID number and shouting out the penalty percentage that they are bidding. Almost 85 percent of the winning bids are at the zero-percent penalty level; that is, most bids are identical zero-percent bids. How is the auctioneer to pick the winner in such a case? Because the bids are identical, the auctioneer tries to award the lien to the bidder who raised his hand first. But if many bidders raise their hands as soon as the bidding begins, the auctioneer may find it impossible to determine who raised his hand first, in which event he'll probably pick one of the zero-percent bidders at random.

The County's rules permit only one agent of a potential buyer, or of a group of cooperating buyers ("related entities"), to bid. Otherwise a potential buyer could increase the likelihood of winning by packing the room. He would be likely to have some fast hands and some ringside seats, as well as having an advantage just by virtue of the number of his hands, when the auctioneer threw up *his* hands and awarded liens randomly among the zero-percent bidders, or tried to rotate them among the bidders in the interest of "fairness." If a company's violation of the prohibition against bidding by multiple bidders was concealed and thus operated as a fraud on the one-armed bidders (that is, the bidders who complied with the single-bidder rule), the company would have engaged in a pattern of mail fraud in violation of RICO because the County uses the mails to notify property owners that the County has sold its tax liens on the property and that unless the past-due taxes are paid the property will be forfeited to the lienor.

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 4 of 13 PageID #:21356
Case: 12-3235    Document: 00712087038    Filed: 10/04/2013    Pages: 13

4 Nos. 12-3235, *et al.*

The case is a little more complicated than we've let on so far because several groups each composed of entities related to each other are accused of the fraud. Only two groups remain in the case, however, Sass and Gray, the others (or their principals) having settled with the plaintiffs. Each group should have had only one arm to bid with at each auction session; instead each had as many arms as it had members. Each group had (offstage) a kingpin who financed the group's bidding activity. When a member of the group won a lien, the kingpin would buy it from him.

On remand from our decision reversing the district court, the case was tried to a jury that at the end of a four-week trial found in favor of the plaintiffs and awarded damages against the two remaining groups totaling, after various adjustments, some $7 million, to which the judge added some $13 million in plaintiffs attorneys' fees and related expenses.

The defendants make a number of arguments for reversing (not all of which merit discussion).

They argue that the plaintiffs were not victims of mail fraud because they had no property interest in the tax liens that they were prevented by the fraud from buying. The premise is true but irrelevant. "Any person *injured in his business* or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains … ." 18 U.S.C. § 1964(c) (emphasis added); see also *Maiz v. Virani*, 253 F.3d 641, 662–64 (11th Cir. 2001); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994). The plaintiffs were deprived of the profit they would have made had the fraud not prevented them from

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 5 of 13 PageID #:21357
Case: 12-3235     Document: 00712087038     Filed: 10/04/2013     Pages: 13

being awarded as many tax liens as they would have been awarded otherwise.

It is true that the criminal act on which the RICO claim is based—mail fraud—requires that the defendants have obtained "money or property" by fraud. 18 U.S.C. § 1341. But tax liens, which is what the defendants obtained, are property. *United States v. Security Industrial Bank,* 459 U.S. 70, 76–77 (1982); *In re Tarnow*, 749 F.2d 464, 466 (7th Cir. 1984). In this case they are property of Cook County. The property to which section 1341 refers need not be the plaintiffs', provided they are directly injured by the defendants' unlawful acquisition of the property. See *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007), affirmed, 553 U.S. 639 (2008); *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374, 378, 382–83 (2d Cir. 2001); *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 260, 263 (4th Cir. 1994). As they were: the defendants took from the City property that, had they not taken it, would have been obtained by the plaintiffs at the same time in the same place—the auction room.

The judge was correct to deny the defendants' request to instruct the jury that it could not find for the plaintiffs "if there has been only a deprivation of intangible rights to a fair opportunity to obtain money or property." The instruction was irrelevant. The plaintiffs were not complaining about a deprivation of intangible rights, such as a right to honest service by an agent; they were complaining about a fraud that caused them a money loss.

The County's rule against bids by multiple agents of the same principal (the "single bidder" rule) defines "principal" as the "tax-buying entity," a term the defendants argue

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 6 of 13 PageID #:21358
Case: 12-3235    Document: 00712087038    Filed: 10/04/2013    Pages: 13

6                                                         Nos. 12-3235, *et al.*

should be limited to bidders at the tax-lien sale, as distinct from some distant puppet master. There's no basis for such a narrow definition, which would deprive the rule of any bite. There was additional evidence that the defendants' elaborately concealed multiple-agent bidding scheme was contrary to the County's policy and that the defendants knew this.

They argue that had the County known of their fraud it might nevertheless have done nothing about it, in which event the fraud would not have made the plaintiffs worse off. Cf. *United States v. Fenzl*, 670 F.3d 778, 781 (7th Cir. 2012). But a County official testified that the County would have barred bidders found in violation of the single-bidder rule. There was also evidence that the defendants were aware of this possibility and that it was a motive for their attempt to conceal the fraud.

And suppose the County would not have enforced the rule, and knowing this the defendants had not concealed their violation of it. The plaintiffs would have raised a storm, brought pressure to bear on the County (and what could the County have said in defense of its refusal to enforce its rule? It is a perfectly sensible rule), and might have sued to enforce the rule on the ground that they were its intended beneficiaries and had been harmed by its violation.

The defendants object to the judge's refusing to instruct the jury that "statements made when there is a good faith disagreement about the applicable governing law or when the law is unclear are not false." That's preposterous. A statement can be false even though the person making it has a good-faith belief, even a perfectly reasonable belief, that it is true. Good faith does negate intent to defraud, *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992); *South Atlan-*

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 7 of 13 PageID #:21359
Case: 12-3235   Document: 00712087038   Filed: 10/04/2013   Pages: 13

Nos. 12-3235, *et al.*                                                     7

*tic Limited Partnership of Tennessee, L.P. v. Riese*, 284 F.3d 518, 530–32 (4th Cir. 2002)—but the judge correctly so instructed the jury.

The defendants complain about an adjustment that the plaintiffs' damages expert made concerning the number of tax liens on which the plaintiffs bid in competition with the defendants. He made the adjustment after seeing a video of part of the 2007 auction, one of the auctions embraced by the suit. The video revealed that the plaintiffs had not bid on all the tax liens that their records stated they intended to bid on. The expert revised his report to reduce his estimate of the plaintiffs' bids at all the auctions in the period covered by the suit by the same percentage that the video required him to reduce his estimate of the number of bids by each plaintiff at the 2007 auction. The percentage reduction was 19.3 percent for BCS and 22.3 percent for Phoenix.

The defendants argue that the district judge should have subjected this adjustment to a *Daubert* examination to determine whether the expert should have been permitted to offer his revised estimate at the trial. But that would have been a waste of time, because it is clear that the adjustment that the expert made on the basis of the video was reasonable. What choice had he? Not knowing that they were being defrauded, the plaintiffs had no reason to think they needed to make and retain good records of their unsuccessful bids—for of what use would such records have been had there been no fraud and thus no lawsuit?

So this is a case in which defendants' misconduct prevented the plaintiffs from calculating damages accurately—and in such cases damages can be estimated by methods that would be deemed impermissibly speculative in other con-

texts. E.g., *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566–67 (1981); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–66 (1931); *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 658 (7th Cir. 2004). "Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." *Id*. Even "speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996), quoting *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir. 1986). Otherwise "the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946). The unavoidable element of speculation in the adjustment of damages on the basis of the video was within permissible bounds.

The defendants also object that the expert's method of calculating damages exaggerated each defendant's proper share. The expert divided the number of liens that the plaintiffs had won by the number of liens won by all eligible bidders, thus excluding the liens won by the defendants (including the defendants who had settled before trial). This procedure yielded what the expert termed the "bid win percentage," an estimate of how well the plaintiffs would have done if the bidding had been completely honest—no multiple bidders. He then multiplied the number of liens that each defendant had won by the bid win percentage. Since the bid win percentage was the percentage of liens that an honest bidder could expect to win, any lower percentage, such as the percentage the plaintiffs won, presumably reflected the unfair competition of the multiple bidders.

Nos. 12-3235, *et al.*                                                        9

Each defendant argues that in computing the bid win percentage the expert should have excluded the defendants one by one rather than as a group. For example, the expert calculated the bid win for plaintiff BCS at the 2003 auction to have been 12.45 percent. Defendant Gray argues that it should have been 5.2 percent. (The lower the percentage, the lower BCS's damages, because its damages are based on its failure to have obtained the bid win percentage—the percentage it could expect to win in a non-rigged auction of tax liens.) Gray arrives at that figure by dividing the number of liens won by BCS not by the number of liens won by all honest bidders but by the number won by all bidders minus Gray—a group that includes other multiple bidders. That's an improper procedure, because it depresses BCS's (and Phoenix's) bid win percentages by bids won by dishonest as well as honest bidding methods.

The plaintiffs' state law claim was for tortious interference with a business opportunity, and the jury awarded punitive damages for the tort. The defendants argue that this was double counting, because the damages for the same activity that were awarded for the defendants' violation of RICO were treble the loss that the violation had inflicted on the plaintiffs, yet the same acts had been charged as violations both of RICO and of state tort law. To this the plaintiffs respond that damages are trebled under RICO not as punishment but because the ordinary methods of calculating compensatory damages undercompensate. And so the Supreme Court has held. *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401, 405–06 (2003); *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129–31 (2003); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 240–41 (1987); see also *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 n. 8 (7th Cir.

1987). The holding can be questioned. It's true that undercompensation is one of the reasons for awarding punitive damages, *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 676–77 (7th Cir. 2003), though the main reason is punishment (deterrence). But even if the methods used to calculate compensatory damages systematically undercompensate plaintiffs, it can't be right that in RICO cases those methods always yield exactly one third of the damages actually sustained by a plaintiff, in which event trebling would indeed be necessary to provide him with full compensation. But of course we're bound by the Supreme Court's interpretation of RICO's treble-damages remedy as being compensatory rather than punitive, and this defeats the defendants' argument.

Sass makes a somewhat related argument, that the district judge violated the "one-satisfaction" rule by not allowing Sass to set off against its damages liability the full amount that the plaintiffs received in settlement of claims against other participants in the tax-lien fraud. The judge did allow a setoff, but only after deducting his estimate of how much of the total amount of the settlements was in respect of liability to pay punitive damages, pursuant to the rule that money paid in settlement of punitive damages claims is not subject to setoff. *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987); *Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 804 (5th Cir. 1983). The one-satisfaction rule is intended to prevent compensation in excess of the plaintiff's loss; punitive damages, to the extent not intended to remedy undercompensation, are deliberately excess compensation.

The district judge set off more than half the settlement payments against the damages awarded at trial. The jury had awarded the plaintiffs both untrebled compensatory

Case: 1:05-cv-04095 Document #: 1170 Filed: 10/04/13 Page 11 of 13 PageID #:21363
Case: 12-3235    Document: 00712087038    Filed: 10/04/2013    Pages: 13

Nos. 12-3235, *et al.*                                    11

damages and punitive damages, the latter limited to the state law claim for tortious interference with the plaintiffs' chances for buying tax liens at the auctions. Of the total damages awarded by the jury 46 percent represented punitive damages, the other 54 percent compensatory damages, and it was the latter percentage that the judge used to decide what percentage of the settlement moneys received by the plaintiffs should be set off against the judgment. The defendants point out that the 46 percent allocation to punitive damages dropped to 9.6 percent when, after the jury delivered its verdict, the judge trebled the compensatory damages that the jury had awarded for the RICO violations and added attorneys' fees and costs (without these additions the punitive damages would have dropped from 46 to 22.1 percent of the total settlement moneys). And remember that the entire trebled damages are deemed compensatory. The settlements do not distinguish between punitive and compensatory damages. But since the settling parties must have foreseen that damages awarded by the jury for the RICO violations would be trebled and that the plaintiffs would be entitled to an award of attorneys' fees and costs, a more realistic guess was that a shade more than 90 percent of the settlement amount was the settling parties' estimate of a likely award of compensatory damages if the case went to trial.

That is not a bad argument, but it is vitiated by the defendants' refusal to acknowledge the implication that 9.6 percent of the amount of the settlement should *not* be subtracted from the judgment. They insist that because the settlement agreements do not mention punitive damages the entire amount of the settlements must be compensatory. That's wrong. The parties negotiating the settlements were sophisticated and must have been aware that an award of

12　　　　　　　　　　　　　　　　　　　　Nos. 12-3235, *et al.*

punitive damages for fraud would be likely if there were a trial. That awareness would influence the amount of the settlement.

An appellant cannot prevail by making an unreasonable argument while forfeiting the only reasonable one he could have made.

Last the defendants complain about the amount of attorneys' fees and expenses that the district judge awarded the plaintiffs. They argue that the award includes fees that the plaintiffs' lawyers expended in investigating other actually or possibly ineligible bidders at the tax-lien auctions in which the plaintiffs participated. Yet these investigations were essential. Without them the plaintiffs would not have known whether the harm they suffered was attributable only to the defendants or to others as well, in which case they would not be entitled to as large a damages award from the defendants. See *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 526 (7th Cir. 1995); *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1215 (3d Cir. 1978); *Rode v. Dellarciprete*, 892 F.2d 1177, 1185 (3d Cir. 1990).

The defendants further argue that the plaintiffs should have been required to allocate a portion of their attorneys' fees to the settlements they made with other parties accused of ineligible bidding. That would be correct if the settlements had reduced the injury that the defendants' ineligible bidding had inflicted on the plaintiffs, for then the fees would have been allocable, in part anyway, to the present suit. But the judge found, not clearly erroneously, that the injuries were separate.

And finally we reject as did the district court the argument that the fee award was excessive because it was almost

Nos. 12-3235, *et al.* 13

twice the damages awarded the plaintiffs at trial. Plaintiffs cannot know in advance how much they'll win at a trial, or how elaborate a defense the defendants will mount, and so they cannot estimate with any precision either the cost of winning or whether they will win. The plaintiffs asked the jury for roughly twice the compensatory damages that the jury awarded them, and if that was a reasonable albeit unsuccessful request, the legal fees and costs that they incurred were not unreasonable.

How much the plaintiffs would have to spend on the litigation would depend in part on the stubbornness of the defense—and it turned out to be enormously though futilely stubborn. Attorney fee shifting, as under RICO, is intended to facilitate suit by victims of unlawful behavior, see, e.g., *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987); *PrimeCo Personal Communications, Limited Partnership v. City of Mequon*, 352 F.3d 1147, 1152 (7th Cir. 2003), and awarding legal fees reasonably incurred ex ante even if excessive-seeming ex post (which is to say with the wisdom of hindsight) is necessary to achieve that objective. See *City of Riverside v. Rivera*, 477 U.S. 561, 573–76, 578 (1986) (plurality opinion); *FMC Corp. v. Varonos*, 892 F.2d 1308, 1316–17 (7th Cir. 1990). The defendants were hyperaggressive adversaries. They drove up the plaintiffs' legal costs without justification.

AFFIRMED.